14–1166

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

TEVA NEUROSCIENCE, INC., TEVA PHARMACEUTICALS USA, INC.,
and TEVA PHARMACEUTICAL INDUSTRIES, LTD.,

*Plaintiffs-Appellees*,

v.

MYLAN PHARMACEUTICALS INC., MYLAN INC., and MYLAN LLC,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the District of New Jersey
in case no. 2:10-cv-05078, Judge Claire C. Cecchi

_____

## APPELLANTS' OPENING BRIEF

_____

Shannon M. Bloodworth
Brandon M. White
PERKINS COIE LLP
700 13th Street N.W., Suite 600
Washington, D.C. 20005
(202) 654–6200
SBloodworth@perkinscoie.com
BMWhite@perkinscoie.com

David E. Jones
Autumn N. Nero
PERKINS COIE LLP
1 E. Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663–7460
DEJones@perkinscoie.com
ANero@perkinscoie.com

Dan L. Bagatell
PERKINS COIE LLP
2901 N. Central Avenue
Phoenix, Arizona 85012
(602) 351–8250
DBagatell@perkinscoie.com

Counsel for Appellants

February 18, 2014

## CERTIFICATE OF INTEREST

Counsel for defendants-appellants certifies the following:

The full names of every party or amicus curiae represented by me are Mylan Pharmaceuticals Inc., Mylan Inc., and Mylan LLC.

The names of the real parties in interest are all listed in the caption.

Mylan Inc. has no parent corporations, and no publicly held corporation holds more than 10 percent of its stock. Mylan LLC is a wholly-owned subsidiary of Mylan International Holding Inc., which in turn is wholly owned by Mylan Pharmaceuticals Inc., which in turn is a wholly-owned subsidiary of Mylan Inc.

The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or are expected to appear in this Court are:

### PERKINS COIE LLP

| Dan L. Bagatell | Shannon M. Bloodworth | Emily J. Greb |
| Dennis C. Hopkins | David E. Jones | Autumn N. Nero | Brandon M. White |

### SAIBER LLC

Arnold B. Calmann                Katherine Escanlar

### MCDERMOTT, WILL & EMERY LLP

| Louis J. Del Juidice | Michael D. Hall | Shilpa V. Patel |
| Joseph R. Robinson | Robert Schaffer | Paul Zagar |

### TROUTMAN SANDERS

Joseph R. Robinson        Robert Schaffer        Mark I. Schlesinger

Dated: February 18, 2014            /s/Shannon M. Bloodworth
                                     Shannon M. Bloodworth

TABLE OF CONTENTS

Certificate of Interest ........................................................................ i

Table of Authorities ........................................................................ vi

Table of Abbreviations and Conventions ......................................x

Related Cases ................................................................................ xi

Introduction ....................................................................................1

Jurisdiction .....................................................................................4

Statement of Issues..........................................................................4

Statement of the Case......................................................................6

    I.    Racemic PAI was recognized as an effective treatment for
        Parkinson's disease and the most attractive candidate for clinical
        development .........................................................................6

        A.    Scientists recognized that selective MAO-B inhibitors
                effectively treated Parkinson's disease because they increased
                dopamine levels in the brain without producing the
                undesirable "cheese effect" ..............................................6

        B.    As the '446 patent recognized, numerous publications
                reported that racemic PAI was a particularly effective and
                selective MAO-B inhibitor that, unlike deprenyl, did not
                produce amphetamine-related side effects .........................9

    II.   Scientists were motivated to isolate and study the enantiomers of
        racemic PAI...........................................................................11

        A.    Scientists knew to investigate enantiomers of racemic PAI
                because both the MAO-B enzyme and racemic PAI had chiral
                structures and one enantiomer of deprenyl had been shown to
                be far more potent..........................................................12

        B.    Racemic PAI was easily separated into its enantiomers, and
                the separated compounds produced no unexpected results..............14

C.    Scientific publications and regulatory guidelines offered clear guidance on the importance of evaluating the isomers of racemic compounds .......................................................................15

III.   Teva's patent itself recognized that the relevant art consisted of MAO-B inhibitors and that racemic PAI was a logical place to begin investigation ...................................................................16

IV.   The district court agreed that racemic PAI was a well-known and highly regarded candidate for treating Parkinson's disease but nevertheless found it non-obvious to use its enantiomer to treat Parkinson's disease ...................................................................18

Summary of Argument ........................................................................22

Argument..............................................................................................25

I.    It was obvious to skilled artisans to pursue the R(+) enantiomer of racemic PAI as a treatment for Parkinson's disease ................................25

A.    The patent itself makes clear that the relevant prior art consisted of MAO-B inhibitors, not all possible Parkinson's treatments...........................................................................26

B.    The district court's own findings demonstrate that racemic PAI was an obvious place to start research because it was known to be a highly promising treatment for Parkinson's disease that did not have the amphetamine effect of the then-leading MAO-B inhibitor, deprenyl .................................28

C.    It was obvious to pursue the R enantiomer of racemic PAI given the success with the R enantiomer of deprenyl .....................29

D.    Nothing discouraged researchers from investigating the enantiomers of PAI ..........................................................34

II.   The district court erred by effectively applying a "lead compound" analysis even though it agreed that that approach was inapposite here ................................................................................36

A.    Mylan was not required to show that racemic PAI was the single "most attractive candidate" for investigation.........................37

B.    The district court's focus on other classes of drugs was improper ........................................................................38

III.  The district court improperly analyzed whether there was a "reasonable expectation of success" .......................................39

A.    The district court erred in requiring absolute predictability ............40

B.    The district court erred in requiring a reasonable expectation of success in producing a commercial product ................................42

C.    Teva did not show, and the district court did not find, that R(+)-PAI produced unexpected results as a treatment ....................43

D.    The district court's enablement analysis contradicted its analysis of the reasonable expectation of success ...........................44

IV.   The district court's analysis of secondary considerations was flawed ...................................................................................45

A.    Failures of drugs in classes other than MAO-B inhibitors are irrelevant, as are any failures that occurred after the claimed invention ........................................................................47

B.    Any skepticism involved economics, not science ...........................48

C.    The district court's finding that the invention solved a long-felt need was unsupported by the record ...........................................50

D.    The district court erred in analyzing commercial success................51

1.    L-Dopa, Requip®, and Mirapex® are all far more popular than Azilect® ............................................................................52

2.    The district court improperly assumed that Teva's sales were linked to the invention claimed here................................53

V.    The dependent claims of the '446 patent are equally invalid..................55

Conclusion .........................................................................................56

Addenda

    1.      Final Judgment Order

    2.      Opinion with Findings of Fact and Conclusions of Law

    3.      U.S. Patent No. 5,453,446

Certificate of Compliance

Certificate of Authority and Proof of Service

## TABLE OF AUTHORITIES

**Cases**                                                              **Pages**

*Allergan, Inc. v. Sandoz Inc.*,
    726 F.3d 1286 (Fed. Cir. 2013), *petition for cert. filed*,
    No. 13-889 (U.S. Jan. 22, 2014) ........................................................43, 46

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
    499 F.3d 1293 (Fed. Cir. 2007) ........................................... 3, *passim*

*Boston Scientific Scimed, Inc. v. Cordis Corp.*,
    554 F.3d 982 (Fed. Cir. 2009) ......................................................48

*Cable Elec. Prods., Inc. v. Genmark, Inc.*,
    770 F.2d 1015 (Fed. Cir. 1985), *overruled on other grounds*,
    *Midwest Indus., Inc. v. Karavan Trailers, Inc.*,
    175 F.3d 1356 (Fed. Cir. 1999) ....................................................52

*Cyclobenzaprine Hydrochloride Extended-Release Capsule
    Patent Litig., In re*, 676 F.3d 1063 (Fed. Cir. 2012) ...................46, 48

*Daiichi Sankyo Co. v. Apotex, Inc.*,
    501 F.3d 1254 (Fed. Cir. 2007) ................................................37, 38

*Dow Chem. Co. v. Halliburton Oil Well Cementing Co.*,
    324 U.S. 320 (1945) ..................................................................51

*Duramed Pharms., Inc. v. Watson Labs., Inc.*,
    413 F. App'x 289 (Fed. Cir. 2011) ................................................42

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
    619 F.3d 1329 (Fed. Cir. 2010) ....................................................37

*Friskit, Inc. v. Real Networks, Inc.*,
    306 F. App'x 610 (Fed. Cir. 2009) ................................................49

*Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
    618 F.3d 1294 (Fed. Cir. 2010) ....................................................50

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ................................................................25, 37

*Huang, In re*,
      100 F.3d 135 (Fed. Cir. 1996) ........................................................52

*Joy Techs., Inc. v. Manbeck*,
      751 F. Supp. 225 (D.D.C. 1990),
      *aff'd*, 959 F.2d 226 (Fed. Cir. 1992) .............................................49

*Jungersen v. Ostby & Barton Co.*,
      335 U.S. 560 (1949) .......................................................................51

*KSR Int'l Co. v. Teleflex Inc.*,
      550 U.S. 398 (2007) ............................................... 3, *passim*

*Kubin, In re*,
      561 F.3d 1351 (Fed. Cir. 2009) ....................................................34

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
      485 F.3d 1157 (Fed. Cir. 2007) ....................................................46

*Media Techs. Licensing, LLC v. Upper Deck Co.*,
      596 F.3d 1334 (Fed. Cir. 2010) ....................................................47

*Merck & Co. v. Biocraft Labs., Inc.*,
      874 F.2d 804 (Fed. Cir. 1989) ......................................................41

*Microsoft Corp. v. i4i Ltd. P'ship*,
      131 S. Ct. 2238 (2011) ..................................................................25

*O'Farrell, In re*,
      853 F.2d 894 (Fed. Cir. 1988) ......................................................41

*Ohio Willow Wood Co. v. Alps S., LLC*,
      735 F.3d 1333 (Fed. Cir. 2013) ....................................................46

*Ormco Corp. v. Align Tech., Inc.*,
      463 F.3d 1299 (Fed. Cir. 2006) ....................................................53

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
      587 F.3d 1324 (Fed. Cir. 2009) ....................................................46

*Pfizer, Inc. v. Apotex, Inc.*,
      480 F.3d 1348 (Fed. Cir. 2007) ......................................30, 41, 43

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007) ........................................................36

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ...................................................48, 51

*Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*,
   377 F. App'x 978 (Fed. Cir. 2010) ...................................................52

*Rasmusson v. SmithKline Beecham Corp.*,
   413 F.3d 1318 (Fed. Cir. 2005) ........................................................45

*Rothman v. Target Corp.*,
   56 F.3d 1310 (Fed. Cir. 2009) .........................................................46

*Sanofi-Synthelabo v. Apotex, Inc.*,
   550 F.3d 1075 (Fed. Cir. 2008) .....................................33, 34, 38, 44

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*,
   528 F.3d 1365 (Fed. Cir. 2008) ........................................................31

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.*,
   346 F.3d 1057 (Fed. Cir. 2003) ........................................................27

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   731 F.3d 1271 (Fed. Cir. 2013) ........................................................12

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
   407 F.3d 1371 (Fed. Cir. 2005) ........................................................54

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007) ........................................................36

*Tex. Instruments Inc. v. USITC*,
   988 F.2d 1165 (Fed. Cir. 1993) ........................................................47

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   593 F.3d 1289 (Fed. Cir.), *vacated for reh'g en banc on other grounds*,
   374 F. App'x 35 (Fed. Cir. 2010), *reinstated in relevant part*,
   649 F.3d 1276 (Fed. Cir. 2011) (en banc) .......................................54

*Unigene Labs., Inc. v. Apotex, Inc.*,
   655 F.3d 1352 (Fed. Cir. 2011) ........................................................36

*Velander v. Garner*,
  348 F.3d 1359 (Fed. Cir. 2003) ...........................................................41

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
  626 F.3d 1361 (Fed. Cir. 2010) ...................................................46, 53

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
  683 F.3d 1356 (Fed. Cir. 2012) ...........................................................46

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) ...........................................................46

**Statutes**                                                          **Pages**

28 U.S.C. § 1338(a) ...............................................................................4

28 U.S.C. § 1295(a)(1) ..........................................................................4

35 U.S.C. § 101 ...................................................................................45

35 U.S.C. § 103 ...................................................................................18

35 U.S.C. § 112 ...........................................................................18, 45

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| A___ | joint appendix page ___ |
|---|---|
| ADME | absorption, distribution, metabolism, and elimination |
| deprenyl | the R(-) enantiomer of racemic deprenyl |
| FDA | Food and Drug Administration |
| MAO-B | the B form of the monoamine oxidase enzyme |
| MPTP | a neurotoxin used in studying MAO-B inhibitors |
| Mylan | Mylan Inc. and the related appellants |
| Op. | the district court's opinion |
| PAI | N-propargyl-1-aminoindan |
| racemic PAI | the racemic compound PAI, also known as "AGN-1135" |
| R(+)-PAI | the R(+) enantiomer of racemic PAI |
| S(-)-PAI | the S(-) enantiomer of racemic PAI |
| Teva | Teva Neuroscience, Inc. and the related appellees |
| '446(*xx*:*yy*-*zz*) | U.S. Patent No. 5,453,446, column *xx*, lines *yy*-*zz* |

## RELATED CASES

No other appeal in or from this same civil action in the district court was previously before this or any other appellate court. Mylan and its counsel are not aware of any other cases that may directly affect or will be directly affected by this Court's decision in this case.

## INTRODUCTION

In this case, the district court's own findings of fact undercut its conclusion of law that Teva's claimed invention was non-obvious.

The patent at issue, No. 5,453,446, claims a method for treating Parkinson's disease by administering R(+)-PAI, a compound that falls within the class of Parkinson's disease treatments known as MAO-B inhibitors. Parkinson's disease is caused by a loss of dopamine in the brain, and scientists knew that the MAO-B enzyme breaks down dopamine. Based on that knowledge, numerous publications had investigated compounds that would bond with the MAO-B enzyme, inhibit its dopamine-destroying activity, and thus treat the symptoms of Parkinson's disease.

One well-known and extensively studied MAO-B inhibitor was the R(-) enantiomer of racemic deprenyl. Compounds are "racemic" if they consist of mirror-image "enantiomers" (analogous to left and right hands), and they have "chiral" centers if they include a carbon atom with four different attached groups. Scientists had long known that isolated enantiomers are often more potent than the racemic mixture of enantiomers. The reason for this is that chiral compounds have particular spatial arrangements, and the "hand" (active ingredient) must properly "fit" (bond with) the "glove" (target site). Both MAO-B and deprenyl are chiral, and studies had shown that the R(-) enantiomer of deprenyl was not only highly

effective in inhibiting the MAO-B enzyme but also 500 times more potent than the S(+) enantiomer.

A clinical study showing deprenyl's effectiveness in treating Parkinson's disease fueled interest in studying other MAO-B inhibitors. Deprenyl itself proved problematic because it metabolized into amphetamines and produced undesirable side effects. But researchers had found that another long-known MAO-B inhibitor, racemic PAI (also known as "AGN-1135"), was also highly potent and had no such side effects. Research specifically identified racemic PAI as an "attractive candidate" for development as a Parkinson's disease treatment. Racemic PAI was also known to be chiral, and publications and FDA guidance taught that isolating the enantiomers of racemic compounds was both good science and good sense.

These developments in the prior art led predictably and inexorably to the isolation of R(+)-PAI and confirmation that it was highly effective at inhibiting MAO-B activity and thus treating Parkinson's disease. Teva merely repeated the steps previously taken with deprenyl: isolating enantiomers of racemic PAI using conventional methods, determining through routine testing that one enantiomer, R(+), was a more active MAO-B inhibitor than the other, S(-), and concluding that the more active enantiomer would be effective at treating Parkinson's disease. Teva's efforts were competent science, not creative invention. Indeed, Teva has never claimed that R(+)-PAI demonstrated any unexpected results.

The district court recognized nearly all of this in its findings of fact. Unfortunately, it went astray in its legal analysis, imposing hurdles unsupported in the law. It required Mylan to prove that racemic PAI would have been the single "most attractive candidate for a Parkinson's disease drug" even though Teva's patent recognized that the relevant class of drugs was limited to MAO inhibitors and even though the court itself agreed that the "lead compound" analysis does not apply to method-of-treatment claims. The court also held that Mylan failed to show a reasonable expectation of success because prior art did not specifically describe administering R(+)-PAI to treat Parkinson's disease and thus did not show that the drug would "possess all of the properties needed to be a successful Parkinson's treatment." But obviousness requires only a *reasonable probability* of success, not absolute certainty, and Teva's own patent included no tests showing that R(+)-PAI had been successfully administered in humans.

As the Supreme Court held in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, skilled artisans have good reason to pursue known options within their technical grasp. This Court recognized this in another enantiomer case, *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293 (Fed. Cir. 2007), explaining that when prior art teaches that a desirable property of a mixture derives from a component of that mixture,

– 3 –

isolating the components is obvious even without an explicit teaching to purify the mixture. This Court should apply the same logic and hold that Teva's routine purification of a known compound and the claimed method of treatment were obvious.

### JURISDICTION

The district court had subject-matter jurisdiction over this patent infringement case under 28 U.S.C. § 1338(a). The district court entered a final judgment and permanent injunction on December 13, 2013 [A1-4], and Mylan filed a timely notice of appeal [A3590-92]. This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

### STATEMENT OF ISSUES

1.    As the district court found, racemic PAI was known to be a potent, selective MAO-B inhibitor that could be used to treat Parkinson's disease because it inhibited the dopamine-destroying MAO-B enzyme and thereby increased the level of dopamine in the brain. It was also well known that MAO-B was chiral and thus would react differently with different enantiomers of racemic compounds. Indeed, the R(-) enantiomer of a similar MAO-B inhibitor was known to be 500 times more potent than its S(+) counterpart. Isolating the R(+) enantiomer of racemic PAI posed no problems and, not unexpectedly, it proved effective in treating Parkinson's disease. Was it obvious to use the R(+) enantiomer of racemic PAI to treat Parkinson's disease?

2.    Teva's patent recognized that the relevant art involved irreversible MAO-B inhibitors.  The district court recognized that a "lead compound" analysis of obviousness was inappropriate because the asserted claims were method claims, not compound claims, and that racemic PAI had shown great promise as an MAO-B inhibitor to treat Parkinson's disease.  Nevertheless, the district court required Mylan to prove that racemic PAI was the single most promising compound for treating Parkinson's disease—not only in the class of MAO-B inhibitors, but among all classes of potential Parkinson's therapies, including drugs with completely different mechanisms of action.  Did the district court err in failing to analyze obviousness in view of racemic PAI, the closest prior art?

3.    In ruling that the patent's written description enabled the claimed invention, the district court held that the patent did not need to describe the beneficial properties of Teva's eventual commercial product.  Yet when evaluating obviousness and the "reasonable expectation of success" in using the compound described in the claims, the district court required Mylan to show that the prior art would have enabled a skilled artisan to predict the beneficial properties of Teva's eventual commercial product.  The district court did so even though those properties were neither described nor claimed in the patent and were not alleged to have been unexpected results.  Was that analysis legally erroneous?

# STATEMENT OF THE CASE

## I. Racemic PAI was recognized as an effective treatment for Parkinson's disease and the most attractive candidate for clinical development

Parkinson's disease is a disorder that causes motor movement disturbances. [A14 (Op. 10)]  Scientists have long known that the disease is caused by degradation of dopamine-producing neurons in the brain.  [A14 (Op. 10); '446(1:27-33)] Treatment accordingly involves increasing the level of dopamine in the brain. [A14 (Op. 10)]

The primary therapy for Parkinson's disease involves oral administration of L-Dopa, a precursor to dopamine that is converted to dopamine in the body. Scientists understood, however, that L-Dopa therapy had numerous drawbacks, including reduced efficacy over time.  [A15 (Op. 11)]  They therefore looked to other classes of drugs to treat the disease.

### A. Scientists recognized that selective MAO-B inhibitors effectively treated Parkinson's disease because they increased dopamine levels in the brain without producing the undesirable "cheese effect"

This case involves a method for treating Parkinson's disease by administering a chemical known as R(+)-PAI.  When Teva allegedly invented that method in 1990, one well-known class of promising treatments for Parkinson's disease consisted of selective MAO-B inhibitors, which prevent the breakdown of dopamine by the B form of the monoamine oxidase (MAO) enzyme.  ['446(1:66-2:24)]

– 6 –

Previous publications had recognized that MAO-B was the predominant form of the enzyme in the brain and that selectively inhibiting MAO-B was an effective way to increase dopamine levels in the brain and thereby treat Parkinson's disease. ['446(2:10-24); A4956, A4966 (Finberg 1981 (DTX-1042) at 31, 41 (offering "further proof" that "MAO-B inhibitors have potential therapeutic value since most of the MAO activity in [the] human brain is type B" and noting that "the only proven clinical use of [selective MAO-B inhibitors] is as adjuncts to L-Dopa therapy of Parkinson's disease")]

Those skilled in the art thus knew that a compound that effectively inhibited MAO-B would be an effective treatment for Parkinson's disease. Indeed, the prior art expressly taught that it was "logical" to use selective MAO-B inhibitors to treat Parkinson's disease. [A5126 (Youdim and Finberg 1986 (DTX-1076) at 127 ("From the clinical point of view the use of [MAO] inhibitors in potentiating the pharmacological action of dopamine, formed from L-DOPA, has always been considered logical for the management of Parkinson's disease."); *see also* A5110 (Youdim 1986 (DTX-1075) at 91) ("The selective [MAO-B] inhibitor has proven to be a useful adjunct to L-dopa therapy of Parkinson's disease."); A4929 (Youdim 1980 (DTX-1033) at 348 (identifying requirements for an MAO inhibitor to be useful in augmenting dopaminergic activity); A4927 (Youdim 1980 (DTX-1033) at 346) ("[R]ecent development in the biochemistry, pharmacology, and physiology

of MAO has led to the use of selective MAO [inhibitors] in the treatment of [Parkinson's disease.]")]

No prior art taught that a selective, potent, and irreversible MAO-B inhibitor would *fail* to be an effective Parkinson's disease treatment.  Previous research had shown that inhibiting the *A* form of the MAO enzyme was problematic because doing so could cause a cardiovascular problem known as the "cheese effect"—so-called because it appears after patients consume tyramine-rich foods such as certain wines and cheeses.  ['446(2:10-24)]  As a result, researchers recognized that the effects of *non*-selective MAO inhibitors (inhibitors of both MAO-A and MAO-B enzymes) and selective MAO-*A* inhibitors should be reversible.  Selective MAO-*B* inhibitors, however, were known not to produce the cheese effect.  [A34 (Op. 30) n.12]  Indeed, irreversible selective MAO-B inhibitors were considered advantageous because they were inherently long-acting and thus reduced aggravation of symptoms if a patient missed a dose.  [A3301-02 (Tr. 1178:20-1179:8) (Henchcliffe)]

One well-known selective, potent, and irreversible MAO-B inhibitor was the R(-) enantiomer of racemic deprenyl, often simply called "deprenyl."  Deprenyl had been well studied and was used to treat Parkinson's disease before 1990.  Researchers found that deprenyl was effective at treating Parkinson's symptoms and, due to its selectivity for MAO-B, not subject to the "cheese effect."  More-

over, administering deprenyl enabled physicians to reduce the amount of L-Dopa they administered, thereby extending the time period during which L-Dopa would be effective. By 1990, the date of Teva's claimed invention, researchers understood that MAO-B inhibitors such as deprenyl were effective Parkinson's disease treatments both with and without co-administration of L-Dopa. [A4562-70 (PTX-655) (DATATOP)] Indeed, deprenyl and the class of irreversible, selective MAO-B inhibitors were the only class of drugs to offer the hope of neuroprotection (as opposed to mere symptomatic relief) and a longer lifespan for patients. [A2615-16 (Tr. 493:1-494:6) (LeWitt)]

> **B.    As the '446 patent recognized, numerous publications reported that racemic PAI was a particularly effective and selective MAO-B inhibitor that, unlike deprenyl, did not produce amphetamine-related side effects**

Although deprenyl was a highly effective Parkinson's treatment, it had its own drawback: the body metabolizes it into amphetamine and methamphetamines, causing undesirable side effects. Researchers were therefore motivated to pursue other irreversible, selective MAO-B inhibitors that would not cause those problems. [A31 (Op. 27) (citing Castagnoli)] As recognized in the '446 patent, racemic PAI—also known as "AGN-1135," the code name used by the company that first synthesized and patented it in the 1960s—was known to be a selective, irreversible inhibitor of MAO-B that would not metabolize into amphetamines and thus would not produce unwanted sympatho-mimetic effects. ['446(2:52-60)]

Indeed, racemic PAI was known to possess "considerable advantages" over deprenyl as a possible Parkinson's treatment. ['446(2:61-3:7)]

The prior art was replete with publications teaching the excellent properties of racemic PAI and lauding its potential as an improved Parkinson's disease treatment:

- Youdim 1980 taught that use of a selective, irreversible MAO-B inhibitor to treat Parkinson's disease "should be extended to other MAO-B inhibitors, *e.g. AGN 1135* … which ha[ve] similar pharmacological actions to deprenyl but without deprenyl's amphetamine-like property." [A4934 (DTX-1033 at 353) (emphasis added); A29-30 (Op. 25-26)]

- Kalir 1981 taught that racemic PAI "show[ed] the most promise in Parkinson's disease … because of [its] irreversible selective type B MAO inhibition *in vitro* and *in vivo*." [A4984 (DTX-1044 at 55); A30-31 (Op. 26-27)] The article described racemic PAI as being of "great interest" because of its potency, its irreversible inhibition of MAO-B, and its lack of side effects, including not causing the cheese effect at high doses. [A4991 (DTX-1044 at 62); A30-31 (Op. 26-27)]

- Finberg 1985 taught that racemic PAI could be a useful drug in treating Parkinson's disease due to its selective and irreversible inhibition of MAO-B. [A3917-21 (PTX-47 at 541, 545); A31 (Op. 27)]

- Heikkila 1985 taught that racemic PAI should be considered as a Parkinson's disease therapy based on its efficacy in a model using MPTP, a neurotoxin used in animal studies. [A5100 (DTX-1066 at 316); A31-32 (Op. 27-28)]

Thus, by 1990 the prior art blazed a clear path to racemic PAI as the most promising candidate for Parkinson's disease treatments to improve on the already successful deprenyl therapy. Indeed, the prior art pointed to racemic PAI without reservation. To the extent there was any impediment to the development of drugs based on racemic PAI, that impediment was not scientific, but instead the fact that the PAI compound had already been patented. [*See* A4862 (U.S. Patent No. 3,253,037 (DTX-1003) claim 4][1]

## II.    Scientists were motivated to isolate and study the enantiomers of racemic PAI

Researchers were motivated to investigate not only racemic PAI, but also its two enantiomer components.

---

[1] Teva's lead named inventor, Dr. Youdim, testified that other pharmaceutical companies had turned down his entreaties to investigate racemic PAI, but the only documentary evidence of such a refusal was a letter from Warner-Lambert saying that Dr. Youdim's request did not justify the funding requested. [A4167 (PTX-140 at TECH00000005)]

**A.    Scientists knew to investigate enantiomers of racemic
PAI because both the MAO-B enzyme and racemic
PAI had chiral structures and one enantiomer of
deprenyl had been shown to be far more potent**

Stereoisomers are molecules with the same atomic composition but arranged differently in space.  Enantiomers are a pair of stereoisomers that are non-super-imposable mirror images of each other.  To distinguish between enantiomers of the same compound, chemists use various naming conventions.  Some enantiomeric pairs are "chiral," meaning that they share a stereogenic center of carbon atoms with four different substituent atoms or groups of atoms.  By convention, these chiral enantiomers are labeled "R" or "S" to differentiate between the different spatial arrangements of molecules.  Enantiomers are also distinguished by their optical characteristics.  If polarized light passing through an enantiomer rotates clockwise, it is labeled (+).  The counterpart enantiomer will rotate the light counterclockwise and is labeled (-).  A racemate or racemic mixture is an equal mixture of two enantiomers and optically inactive.  *See Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1273 n.* (Fed. Cir. 2013).

Long before 1990, researchers understood that enantiomers of racemic compounds may exhibit different pharmacological activity.  [A24, A38-39 (Op. 20, 34-35); '446(3:11-16); A5080-86 (Ariens 1984) (DTX-1059); A5228-32 (DeCamp 1989) (DTX-1126)]  This was especially true of chiral enantiomers such as

MAO-B enzymes and their inhibitors because of their "lock-and-key" nature, as shown in this Teva demonstrative exhibit at trial:



As the district court found, "[b]ecause of the chirality of the MAO-B enzyme and MAO-B inhibitors, each enantiomer of an MAO-B inhibitor [wa]s expected to bind to the MAO-B enzyme in a different manner."  [A24 (Op. 20) (citing A2401-03 (Tr. 281:21-283:9) (Castagnoli))]  The patent-in-suit itself recognized that there was an expectation that one enantiomer of racemic PAI would be more active than the other.  ['446(3:11-17)]

Furthermore, studies with the prior-art MAO-B inhibitor deprenyl had shown that one of its enantiomers was far more effective than both the other

enantiomer and their racemate. Indeed, prior-art publications had reported that the R(-) enantiomer of deprenyl was 500 times more active than the S(+) enantiomer. [A4870 (Knoll 1967 (DTX-1004) at 384); *see also* '446(3:11-17) (acknowledging that the R(-) enantiomer of deprenyl was known to be more active)]

### B.    Racemic PAI was easily separated into its enantiomers, and the separated compounds produced no unexpected results

Teva has never suggested that separating racemic PAI was difficult or that doing so produced unexpected results. And for good reason.

As the patent concedes, separating racemic PAI into its component enantiomers could "be accomplished by any conventional resolution method, well known to a person skilled in the art." ['446(4:36-39)] The 1966 patent on racemic PAI had taught to resolve the compound with tartaric acid. [A4857 (DTX-1003 at 9:51-64)] In Teva's case, a third-party vendor separated the enantiomers in just over a week [A6857-58 (JTX-3002 at 54:01-55:06) (Sterling)], and Teva did not name any employees of that vendor as co-inventors.

Furthermore, as the district court recognized [A59 (Op. 55) n.15], Teva never claimed that the R(+) enantiomer it patented exhibited any results that were unexpected in light of the known effectiveness of racemic PAI in treating Parkinson's disease. As discussed above, the expectation based on the prior art was that one enantiomer of racemic PAI would be more active than the other, and routine experimentation confirmed that expectation. For both racemic deprenyl and

racemic PAI, it was the R configuration that proved to be the more active enantiomer, and the separated enantiomer of racemic PAI behaved as anticipated based on experience with other MAO-B inhibitors.

### C.  Scientific publications and regulatory guidelines offered clear guidance on the importance of evaluating the isomers of racemic compounds

The importance of separating and evaluating the enantiomers of racemic compounds was also reflected in scientific literature and regulatory guidelines.

In 1984, E.J. Ariens, a renowned expert in stereochemistry, stressed the importance of separating and evaluating enantiomers of racemic compounds:

> Often only one isomer is therapeutically active, but this does not mean that the other is really inactive.  It may very well contribute to the side-effects.  The therapeutically non-active isomer in a racemate should be regarded as an impurity (50% or more).

[A5081 (DTX-1059 at 663)]  Ariens further taught that "[o]ne must be aware of the fact that stereoisomers definitely are different chemicals, mostly with quite distinct biological properties."  [A5082 (*id.* at 664)]  Likewise, in February 1987, the FDA issued a Guideline for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances, instructing that

> [w]hen the [New Drug Substance] is asymmetric (e.g., contains one or more chiral centers …), the sponsor should ideally … have either separated the various potential stereoisomers of the NDS or synthesized them independently.  Physical/chemical information about each stereoisomer should be provided (in detail), or may

> be requested. Individual stereoisomers may need to be
> studied for pharmacological and toxicological properties
> (and/or for safety and efficacy).

[A5191 (DTX-1087 at ORC-RAS011735)] And when, in 1989, the FDA's Wilson

DeCamp discussed the "current regulatory position of the [FDA] with regard to the

approval of racemates and pure stereoisomers" in a leading journal on stereochem-

istry, he specifically instructed that "good science" and "good sense" both required

that "enantiomers should be separated, or they should be synthesized." [A5228,

A5232 (DTX-1126 at Abstract, 6)]

### III.  Teva's patent itself recognized that the relevant art consisted of MAO-B inhibitors and that racemic PAI was a logical place to begin investigation

When Teva applied for its patent in January 1990, both laboratory and thera-

peutic uses of MAO-B inhibitors had been well studied. [A24-33 (Op. 20-29)]

Teva recognized that both deprenyl and racemic PAI were relevant prior art: it

disclosed both during prosecution of its patent. Moreover, the applicants speci-

fically defined the field of their invention as "selective irreversible inhibitors of the

enzyme monoamine oxidase (hereinafter, MAO)." ['446(1:13-14)]

Equally notably, Teva did *not* describe or disclose prior art related to classes

of therapeutic agents *other than* irreversible MAO-B inhibitors. The patent no-

where discussed other classes of drugs such as COMT inhibitors and dopamine

agonists, and it nowhere discussed any therapeutic targets other than the MAO

enzyme.  [A2183 (Tr. 77:9-20) (Ruffolo)]  Instead, the Background section of the patent indicated that the applicants focused on racemic PAI because it was known to be "a potent, selective, irreversible inhibitor of MAO-B, … not metabolized to amphetamines and … not [known to] give rise to unwanted sympatho-mimetic effects." ['446(2:52-60)]

Indeed, the patent recorded much of the history recounted above.  It recognized that L-Dopa had drawbacks that could be overcome with the use of an MAO-B inhibitor. ['446(1:66-2:9)]  The patent also described the recognized efficacy of the selective, irreversible MAO-B inhibitor deprenyl in treating Parkinson's disease, but then described deprenyl's own drawbacks, including metabolization to amphetamine.  ['446(2:42-51)]  The patent went on to describe racemic PAI, acknowledging that it was disclosed in two prior-art patents and had a "similar structure" to deprenyl.  ['446(2:52-3:16)]  Based on the literature, the applicants acknowledged that racemic PAI was a selective, irreversible MAO-B inhibitor that exhibited "considerable advantages" over deprenyl and had none of the drawbacks associated with deprenyl.  ['446(2:52-3:7)]

The patent thus treated racemic PAI as the closest prior art and the starting point for developing a Parkinson's disease treatment that improved on the known properties of racemic PAI.  That development included separating the two enantiomers of PAI and comparing their performance to that of the racemate.  Although

the patent expressed surprise that the R(+) enantiomer was a better MAO-B inhibitor than the S(-) enantiomer, it did not suggest that separating and examining the two enantiomers was itself inventive.  ['446(3:8-28)]

Finally, although the patent reported a variety of test results, it did not include any human clinical data.  When it was filed, the applicants' only basis to conclude that they possessed a method of treating Parkinson's disease was the previously known fact that MAO-B inhibitors prevented the enzymatic breakdown of dopamine, data from experiments in mice disclosed in Example 24, and (according to the district court) a memory test in Example 25.  ['446(15:52-17:67)]

## IV.   The district court agreed that racemic PAI was a well-known and highly regarded candidate for treating Parkinson's disease but nevertheless found it non-obvious to use its enantiomer to treat Parkinson's disease

This case began when Mylan filed an abbreviated new drug application (ANDA) seeking FDA approval to market generic rasagiline mesylate tablets to treat Parkinson's disease, both alone and in conjunction with L-Dopa.  The active ingredient of the proposed products was R(+)-PAI.  Teva sued Mylan for infringement of the '446 patent based on the ANDA.  [A128, A134, A140-42]  Mylan conceded infringement but contended that the asserted claims were invalid under 35 U.S.C. § 103 for obviousness and under 35 U.S.C. § 112 for lack of enablement.

The asserted claims were claims 1, 2, 17, 18, and 19 of the '446 patent. Independent claim 1 recites:

> A method of treating a subject for Parkinson's disease which comprise administering to the subject an amount of R(+)-N-propargyl-1-aminoindan or a pharmaceutically acceptable salt thereof effective to treat the subject.

['446(20:20-23)] The other asserted claims depend from claim 1 and recite various additional limitations (e.g., oral administration or administration with L-Dopa), but Teva's non-obviousness arguments were limited to base claim 1.

The district court recognized the voluminous prior-art teachings regarding deprenyl and racemic PAI [A24-33 (Op. 20-29)] and summarized them as follows:

> [T]hese articles indicate that, as of the priority date of the '446 Patent, it was known that:
>
> > a. selective inhibitors of MAO-B had potential therapeutic value in the treatment of Parkinson's disease;
> >
> > b. 80% of the MAO activity in the brain involves the MAO-B form of the enzyme;
> >
> > c. (-) deprenyl was a selective MAO-B inhibitor that was useful as an adjunct to L-DOPA in the treatment of Parkinson's disease and … (-) deprenyl inhibited the [cheese] effect;
> >
> > d. the clinical usefulness of (-) deprenyl derived from the fact that it was an MAO-B inhibitor;
> >
> > e. Parkinson's disease patients treated with (-) deprenyl and L-DOPA had a significant prolongation of their life span compared to those patients treated with L-DOPA alone;
> >
> > f. [Racemic PAI] showed biochemical and pharmacological properties similar to (-) deprenyl in

– 19 –

that it was a potent, highly selective and irreversible inhibitor of MAO-B that did not cause [the "cheese effect"];

g. [Racemic PAI] lacked (-) deprenyl's amphetamine-like actions; and

h. [Racemic PAI], like (-) deprenyl, protected against MPTP-induced parkinsonism.

[A33 (Op. 29)]

Nevertheless, although there was no evidence that MAO-B inhibitors caused the "cheese effect" or other severe side effects [A34 (Op. 30) n.12], the district court credited Teva's argument that researchers would have preferred reversible MAO-B inhibitors [A34-35 (Op. 30-31)].  The district court also found that deprenyl was not structurally similar to racemic PAI even though both compounds shared the propargyl amine group that Teva's expert conceded was the structure that formed the bond between the compounds and the MAO-B enzyme.  [A35-37 (Op. 31-33); *see* A3176 (Tr. 1053:19-23) (Ruffolo)]  In addition, although the district court also recognized that prior art taught to separate the components of racemic mixtures [A38-40 (Op. 34-36) (discussing the Ariens, FDA 1987 Guidelines, and DeCamp references discussed above)], it credited Teva's expert testimony that "there is no way to predict based on the racemic compound whether a separated enantiomer will have any particular characteristic necessary to be a successful drug for treating Parkinson's disease." [A41 (Op. 37)]

The district court further concluded that the prior art would not have provided a reasonable expectation of success that the "R(+) enantiomer of [racemic PAI] would possess all of the properties needed to be a successful Parkinson's disease treatment." [A42 (Op. 38)] According to the district court, "as of 1990, there was no information on whether either enantiomer of [racemic PAI] would possess all of the additional favorable characteristics of R(+) PAI, including the appropriate absorption, distribution, metabolism, and elimination ('ADME') characteristics required to be an effective treatment for Parkinson's disease." [*Id.*]

Although the district court purported to reject Teva's argument that the obviousness of Teva's method-of-treatment claims should be analyzed based on what single compound a skilled researcher would have started with [A43-44 (Op. 39-40)], it nevertheless proceeded to apply an essentially similar "lead-compound" analysis. In particular, it concluded that the '446 patent was not obvious because prior art did not teach that racemic PAI or R(+)-PAI was "*the most attractive candidate for a Parkinson's disease drug.*" [A45 (Op. 41) (emphasis added)] In the same vein, the district court found that a skilled artisan would not have been motivated to resolve racemic PAI into its components and instead would have "chosen a close structural analog of (-) deprenyl, rather than [racemic PAI], in the hopes of improving upon (-) deprenyl's effectiveness." [A46-47 (Op. 42-43)] The district court further found that secondary considerations (failure of others, skepti-

cism, satisfaction of long-felt need, and commercial success) supported its conclusion that the claims were non-obvious. [A51-59 (Op. 47-55)]  It identified no unexpected results resulting from the invention claimed in the '446 patent.

Finally, the district court ruled that the claims were not invalid for lack of enablement.  [A59-63 (Op. 55-59)]  In so holding, the court held that the applicants were not required to show that their claimed invention was safe, effective, and reliable for use in treating humans—only that R(+)-PAI was a potent and selective MAO-B inhibitor that could "potentially increase dopamine in the brain and therefore have a positive effect on motor activity in Parkinson's patients." [A61-63 (Op. 57-59)]  The court did not try to square that analysis with its previous analysis requiring Mylan to show that R(+)-PAI "would possess all of the properties needed to be a successful Parkinson's disease treatment" in order to prove obviousness.

Mylan now appeals from the judgment of no invalidity.

## SUMMARY OF ARGUMENT

It was obvious for a skilled artisan to pursue R(+)-PAI as a treatment for Parkinson's disease.  Racemic PAI was an obvious place for researchers to begin because racemic PAI was already known as a potent, selective MAO-B inhibitor that did not have the amphetamine-like effects of deprenyl, the leading MAO-B inhibitor previously used to treat Parkinson's disease.  Isolating and testing the two

enantiomer components of racemic PAI was also obvious.  Researchers knew that MAO-B was chiral and thus reacted differently with different enantiomers of racemic compounds.  Indeed, the R(-) enantiomer of deprenyl was known to be 500 times more potent than the other enantiomer.  Isolating the R(+) enantiomer of racemic PAI was simple to do, and Teva has never claimed that the effectiveness of R(+)-PAI in treating Parkinson's disease was an unexpected result.  Those facts, combined with the governing law set forth in the Supreme Court's decision in *KSR* and this Court's decision in *Aventis v. Lupin*, compelled the conclusion that the asserted claims are invalid for obviousness.

In holding otherwise, the district court made several legal errors and clearly erroneous factual findings:

*First*, the district court committed legal error by failing to consider the obviousness of R(+)-PAI over the closest prior art, racemic PAI.  Instead, the court required Mylan to prove that racemic PAI was the single most attractive drug for treating Parkinson's disease—not only in the class of MAO-B inhibitors, but among all classes of potential Parkinson's disease therapies including drugs with completely different mechanisms of action.

*Second*, the district court improperly required a near-certainty of success rather than a reasonable expectation of success, and in so doing produced an internally inconsistent ruling.  In rejecting Mylan's non-enablement argument, the

court held that the patent did not need to describe the beneficial properties of Teva's eventual commercial product. Yet when evaluating obviousness and the "reasonable expectation of success" in using the compound described in the claims, the court required Mylan to show that the prior art would have enabled a skilled artisan to unerringly predict the beneficial properties of Teva's commercial product. The court did so even though those properties were neither described nor claimed in the patent and were not alleged to have been unexpected results. By essentially requiring certain success rather than a reasonable likelihood of success, the court imposed too high a burden on Mylan.

*Finally*, the district court's findings regarding secondary considerations were flawed and insufficient to overcome the strong showing that the claimed invention was obvious. In finding failures of others, the court relied on instances that involved drugs unrelated to PAI and events that occurred after the claimed invention. Likewise, the evidence of skepticism of others reflected economic skepticism, not technical or scientific impediments. And the court's findings regarding commercial success ignored that Teva's commercial product has a small market share well below the market shares of three other treatments.

The judgment and injunction should therefore be reversed. At a minimum, the case should be remanded for reconsideration of whether Teva's claims were obvious over the known characteristics of the nearest prior art, racemic PAI.

ARGUMENT

A patent claim is invalid as obvious "when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.'" *KSR*, 550 U.S. at 406 (citation omitted). In determining whether claims are obvious, courts consider: (1) the scope and content of the prior art; (2) differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) secondary considerations such as commercial success and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). "'Obviousness is a question of law, reviewed *de novo,* based upon underlying factual questions which are reviewed for clear error following a bench trial.'" *Aventis v. Lupin*, 499 F.3d at 1300 (citation omitted). A challenger bears the burden of proving the factual aspects of obviousness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011).

This Court should invalidate the asserted claims because most of the district court's own analysis pointed toward a conclusion of obviousness, and the parts that did not reflected either legal error or clear factual mistakes.

I.     **It was obvious to skilled artisans to pursue the R(+) enantiomer of racemic PAI as a treatment for Parkinson's disease**

Prior research provided strong motivation to investigate R(+)-PAI as a treatment for Parkinson's disease.

### A. The patent itself makes clear that the relevant prior art consisted of MAO-B inhibitors, not all possible Parkinson's treatments

As a threshold matter, the relevant prior art consisted of the class of irreversible MAO-B inhibitors on which the '446 patent focused. [A15, A18-19 (Op. 11, 14-15)] In holding that the relevant art consisted of all possible treatments for Parkinson's disease, the district court committed legal error.

*Aventis v. Lupin* illustrates the point. There this Court addressed the obviousness of an enantiomer of a compound within the class of high-blood-pressure treatments known as ACE inhibitors. 499 F.3d at 1296, 1300. When assessing the relevant prior art, this Court did not catalog the numerous other classes of high-blood-pressure treatments, such as beta-blockers, central agonists, or diuretics. Rather, it focused on the class that was the subject of the patent: ACE inhibitors. *Id.* at 1296-98.

Likewise here, the patent identifies irreversible MAO-B inhibitors as the relevant class of treatment, describing the "Field of Invention" as "selective irreversible inhibitors of the enzyme monoamine oxidase (hereinafter MAO)." ['446(1:11-15)] Every prior-art reference cited in the patent involved irreversible MAO inhibitors. ['446(References Cited & 1:25-4:13)] And the Background section of the patent included a detailed explanation of irreversible MAO-B inhibitors, identified deprenyl as a promising drug that had undesirable side effects,

– 26 –

and then described racemic PAI as a compound with a structure similar to deprenyl but free of its side effects. [’446(1:66-2:60)]

"‘A reference is reasonably pertinent if … it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem. Thus, the purposes of both the invention and the prior art are important in determining whether the reference is reasonably pertinent to the problem the invention attempts to solve.'" *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1070 (Fed. Cir. 2003) (citation omitted). Here the patent shows that the problem that the invention purported to solve was developing a selective, irreversible MAO-B inhibitor that did not have deprenyl's downsides. The district court therefore erred when it looked to other drug classes and selective MAO-B inhibitors that bore no relation to the purpose of the invention.

This error was prejudicial. The district court's inclusion of other classes of Parkinson's treatments led to its erroneous conclusion that the "prior art was not in accord as to the promise of either [racemic PAI] or R(+)-PAI as the most attractive candidate for a Parkinson's disease drug" and that "only hindsight bias could support the conclusion that R(+)-PAI would have been selected as a potential treatment for Parkinson's disease." [A45 (Op. 41)] Given the focus of the patent, the only class that was pertinent was MAO-B inhibitors, and the promise of racemic

PAI and its enantiomers thus would have been considered in that context. Indeed, the district court's requirement that racemic PAI be the "most attractive candidate to develop" smacks of the very "lead compound" analysis that the court itself held was inappropriate for a method claim [A43-45 (Op. 39-41)].

**B. The district court's own findings demonstrate that racemic PAI was an obvious place to start research because it was known to be a highly promising treatment for Parkinson's disease that did not have the amphetamine effect of the then-leading MAO-B inhibitor, deprenyl**

Mylan detailed above the district court's findings demonstrating that a skilled artisan would have found it obvious to concentrate on enantiomers of racemic PAI as a treatment for Parkinson's disease. In particular:

- selective MAO-B inhibitors were known to have therapeutic potential for treating Parkinson's disease;

- deprenyl was a selective, irreversible MAO-B inhibitor that was useful as an adjunct to L-Dopa in treating Parkinson's disease;

- deprenyl did not produce the "cheese effect";

- Parkinson's disease patients treated with deprenyl and L-Dopa had a significantly longer lifespan than patients treated with L-Dopa alone;

- racemic PAI was known to be similar to deprenyl in that it was a potent, highly selective, and irreversible inhibitor of MAO-B that did not cause the "cheese effect";

- racemic PAI lacked deprenyl's amphetamine-like effects; and

- racemic PAI, like deprenyl, protected against MPTP-induced parkinsonism, which offered the hope of neuroprotection.

[*See* A24-33 (Op. 20-29)]

The district court further recognized that the 1989 DATATOP study would have "'encouraged a [skilled artisan] to pursue avenues to generate potent, selective, irreversible and safe [MAO-B inhibitors] to use in Parkinson's patients.'" [A26 (Op. 22) (quoting A2425-27 (Tr. 305:12-14, 306:25-307:5) (Castagnoli))] Even more specifically, the district court acknowledged that the 1985 Heikkila reference had described racemic PAI as "attractive as a potential therapeutic agent in treating [Parkinson's disease]." [A31-32 (Op. 27-28)]

The relevant art thus pointed inexorably to investigating PAI compounds as a treatment for Parkinson's disease.

### C. It was obvious to pursue the R enantiomer of racemic PAI given the success with the R enantiomer of deprenyl

The district court's findings also confirmed that a skilled artisan would have found it obvious that an enantiomer of racemic PAI would prove more potent than the racemate and thus would have proceeded to separate and test those enanti-

omers.   As the district court found, PAI consisted of two enantiomers, and "[b]ecause of the chirality of the MAO-B enzyme and MAO-B inhibitors, each enantiomer of an MAO-B inhibitor [wa]s expected to bind to the MAO-B enzyme in a different manner."   [A24 (Op. 20)]   Given those facts, alternatives, an investigator would have had a reasonable expectation that one of the two enantiomers would prove more active.   Moreover, PAI itself was no longer patentable, so there was a market incentive to pursue a variation of the racemate that shared its promising qualities.

This case is thus controlled by the Supreme Court's teaching that when there is "a design need or market pressure to solve a problem" and "a finite number of identified, predictable solutions," a skilled artisan "has good reason to pursue the known options within his or her technical grasp." *KSR*, 550 U.S. at 421.   And "[i]f this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *Id.*   This "anticipated success" need not be a certainty, as "only a reasonable expectation of success, not a guarantee, is needed." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

The district court erred as a matter of law in demanding that the prior art specifically teach that the R(+)-enantiomer of PAI would show superior results over the S(-) enantiomer.   Of course, the specific properties of R(+) PAI were unknown, but it was obvious to isolate and test both enantiomers and compare the

results with each other and the results with the racemate.  In *Aventis*, the district court held that a 5(S) enantiomer of the racemic compound SCH 31925 was not obvious over the racemate.  But this Court reversed, holding that the district court erred in "[r]equiring an explicit teaching to purify the 5(S) stereoisomer from a mixture in which it is the active ingredient" because such a requirement was "precisely the sort of rigid application of the TSM test that was criticized in *KSR*." 499 F.3d at 1301.  Rather, this Court explained, "if it is known that some desirable property of a mixture derives in whole or in part from a particular one of its components, or if the prior art would provide a person of ordinary skill in the art with reason to believe that this is so, the purified compound is prima facie obvious over the mixture even without an explicit teaching that the ingredient should be concentrated or purified."  *Id.*; *see also Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1382 (Fed. Cir. 2008) ("[A]n obviousness analysis 'need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of skill ordinary in the art would employ.'") (citation omitted).

The chiral nature of MAO-B and its inhibitors gave skilled artisans especially strong reason to believe that one of the enantiomers would prove more potent.  Differences in effects across enantiomers are characteristic of chiral compounds generally, and deprenyl illustrated that fact.  The prior art taught, and the

district court found, that the R(-)-deprenyl enantiomer was "500 times more potent" than S(+)-deprenyl in its inhibition of MAO.  [A25 (Op. 21)]  In fact, the patentees admitted that this far greater activity of one deprenyl enantiomer over the other motivated them to purify racemic PAI, as racemic PAI had a "similar structure" to deprenyl.  ['446(3:11-17)]

Based on a misunderstanding of the (+) and (-) designations, which address light polarity rather than the physical structure that is key to bonding with enzymes, the applicants themselves expected the S(-) enantiomer of PAI to be more effective than the R(+).  [*Id.*]  But that is irrelevant.  To begin with, ordinary artisans knew that physical structure was more important than light polarity and that the R enantiomer of deprenyl was far more potent.  In any event, because there were only two enantiomers, isolating S(-) also isolated R(+).  A skilled artisan certainly would have proceeded to test both—especially in light of the history with the R enantiomer of deprenyl.  *See KSR*, 550 U.S. at 401 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill."); *Aventis*, 499 F.3d at 1302 (obvious to isolate 5(S) enantiomer where past resolution of structurally analogous compound yielded enantiomer with 700 times greater potency).

To be sure, isolating an enantiomer is not always obvious. In some cases "it may not be known that the purified compound is present in or an active ingredient of the mixture, or the state of the art may be such that discovering how to perform the purification is an invention of patentable weight in itself." *Aventis*, 499 F.3d at 1301. But that was not so in *Aventis*, and it was not the case here. As in *Aventis*, isolating the enantiomers was "accomplished by any conventional resolution method, well known to a person skilled in the art." ['446(4:36-39); *see also* A26-27 (Op. 22-23) (citing the '037 patent's 1966 teaching that racemic PAI could be resolved by known methods including use of tartaric acid)]

Both the positive experience with the R(-)-deprenyl enantiomer and the ease of resolving PAI distinguish this case from *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075 (Fed. Cir. 2008), on which the district court relied [A42, A47, A50 (Op. 38, 43, 46)]. In *Sanofi*, this Court affirmed a finding that the enantiomer of the racemic compound PCR 4099 was non-obvious. There, however, experience in resolving compounds in the same class had not shown that one enantiomer was superior to the racemate. *Id.* at 1080-81. If anything, prior resolutions had produced enantiomers with *worse* properties than the racemate, leading to the conclusion that "there was no advantage to separation of the enantiomers." *Id.* at 1081. This Court also noted that resolution of PCR 4099 consumed five failure-littered months and that there was no "reference showing or suggesting any reliable

– 33 –

method of separation for any analogous compounds." *Id.* at 1081, 1087-88. As shown above, the experience with resolving deprenyl and PAI was the opposite.

The district court also erred in demanding a showing that a skilled artisan have had a reason to expect that R(+)-PAI "would possess all of the properties needed to be a successful Parkinson's disease treatment." [A42 (Op. 38)] This test finds no support in case law. The proper test comes from *Aventis*: whether a skilled artisan had reason to believe that one of the enantiomers of PAI would be more potent than the racemate. *See* 499 F.3d at 1302. The far greater potency of R(-)-deprenyl over its racemate gave skilled artisans a compelling reason to believe resolving the structurally similar PAI compound would also be advantageous.

### D. Nothing discouraged researchers from investigating the enantiomers of PAI

The district court partially credited Teva's arguments that there were "potential issues" with racemic PAI. [A34-37 (Op. 30-33)] Those findings, however, were tainted by legal error and contradicted by the court's other findings.

The district court first cited a supposed preference for *reversible* MAO-B inhibitors. But nothing in prior art taught away from *irreversible* MAO-B inhibitors. To begin with, teaching away occurs only "'when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.'" *In re Kubin*, 561 F.3d 1351, 1357 (Fed. Cir. 2009) (cita-

tion omitted). Rather than holding Teva to this rigorous standard, the district court improperly accepted the unsupported opinion of Teva's expert Dr. Jenner, which did not cite a single published reference backing up his assertion that researchers would have been discouraged from pursuing irreversible MAO-B inhibitors.

In fact, Dr. Jenner's argument was spurious. He claimed that reversible MAO-B inhibitors would have been preferred because the "cheese effect" and other unspecified adverse side effects could be managed by stopping the inhibitor. But neither deprenyl nor racemic PAI produced the "cheese effect," which, as the district court itself recognized [A34 (Op. 30) n.12], had been linked to *MAO-A* inhibitors, not selective *MAO-B* inhibitors. And while deprenyl produced amphet-amine-like reactions, racemic PAI did not. Reversibility is important only when major side effects need to be reversed. In any event, the district court's own find-ings regarding the steady development of irreversible MAO-B inhibitors through-out the 1980s [A24-33 (Op. 20-29)] laid to rest any claim of teaching away.

The district court also erred in accepting the testimony of Teva's expert Dr. Ruffolo that PAI and deprenyl did not share close structural similarity. [A35-37, A50 (Op. 31-33, 46)] The patent admitted the opposite: "deprenyl has a simi-lar structure to PAI." ['446(3:11-17)] Moreover, the one structure that the district court identified as present in both deprenyl and PAI—the propargyl amine group [A36 (Op. 32)]—was the very structure that formed the bond with the MAO-B

enzyme [A3177-78 (Tr. 1054:16-1055:12) (Ruffolo)]. Because that bond const-ituted the interaction necessary for inhibition, the identity of the propargyl amine group in both deprenyl and PAI would have been far more significant than the differences found by the district court. [A2453 (Tr. 333:8-25) (Castagnoli)] In any event, Dr. Ruffolo's testimony should have been given little weight, as it could not be "reconciled with statements made by the inventors in the … specification." *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1361-62 (Fed. Cir. 2007).

## II.    The district court erred by effectively applying a "lead compound" analysis even though it agreed that that approach was inapposite here

At trial and in post-trial briefing, Teva argued that a "lead compound" analysis should apply. "[O]bviousness in the chemical arts is often based on a known compound, called a 'lead compound,' which serves as a starting point for a person of ordinary skill developing the claimed invention." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011). Under this analysis, courts look to determine whether the prior art suggested to a skilled artisan that a com-pound would be the best candidate as the lead compound for further development of other compounds. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1358-59 (Fed. Cir. 2007).

But as the district court recognized, this Court has never used a "lead com-pound" analysis to evaluate the obviousness of *method-of-treatment* claims, as

opposed to pharmaceutical compound claims.  [A44-45 (Op. 40-41)]  The district court thus agreed that "the ultimate question here, is whether it would have been obvious to a [skilled artisan] in 1990 to treat Parkinson's disease by administering to a patient the MAO-B inhibitor R(+)-PAI."  [A45 (Op. 41)]

Nevertheless, the district court immediately proceeded to reverse course and effectively apply a "lead compound" analysis when it found that skilled artisans would not have picked either racemic PAI or R(+)-PAI "as the most attractive candidate for a Parkinson's disease drug based on the presence of several *other* promising candidates, including dopamine agonists, COMT inhibitors and L-DOPA pro-drugs."  [*Id.*]  That was legal error for several reasons.

### A.   Mylan was not required to show that racemic PAI was the single "most attractive candidate" for investigation

This Court's jurisprudence does not require identification of a single "most attractive candidate" for treating a disease.  For example, in *Eli Lilly & Co. v. Teva Pharmaceuticals USA, Inc.*, 619 F.3d 1329, 1335 (Fed. Cir. 2010), the asserted claims recited "[a] method of inhibiting post-menopausal bone loss" using a known compound, raloxifene.  This Court did not examine whether a skilled artisan would have used raloxifene as *the* or even *a* lead compound; rather, it based its obviousness inquiry on *Graham* and *KSR*.  *See id.* at 1336.  So too in *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254 (Fed. Cir. 2007).  The claim there recited "a method for treating bacterial ear infections," and rather than using a lead compound

analysis, this Court applied the traditional four-part obviousness test and focused on prior-art compounds found in the same drug class. *Id.* at 1256-59.

The district court therefore erred by requiring Mylan to show that PAI or its enantiomers were "*the* most attractive candidate" for treating Parkinson's disease. And to the extent it matters whether PAI compounds were *a* leading candidate for treating Parkinson's disease, the district court's own findings confirm they were.

## B.    The district court's focus on other classes of drugs was improper

The district court's consideration of other drug classes when assessing the obviousness of Teva's claimed invention deviated from this Court's approach in other enantiomer cases. As noted above, this Court in *Aventis* focused on the class of high-blood-pressure medication that was the focus of the patent: ACE inhibitors. 499 F.3d at 1296-98. This Court followed the same approach in *Sanofi*, limiting its consideration of the art to the class of drugs described in the patent, not all possible treatments of heart attacks and strokes. 550 F.3d at 1079-81. The district court should have done the same here—especially when the patent itself identified the relevant art as selective, irreversible MAO inhibitors.

In particular, the district court should have assessed the obviousness of using R(+)-PAI to treat Parkinson's disease in light of the closest prior art, racemic PAI. That was the approach this Court used in both *Aventis*, 499 F.3d at 1301-02, and *Sanofi*, 550 F.3d at 1086. Had the district court focused on the right issue, it would

have found it obvious that an enantiomer of PAI would prove more potent than the
racemic PAI mixture as a potential treatment for Parkinson's disease—especially
given the history with deprenyl. In *Aventis*'s words:

> Ordinarily, one expects a concentrated or purified
> ingredient to retain the same properties it exhibited in a
> mixture, and for those properties to be amplified when
> the ingredient is concentrated or purified; isolation of
> interesting compounds is a mainstay of the chemist's art.
> If it is known how to perform such an isolation, doing so
> "is likely the product not of innovation but of ordinary
> skill and common sense."

499 F.3d at 1302 (quoting *KSR*, 550 U.S. at 402-03).

## III.    The district court improperly analyzed whether there was a "reasonable expectation of success"

The district court concluded that there was no reasonable expectation that
either racemic PAI or R(+)-PAI would have been successful as a treatment for
Parkinson's disease. The district court's reasoning was two-fold. First, the court
found that there was insufficient information that racemic PAI would be a success-
ful treatment because "there was no description in the prior art of actual use of
[racemic PAI] to treat [Parkinson's disease]." [A42 (Op. 38)] Second, because the
enantiomers of racemic PAI had not been separated previously, the district court
found that one of ordinary skill in the art could not reasonably predict that either
enantiomer "would possess all of the additional favorable characteristics of R(+)-
PAI, including the [ADME] characteristics required to be an effective treatment for

Parkinson's disease." [*Id.*; *see also* A48 (Op. 44) (stating that Mylan did not rebut Teva's evidence that R(+)-PAI would not be expected to have "all" those favorable properties)]

In making those findings, however, the district court misapplied the law of reasonable expectation of success. By requiring actual prior use as a Parkinson's treatment, prior separation of enantiomers, and FDA-caliber testing, it imposed a standard of absolute predictability far higher than this Court has imposed.

## A.    The district court erred in requiring absolute predictability

The district court agreed that racemic PAI was known to be "a potent, selective and irreversible MAO-B inhibitor that was not metabolized to amphetamines, that did not potentiate the ["cheese"] effect in animals, and that … was effective in the MPTP mouse model." [A42 (Op. 38)] The court also found that prior art had repeatedly suggested, based on these qualities, that racemic PAI "'was attractive as a potential therapeutic agent in treating [Parkinson's disease].'" [A32 (Op. 28) (quoting A5097 (DTX-1066 at 313)); *see also* A29-33 (Op. 25-29)] Despite acknowledging that PAI was known to be an "attractive candidate," the court nonetheless determined that there was no reasonable probability that R(+)-PAI would be an effective treatment because the prior art did not describe actually administering it as a Parkinson's treatment. [A42 (Op. 38)]

That analysis overstated the standard for reasonable probability of success. The "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer v. Apotex*, 480 F.3d at 1364. "'[A]bsolute predictability of success' is not the criterion ...." *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989) (quoting *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)). "[O]nly a reasonable expectation of success, not a guarantee, is needed." *Pfizer v. Apotex*, 480 F.3d at 1364; *Velander v. Garner*, 348 F.3d 1359, 1377-78 (Fed. Cir. 2003). Thus, it was enough that racemic RAI was known to have traits that made it a likely contender as a treatment for Parkinson's disease. The district court's requirement that it actually have been used to treat Parkinson's disease imposed a certainty requirement unsupported by precedent.

The district court similarly imposed too strict a standard when it concluded there was no reasonable expectation of success because the prior art did not describe actually separating racemic PAI into its two enantiomers. [A42 (Op. 38)] Perhaps, as the district court found, a skilled artisan would not have known with certainty the specific properties of either enantiomer until it was separated, isolated, and characterized. [*Id.*] But Mylan was not required to show absolute predictability. If the district court's logic were correct, then every newly separated enantiomer would be a non-obvious treatment. There is no such rule.

Under the correct standard, Mylan only needed to show a *reasonable probability* that an enantiomer of racemic PAI would have been an effective Parkinson's treatment. For the reasons discussed above, the district court's own findings compelled the conclusion that there was such a reasonable probability.

## B. The district court erred in requiring a reasonable expectation of success in producing a commercial product

The district court also found that there was no reasonable probability of success because it was not known that R(+)-PAI would have favorable absorption, distribution, metabolism, and elimination ("ADME") characteristics. [A42, A48 (Op. 38, 44)] Specifically, the district court relied on the testimony of Dr. Ruffolo, who testified that (a) ADME data were "important to its becoming an effective treatment" for Parkinson's disease, as recognized by the FDA and as identified during clinical trials *after* filing of the '446 patent [A2175 (Tr. 69:2-21), A2950 (Tr. 827:6-16)], and (b) a skilled artisan would not have expected R(+)-PAI to have all these traits. [A2950-52 (Tr. 827:15-829:2), A2965-66 (Tr. 842:10-843:19)]

Again, that was legal error. Patent law does not require that the prior art clear stringent FDA hurdles to meet the reasonable predictability standard of *KSR*. "[T]here is no requirement that a teaching in the prior art be scientifically tested, or even guarantee success .... Rather, it is sufficient that one of ordinary skill in the art would perceive from the prior art a reasonable likelihood of success." *Duramed Pharms., Inc. v. Watson Labs., Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011).

– 42 –

Nor is there a "requirement that one of ordinary skill have a reasonable expectation of success in developing [a commercial product]. Rather, the person of ordinary skill need only have a reasonable expectation of success of developing the claimed invention." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292-93 (Fed. Cir. 2013) (further noting that difficulties in formulating the commercial product are "not particularly probative with respect to obviousness" and "irrelevant"), *petition for cert. filed*, No. 13-889 (U.S. Jan. 22, 2014). Indeed, a skilled artisan need not have data available to identify all favorable traits in the prior art: all that is required is "a reasonable expectation of success" in applying the teachings of the prior art to arrive at the claimed invention. *Pfizer v. Apotex*, 480 F.3d at 1361-64.

Extensive evidence showed that a skilled artisan could reasonably predict that R(+)-PAI would be an effective treatment. As the applicants conceded during prosecution, activity and selectivity—not ADME data—are the two requirements for a therapeutic agent in the treatment of Parkinson's disease, and both were known in the prior art. [*See* A5544-48 (DTX-1232 at Tev00494317-21)] Dr. Ruffolo's hindsight identification of favorable characteristics that Teva itself did not recognize until after it filed for the patent was immaterial.

## C. Teva did not show, and the district court did not find, that R(+)-PAI produced unexpected results as a treatment

Importantly, the district court did not find that R(+)-PAI achieved any unexpected results. [A59 (Op. 55) n.15] Indeed, Teva presented no evidence that

the results achieved by R(+)-PAI were unpredictable.  Teva's failure to present

such evidence confirms that prior art indicated a reasonable probability of success

an enantiomer of racemic PAI would be an effective Parkinson's treatment.

This fact again distinguishes this case from *Sanofi*.  In finding non-obvious-

ness there, this Court relied on "extensive findings" of "unpredictable properties of

[the claimed enantiomer], and there was no contrary evidence suggesting, based on

the prior art, that the stereoselective properties were 'precisely what one would

expect,' as in *Aventis*."  550 F.3d at 1089.  Here, as in *Aventis*, the chiral nature of

both MAO-B enzyme and MAO-B inhibitors was well understood, as demon-

strated by the experience with the R enantiomer of deprenyl.  The absence of any

findings of unexpected results underscores the obviousness of the asserted claims.

### D.    The district court's enablement analysis contradicted its analysis of the reasonable expectation of success

The '446 patent's specification discloses only information of the same caliber

found in the prior art—the very types of animal and *in vitro* testing that the district

court found did not support a reasonable probability of success.  The patent certainly

did not disclose the type of clinical data that the district court and Dr. Ruffolo

demanded for a conclusion that R(+)-PAI had a reasonable probability of success as

a Parkinson's treatment.  If, as Teva contended, the data disclosed in the patent

were sufficient to enable successful treatment of Parkinson's disease, then surely

the same sort of data in the prior art were sufficient to indicate a mere reasonable

probability that PAI compounds would be successful as Parkinson's treatments. *See Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1323 (Fed. Cir. 2005) (35 U.S.C. § 112 incorporates 35 U.S.C. § 101's requirement that the specification disclose practical utility for the invention).

In rejecting Mylan's non-enablement argument, the district court concluded that a skilled artisan could glean from the data disclosed in the '446 specification that R(+)-PAI could be used as an effective Parkinson's treatment.  [A62-63 (Op. 58-59)]  The court thus concluded that a skilled artisan would understand from the various routine models of *in vitro* and *in vivo* testing disclosed in the specification that R(+)-PAI was a potent, selective, MAO-B inhibitor that could potentially increase dopamine in the brain to have a "positive effect" on Parkinson's patients. [A62 (Op. 58)]  But if that is so, then the same was equally true of the prior art. Based on the same *in vivo* and *in vitro tests* disclosed in the prior art, a skilled artisan could reasonably predict that racemic PAI or an enantiomer could be used as an effective treatment for Parkinson's disease.

## IV.    The district court's analysis of secondary considerations was flawed

Although this Court has stressed that an obviousness analysis must take into account "secondary indicia" or "objective evidence" of non-obviousness, it has also repeatedly recognized that weak evidence of secondary indicia of non-obviousness cannot overcome a strong showing of obviousness based on prior art. *See,*

*e.g.*, *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013); *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1363-65 (Fed. Cir. 2012); *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010); *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009); *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332-33 (Fed. Cir. 2009); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007); *Allergan*, 726 F.3d at 1293.  That is the case here.

The district court identified four categories of "objective evidence" supporting the non-obviousness of the claimed invention:  failure of others, industry skepticism, satisfaction of a long-felt need, and commercial success.  [A47-55 (Op. 43-51)]  As to each, however, the court departed from the record and the law.  Courts "must exercise care in assessing proffered evidence of objective considerations, giving such evidence weight only where the objective indicia are 'attributable to the inventive characteristics of the discovery as claimed in the patent.'"  *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 n.6 (Fed. Cir. 2012) (citation omitted).  And here the proffered evidence did not pass muster.

### A.    Failures of drugs in classes other than MAO-B inhibitors are irrelevant, as are any failures that occurred after the claimed invention

The district court first found that others' failure to "develop a treatment for Parkinson's disease" supported the notion that the inventors "'made a genuinely innovative discovery.'"  [A52 (Op. 48)]  In support, it relied on eleven treatments abandoned before commercialization.  In so finding, however, it relied on a combination of failures of drugs other than MAO-B inhibitors and failures that occurred after the date of the claimed invention.  [*See* A52-53 (Op. 48-49); A3180 (Tr. 1057:1-25)]  That was an error of law.

Although failure of others to find a solution can suggest that the patentee made an innovative discovery, here the problem according to the patent itself was to improve upon specific side effects associated with deprenyl within the class of MAO-B inhibitors.  Problems with dopamine agonist or COMT inhibitor solutions had no bearing on failure of others to develop an improved MAO-B inhibitor.  *See Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1338 (Fed. Cir. 2010) (the need must "correspond to the asserted claims" and cannot be "overbroad"); *Tex. Instruments Inc. v. USITC*, 988 F.2d 1165, 1178 (Fed. Cir. 1993) (long-felt need requires an "articulated identified problem").

Similarly, the failure of others *after* the invention claimed in the '446 patent is irrelevant.  Prior failures of others may reflect a long-felt and unsolved need for

the patented invention, *Cyclobenzaprine*, 676 F.3d at 1082-83, but that need is judged as of the date of the filing of the patent application, *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009).

Ultimately, the district court identified just one unsuccessful pre-patent MAO-B inhibitor:  MDL-72145, which was abandoned because of toxicity problems.  [A53 (Op. 49)]  But MDL-72145 had little relevance:  Teva's own expert conceded that it was chemically distinct from racemic PAI and R(+)-PAI, that skilled artisans would not infer that the toxicity issues with MDL-72145 had any bearing on racemic PAI or R(+)-PAI, and that there were no known toxicity concerns with PAI or R(+)-PAI.  [A3178-80 (Tr. 1055:20-1057:6)]  The district court's reliance on this single failure of a chemically distinct compound for reasons wholly unrelated to any attributes of PAI or R(+)-PAI cannot support a finding of non-obviousness.  *See Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009) (evidence of failures of others "weak" where failures were attributable to problems unrelated to invention).

### B.    Any skepticism involved economics, not science

The district court next concluded that the "overall skepticism shown by others in the pharmaceutical field about developing [racemic PAI] as a treatment for Parkinson's disease supports a finding of non-obviousness."  [A55 (Op. 51)] The sole basis for this finding, however, was named inventor Youdim's testimony

that he was unable to pique the interest of various pharmaceutical companies. [*Id.*] Teva failed to show that such disinterest was scientific rather than economic, and skepticism is entitled to little if any weight when it is "directed to economic and commercial factors, not the technical merit" of the claimed invention. *Joy Techs., Inc. v. Manbeck*, 751 F. Supp. 225, 232 (D.D.C. 1990), *aff'd*, 959 F.2d 226 (Fed. Cir. 1992); *Friskit, Inc. v. Real Networks, Inc.*, 306 F. App'x 610, 617-18 (Fed. Cir. 2009) ("market forces that allegedly discouraged" invention not probative of non-obviousness); *cf. KSR*, 550 U.S. at 417 (cautioning against rewarding obvious variations brought on by "market forces").

The district court itself recognized that funding—not technical concerns— fueled the inventors' inability to entice investors. [A54 (Op. 50) (citing A4165-67 (PTX-140))] The only document Teva cited was an ambiguous 1986 letter from Warner Lambert that declined to fund research at the levels requested by Youdim. [*See* A4167 (PTX-140 at TECH00000005)] Moreover, as the district court acknowledged [A54-55 (Op. 50-51)], another company had already patented racemic PAI, which limited patenting options and therefore economic opportunities. Given this evidence, Teva's claims of industry skepticism did not undermine the obviousness of the claimed invention.

### C.    The district court's finding that the invention solved a long-felt need was unsupported by the record

The district court's finding that there was a long-felt need for the claimed invention was also mistaken.

The court found that there was a long-felt need for an improved Parkinson's treatment and, in particular, a treatment that delayed the clinical progression of the disease.  [A55 (Op. 51)]  But as explained above, the sole difference between the closest prior art (racemic PAI) and the '446 patent was that the '446 patent claims use of the separated enantiomer.  "Where the differences between the prior art and the claimed invention are as minimal as they are here ... it cannot be said that any long-felt need was unsolved."  *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304-05 (Fed. Cir. 2010).

Moreover, to establish that there was a long-felt need for a more effective treatment in 1990, the district court relied solely on the testimony of Teva's expert Dr. Henchcliffe.  [A55 (Op. 51)]  Dr. Henchcliffe did not receive a medical degree until 1997 and did not treat patients until years after the filing of the 1990 application that resulted in the '446 patent.  [A3203 (Tr. 1080:8-22), A3278 (Tr. 1155:11-18)]  What is more, she did not review the prior art to the '446 patent as a part of her analysis in this case.  [A3278-79 (Tr. 1155:19-1156:9)]  Her opinion thus provided no basis for a finding of long-felt but unsolved need.

The district court's finding that Teva's commercial product, Azilect®, met the need was equally infirm. The district court relied on Dr. Henchcliffe's testimony regarding the "Tempo" study. [A55 (Op. 51)] But whether a long-felt need has been met is determined *as of the patent's filing date*. *Procter & Gamble*, 566 F.3d at 998. The Tempo study did not take place until 2002, twelve years after the '446 patent was filed. [*Id.*]

Finally, the district court's finding, based on post-1990 studies and Dr. Henchcliffe's testimony, that "Azilect® may slow the clinical progression of Parkinson's disease" [A55-56 (Op. 51-52)] also lacked support. The FDA specifically refused to change Azilect's label to indicate that it slows clinical progression of the disease. [*Id.* (citing A6033-38 (DTX-1444))] The district court's speculation that Azilect "could potentially" slow clinical progression contradicted the FDA's expert conclusion.

### D.    The district court erred in analyzing commercial success

Finally, the district court found that Azilect's commercial success indicated non-obviousness. To begin with, however, even a strong showing of commercial success cannot salvage a patent claim that is unmistakably obvious: "Where ... invention is plainly lacking, commercial success cannot fill the void." *Jungersen v. Ostby & Barton Co.*, 335 U.S. 560, 567 (1949); *Dow Chem. Co. v. Halliburton*

*Oil Well Cementing Co.*, 324 U.S. 320, 330 (1945). What is more, Teva's evidence of commercial success was weak.

### 1. L-Dopa, Requip®, and Mirapex® are all far more popular than Azilect®

In finding that Azilect is a commercial success, the district court relied on the drug's cumulative worldwide sales. [A57 (Op. 53)] But naked sales figures alone are weak evidence of commercial success. *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985), *overruled on other grounds*, *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999); *Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 377 F. App'x 978, 983 (Fed. Cir. 2010) ("Nor do we find compelling Purdue's sales figures without any evidence giving context to such figures."). To support non-obviousness, the patentee must demonstrate the commercial embodiment's place in a definable market. *See In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). Moreover, although the district court relied on Azilect's share of Parkinson's disease treatment *revenues*, Azilect is far more expensive than other treatments. [A3346-47 (Tr. 1222:12-14, 1223:5-7)] Its revenue share is thus a misleading indicator of purported commercial success.

Under the more relevant measure, prescription share, Azilect is dwarfed by L-Dopa, which Teva's expert Dr. Hausman referred to as the "the gorilla in the room." [A3351 (Tr. 1227:22-24)] In fact, despite Teva's multimillion dollar marketing campaign, Azilect accounts for only 5.7% of prescriptions, whereas L-Dopa

has a market share of between 60% and 70%.  [A3380-81 (Tr. 1256:11-1257:2), A3389-90 (1265:24-1266:3)]  Nevertheless, the district court omitted L-Dopa from its analysis.  [A56-57 (Op. 52-53)]  The district court likewise ignored that pre-scriptions for Azilect lag well behind those for two other Parkinson's treatments, Requip® and Mirapex®.  [A3381 (Tr. 1257:6-13), A3387 (1263:16-20); A4361 (PTX-198)]

## 2.    The district court improperly assumed that Teva's sales were linked to the invention claimed here

Even if Azilect were a commercial success, the district court incorrectly presumed that such success was attributable to the invention claimed in the '446 patent.  "Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commer-cial success."  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).  And although Teva bore the burden of proving this nexus, *see Western Union*, 626 F.3d at 1372-73, the district court improperly shifted that burden to Mylan [A58-59 (Op. 54-55)].

Dr. Hausman testified that a nexus existed because sales of Azilect "come out of the chemical properties which are claim 1."  [A3364 (Tr. 1240:12-21)]  But claim 1 is a *method-of-treatment* claim, and Azilect is covered by other patents, including claims on R(+)-PAI itself.  [*See* A5960-96 (DTX-1270); A6810 (DTX-5003); A5827-56 (DTX-1241); A5857-97 (DTX-1243); A5912-53 (DTX-1252);

– 53 –

A3366-76 (Tr. 1242:17-1243:11, 1244:9-18, 1245:5-14, 1246:15-24, 1247:15-1249:5, 1251:20-1252:19)]  A patent claiming R(+)-PAI itself would naturally cover the chemical properties of the compound, which Dr. Hausman contended were the reason for Azilect's sales.  [A3364 (Tr. 1240:12-21)]

This shortcoming undermines Teva's commercial success evidence.  Where a separate patent covers the chemical compound used in a method of treatment, any commercial success "may heavily derive from subject matter that does not on the whole contribute to the patentable distinctiveness of these claims," and a trial court thus "should carefully consider whether the nexus requirement of our law is satisfied."  *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1383 (Fed. Cir. 2005).  Rather than doing so, the district court improperly presumed a nexus and ignored Teva's other patents on the grounds that "Mylan [did] not definitively show[ ] that the claimed properties attributable to the other patents are responsible for Azilect®'s commercial success."  [A58 (Op. 54)]  Although a presumption of nexus may attach where a commercial embodiment is coextensive with the patent claims, no such presumption applies where, as here, a commercial product is covered by multiple patents.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1289, 1299 (Fed. Cir.), *vacated for reh'g en banc on other grounds*, 374 F. App'x 35 (Fed. Cir. 2010), *reinstated in relevant part*, 649 F.3d 1276, 1296 (Fed. Cir. 2011) (en banc).

## V.   The dependent claims of the '446 patent are equally invalid

The district court made no findings that dependent claims 2 and 17-19 of the '446 patent added limitations that were non-obvious, and Teva did not argue that they did.

In fact, the dependent claims merely added conventional limitations.  Claim 2 narrows the method of claim 1 to oral administration, but the oral route of administration was known for both racemic PAI and deprenyl.  [A4888 (DTX-1011) at 5:14-18; A2617 (Tr. 495:14-22) (LeWitt); A2392-94 (Tr. 272:19-273:2, 274:5-18), A2455 (335:4-20), A2457 (337:3-5), A2483-85 (363:15-365:15) (Castagnoli)] Similarly, claim 17 recites administering L-Dopa "in an amount relative to the amount of" R(+)-PAI, which the district court construed to mean "adjusting the amount of Levodopa otherwise administered in light of the subject's response to the amount of R(+)-PAI co-administered with Levodopa."  [A1027 (D.I. 463 at 20)]   It was undisputed that prior-art administration of an MAO-B inhibitor allowed treating physicians to reduce the amount of L-Dopa administered to patients.  [A2663-65 (Tr. 541:12-543:25) (LeWitt); A5126 (DTX-1076 at 127) (describing the 30%-50% reduction in the administration of L-Dopa available when co-administered with a selective MAO-B inhibitor)]  Claim 18 recites the use of a decarboxylase inhibitor with L-Dopa, but this too was well known and accepted practice by 1990.  [A2485 (Tr. 365:5-10) (Castagnoli); A2617-18 (Tr.

495:22-496:22) (LeWitt)]  Finally, claim 19 narrows claim 18 to use of carbidopa as the decarboxylase inhibitor, but carbidopa was the best known and most common decarboxylase inhibitor by 1990.    [A2617-18 (Tr. 495:22-496:22) (LeWitt); A2486-87 (Tr. 366:17-367:1) (Castagnoli)]

## CONCLUSION

This Court should reverse the judgment and injunction and declare the asserted claims invalid for obviousness as a matter of law.  At a minimum, the Court should remand for a proper analysis of obviousness in view of the known characteristics of racemic PAI.

Respectfully submitted,

PERKINS COIE LLP

by   /s/ Shannon M. Bloodworth
        Shannon M. Bloodworth

Counsel for Appellants

Addendum 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TEVA NEUROSCIENCE, INC., TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICAL INDUSTRIES LTD., | Civil Action No.: 10-5078(CCC)(MF) |
| *Plaintiffs*, | |
| v. | |
| WATSON LABORATORIES, INC., MYLAN PHARMACEUTICALS INC., MYLAN INC., ORCHID CHEMICALS & PHARMACEUTICALS LTD., ORCHID HEALTHCARE (a division of Orchid Chemicals & Pharmaceuticals Ltd.), and ORGENUS PHARMA INC., | |
| *Defendants.* | |
| TEVA NEUROSCIENCE, INC., TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICAL INDUSTRIES LTD., | Civil Action No.: 11-3076 (CCC)(MF) |
| *Plaintiffs,* | |
| v. | CONSOLIDATED CASES |
| APOTEX CORP. and APOTEX INC., | |
| *Defendants.* | |

## FINAL JUDGMENT ORDER

This matter having come before the Court upon the Complaint of Teva Pharmaceutical

Industries Ltd., Teva Neuroscience, Inc. and Teva Pharmaceuticals USA, Inc. ("Teva") alleging

that Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. ("Mylan") infringe claims 1, 2, 17,

18 and 19 of United States Patent No. 5,453,446 ("the '446 patent"), and with Counterclaims

filed by Mylan seeking declaratory judgment of invalidity of the asserted claims 1, 2, 17, 18 and

19 of the '446 patent and unenforceability of the '446 patent, and the Court having ordered,

following the parties' stipulation, that 1) the making, offering to sell, importation or sale in the

United States of the rasagiline tablets that are the subject of Mylan's Abbreviated New Drug

Application ("ANDA") No. 201971 for use in the treatment of Parkinson's disease would

actively induce and contribute to the infringement of claims 1, 2, 17, 18 and 19 of the '446 patent

(ECF No. 503), 2) that Mylan's counterclaim and affirmative defense that the '446 patent is

unenforceable for inequitable conduct are dismissed with prejudice (ECF No. 503), and 3) that

each party's claim that this is an exceptional case under 35 U.S.C. § 285 is dismissed with

prejudice as against all other parties (ECF No. 503), and having conducted a non-jury trial from

May 15 to May 23, 2013, and, for the reasons set forth in the Court's Opinion dated September

20, 2013,

IT IS this ___13___ day of December 2013,

1.  ORDERED AND ADJUDGED that FINAL JUDGMENT IS ENTERED IN FAVOR OF

    TEVA and AGAINST MYLAN that Mylan's making, offering to sell, selling, or

    importing Mylan's ANDA product that is the subject of ANDA No. 201971 for use in the

    treatment of Parkinson's disease would actively induce and contribute to the infringement

    of claims 1, 2, 17, 18 and 19 of the '446 patent and that Mylan's submission of ANDA

    No. 201971 is an act of infringement of claims 1, 2, 17, 18 and 19 of the '446 patent

    pursuant to 35 U.S.C. § 271(e)(2)(A);

2.  IT IS FURTHER ORDERED AND ADJUDGED that FINAL JUDGMENT IS

    ENTERED IN FAVOR OF TEVA and AGAINST MYLAN with respect to Mylan's

    counterclaims seeking declaratory judgments of non-infringement and invalidity of

    claims 1, 2, 17, 18 and 19 of the '446 patent. All such counterclaims are DISMISSED

    WITH PREJUDICE, and IT IS DECLARED that each of the asserted claims is valid and

infringed by Mylan;

3.  IT IS FURTHER ORDERED that costs are allowed to Teva, as the prevailing party, pursuant to Rule 54(d), Fed. R. Civ. P;

4.  IT IS FURTHER ORDERED, pursuant to 35 U.S.C. § 271(e)(4)(A), that the effective date of any final approval by the U.S. Food and Drug Administration ("FDA") of Mylan's ANDA No. 201971 shall be a date which is not earlier than the expiration of the '446 patent on February 7, 2017, or, to the extent the FDA determines that a pediatric exclusivity is applicable, the date any such exclusivity ends, but that Teva will provide written notice to Mylan of such grant of pediatric exclusivity within five (5) days of receiving such an award of exclusivity from the FDA;

5.  IT IS FURTHER ORDERED that, pursuant to 35 U.S.C. § 271(e)(4)(B), the Mylan defendants, and each of their officers, agents, attorneys, employees, successors, affiliates and assigns, and all persons acting in active concert or participating with any of them, are permanently restrained and enjoined from directly or indirectly engaging in the offer to sell or selling within the United States of Mylan's ANDA product that is the subject of ANDA No. 201971 for the treatment of Parkinson's disease until after the expiration of the '446 patent on February 7, 2017;

6.  IT IS FURTHER ORDERED that nothing in this FINAL JUDGMENT ORDER shall be construed to limit the rights of the parties pursuant to 35 U.S.C. § 271(e)(1) and (e)(3); and

7.  IT IS FURTHER ORDERED that Mylan does not waive any rights to appeal any portion of this final judgment including the injunctive relief granted, to the extent the Court's findings or holdings are modified on appeal.

8. THIS FINAL JUDGMENT supersedes the interim order under 35 U.S.C. § 271(e)(4)(A)

   (ECF No. 548).

_____

Honorable Claire C. Cecchi, U.S.D.J.

4

Addendum 2

**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **TEVA NEUROSCIENCE, INC., TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICALS INDUSTRIES, LTD.,** : | | **Civil Action No. 2:10-cv-05078** |
| **Plaintiffs,** : | | |
| **v.** : | | **Opinion** |
| **WATSON LABORATORIES, INC., MYLAN PHARMACEUTICALS, INC., MYLAN INC., ORCHID CHEMICALS & PHARMACEUTICALS LTD., ORCHID HEALTHCARE (a division of Orchid Chemicals & Pharmaceuticals Ltd.) and ORGENUS PHARMA INC.** : | | |
| **Defendants.** : | | |
| **TEVA NEUROSCIENCE, INC., TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICALS INDUSTRIES, LTD.,** : | | **Civil Action No. 2:11-cv-3076** |
| **Plaintiffs,** : | | |
| **v.** : | | |
| **APOTEX CORP. and APOTEX INC.** : | | |
| **Defendants.** : | | |

**Claire C. Cecchi, U.S.D.J.**

This matter comes before the Court by complaint of Teva Neuroscience, Inc., Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries, Ltd. (collectively, "Teva") against Mylan[1] and certain other defendants.[2] This case concerns the validity of United States Patent No. 5,453,446 ("the '446 Patent"), which is directed to a method of treating Parkinson's disease. This Court conducted a non-jury trial in this matter from May 15-31, 2013. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons stated herein, a finding in favor of Teva will be entered.

## BACKGROUND

### I.   The Parties

Plaintiff Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is an Israeli company with its principal place of business at 5 Basel Street, Petach Ti.Kva, 49131, Israel. (Joint Pretrial Order, Stipulation of Facts ("SOF") ¶ 20.) Teva Ltd. is the sole owner of the '446 Patent. (Id.) Plaintiff Teva Neuroscience, Inc. ("Teva Neuroscience") is a Delaware corporation with its principal place of business at 901 E. 104th Street, Suite 900, Kansas City, Missouri 64131. (Id. ¶ 21.) Teva Neuroscience is a wholly-owned subsidiary of Teva Ltd. (Id.) Plaintiff Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of

---

[1] "Mylan" consists of Mylan Pharmaceuticals, Inc., Mylan Inc. and Mylan LLC.

[2] These defendants included "Orchid," consisting of Orchid Chemicals & Pharmaceuticals Ltd., Orchid Healthcare (a division of Orchid Chemicals & Pharmaceuticals Ltd.), and Orgenus Pharma, Inc., "Watson," consisting of Watson Pharma and Watson Laboratories, Inc., and "Apotex," consisting of Apotex Corp. and Apotex Inc. Orchid, Watson and Apotex settled with Teva prior to the start of trial.

business at 1090 Horsham Road, North Wales, Pennsylvania 19454.  (Id. ¶ 22.)  Teva USA is a wholly-owned subsidiary of Teva Ltd.  (Id.)

Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1500 Corporate Drive, Canonsburg, Pennsylvania 15317.  (Id. ¶ 29.)  Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.  (Id. ¶ 30.)  Mylan Pharmaceuticals is a wholly-owned subsidiary of Mylan.  (Id. ¶ 31.)

## II.   The '446 Patent

The '446 Patent, entitled "Use of the R-Enantiomers of N-Propargyl 1-Aminoindan Compounds for Treating Parkinson's Disease," was issued by the United States Patent and Trademark Office (the "PTO") on September 26, 1995.  (Id. ¶¶ 38-40.)

Moussa B.H. Youdim, John P. M. Finberg, Ruth Levy, Jeffrey Sterling, David Lerner, Tirtsah Berger-Paskin and Haim Yellin are the inventors listed on the face of the '446 Patent. (Id. ¶ 42.)  The named inventors assigned the '446 Patent to Teva Ltd. and the Technion Research and Development Foundation Ltd. ("Technion").  Technion subsequently assigned its rights to the '446 Patent to Teva Ltd.  (Id. ¶¶ 45-46.)

The '446 Patent issued from Application No. 255,046 ("the '046 Application"), filed on June 7, 1994.  (Id. ¶ 43.)  The '046 Application is a continuation of Application No. 63,455 ("the '455 Application"), which was filed on May 18, 1993, and which issued as Patent No. 5,387,612 ("the '612 Patent") on February 7, 1995.[3]  The '455 Application is a continuation of Application

---

[3] The '612 Patent claims the use of R(+)-PAI as monotherapy to treat Parkinson's disease.  (PTX 332.)

No. 632,184 ("the '184 Application"), which was filed on December 21, 1990, and which claims

priority to Israel Application No. 92952, filed January 3, 1990. (Id. ¶¶ 43-44.) The applicants

submitted a terminal disclaimer for the '046 Application over the '612 Patent on February 28,

1995. (Id. ¶ 62.) The '446 Patent issued from the '046 Application on September 26, 1995. (Id.

¶¶ 62-63.) The '446 Patent expires on February 12, 2017. (Id. ¶ 41.)

Teva is asserting Claims 1, 2, 17, 18, and 19 of the '446 Patent in this litigation. (Id. ¶

47.) The asserted claims read as follows:

| Claim 1 | A method of treating a subject for Parkinson's disease which comprises administering to the subject an amount of R(+)-N-propargyl-1-aminoindan or a pharmaceutically acceptable salt thereof effective to treat the subject. |
| Claim 2 | The method of claim 1, wherein the R(+)-N-propargyl-1-aminoindan or a pharmaceutically acceptable salt thereof is administered orally. |
| Claim 17 | The method of claim 1 which further comprises administering to the subject Levodopa in an amount relative to the amount of R(+)-N-propargyl-1-aminoindan or a pharmaceutically acceptable salt thereof effective to treat the subject. |
| Claim 18 | The method of claim 1 which further comprises administering to the subject a decarboxylase inhibitor in an amount effective to ensure L-dopa uptake. |
| Claim 19 | The method of claim 18, wherein the decarboxylase inhibitor is Carbidopa. |

R(+)-N-propargyl-1-aminoindan is referred to herein as "R(+)-PAI." In 1994, the name

rasagiline was adopted for R(+)-PAI. (Id. ¶¶ 47-49.)

R(+)-PAI is the R(+) enantiomer of N-propargyl-1-aminoindan.[4] (Tr. 61:5-14 (Ruffolo).)

R(+)PAI has a chiral center (Tr. 63:25-64:3 (Ruffolo)), meaning that it contains a carbon atom

that has four different groups of atoms attached to it. (Tr. 64:6-7 (Ruffolo).) "Molecules that

have the same chemical substituents, but different spatial arrangements, are referred to as

stereoisomers." Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1372 (Fed. Cir. 2006).

---

[4] N-propargyl-1-aminoindan is also referred to as racemic PAI or AGN 1135.

"Enantiomers are a pair of stereoisomers that are non-superimposable mirror images of each other." Pfizer, Inc. v. Ranbaxy Labs. Ltd., 457 F.3d 1284, 1286 (Fed. Cir. 2006). This characteristic is "often likened to the relative structures of a person's right and left hands." Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc., 348 F. Supp. 2d 713, 720 (N.D.W.Va. 2004). Enantiomers are capable of rotating plane-polarized light. Enantiomers that rotate polarized light to the right are referred to as (+), and enantiomers that rotate polarized light to the left are referred to as (-). Id. at 720-21; Sanofi-Synthelabo, 470 F.3d at 1372. Enantiomers are also sometimes designated d- (dextrorotatory or right rotating) or l- (levorotatory or left rotating), again referring to the direction of optical rotation. Id. A racemate, or a racemic compound, is a 50/50 mixture of two mirror image enantiomers. (Tr. 65:17-18 (Ruffolo).) A racemic compound does not rotate light. (Tr. 65:19-25; 65:18-66:1 (Ruffolo).)

"Chemists also distinguish between enantiomers by designating an enantiomer as either 'R' or 'S' based upon the arrangement of certain atoms at the enantiomer's 'chiral center.' Where one enantiomer is an 'R,' the other will be an 'S.'" Ortho-McNeil, 348 F. Supp. 2d at 720- 21. In other words, the R and S enantiomer naming system simply allows scientists to distinguish and refer to enantiomers based on the orientation of groups of atoms around the chiral center. (Tr. 67:25-68:3; 68:1-4 (Ruffolo).)

In sum, the R(+)-PAI that is the subject of the '446 Patent is the enantiomer of the racemic compound PAI that has the R absolute configuration and that rotates light in the clockwise (+) direction. (Tr. 68:4-8 (Ruffolo).)

## III. FDA Approval

Teva developed, applied for and obtained approval to make, sell, promote and/or market

Azilect®, a rasagiline mesylate tablet product. (SOF ¶ 64.) Azilect® was approved by the FDA and is indicated for the treatment of the signs and symptoms of idiopathic Parkinson's disease as both an initial monotherapy and also as an adjunct therapy to levodopa ("L-DOPA"). (SOF ¶¶ 64.)

Teva Ltd. is listed as the holder of New Drug Application ("NDA") No. 02-1641, under Section 505(a) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(a), for 0.5 and 1.0 mg Azilect® tablets. (Id. ¶¶ 20, 65-66.) Teva Neuroscience is Teva Ltd.'s authorized U.S. agent for NDA No. 02-1641. (Id. ¶ 21.)[5] Teva Neuroscience and Teva USA have been selling, promoting, distributing and marketing Azilect® in the U.S. since July 2006. (Id. ¶ 68.) In 2006, the FDA granted New Chemical Entity exclusivity to Azilect®, which expired in May 2011. (Id. ¶¶ 51-52.)

Mylan filed an Abbreviated New Drug Application ("ANDA"), under 21 U.S.C. § 355(j), seeking FDA approval to market generic rasagiline mesylate tablets in .5 and 1.0 mg dosage strengths (the "generic tablets"). (See id. ¶¶ 76-78.) The generic tablets contain the active ingredient R(+)-PAI as the mesylate salt, and the draft labeling states that the products "are indicated for the treatment of the signs and symptoms of idiopathic Parkinson's disease as initial monotherapy and as adjunct therapy to levodopa." (See id. ¶¶ 98-100.)

Mylan's ANDA also contains a paragraph IV certification, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), alleging that the claims of the '446 Patent are invalid, unenforceable and/or would not be infringed by the manufacture, use, importation, sale or offer for sale of the

---

[5] Teva listed the '446 Patent in the U.S. Food and Drug Administration ("FDA") publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange

generic tablets described in the ANDA.  (Id. ¶ 79.)

## IV.  Procedural History

On October 1, 2010, Teva filed suit against Mylan for infringement of the '446 Patent based on Mylan's submission of its ANDA.  Mylan asserted counterclaims of non-infringement, invalidity and unenforceability of the '446 Patent.  Prior to trial, Mylan stipulated that its use, offer to sell, importation, or sale of the proposed generic product described in its ANDA would directly infringe and/or actively induce and contribute to the infringement of Claims 1, 2, 17, 18 and 19 of the '446 Patent. (Stipulation and Order dismissing certain counterclaims and affirmative defenses, ECF No. 503.)  Mylan also agreed to dismiss with prejudice its defense and counterclaim that the '446 Patent is unenforceable due to inequitable conduct.  (Id.)  Teva and Mylan both stipulated to dismiss with prejudice their claims that this is an exceptional case under 35 U.S.C. § 285.  (Id.)  Thus, the only remaining issue for trial was the validity of the '446 Patent.

## V.  Trial Experts

At trial, this Court heard testimony from a number of expert witnesses provided by Mylan and Teva.

### A.  Teva's Expert Witnesses

Teva presented the following witnesses at trial:

Dr. Robert Ruffolo has a Ph.D. in pharmacology and is the retired President of Research and Development and Corporate Senior Vice President for Wyeth Pharmaceuticals, now a part of Pfizer. (Tr. 40:16-17; 40:6-8 (Ruffolo).)  Dr. Ruffolo is an expert in the fields of pharmacology,

_____

Book") as covering Azilect®.  (Id. ¶ 50.)

7

stereochemistry, and drug discovery and development, and was personally involved in the development and discovery of over two dozen new drugs, including drugs to treat Parkinson's disease. (Tr. 40:4-6; 41:12-15 (Ruffolo).)

Professor Moussa Youdim is the first named inventor on the '446 Patent. (PTX 1.) Professor Youdim is a Distinguished Scientific Professor in the Department of Neurobiology at Yonsei University and a Professor Emeritus and Director of the Eve Topf Center of Excellence for Neurodegenerative Diseases at the Technion Israel Institute of Technology. (Tr. 81:18-21; 82:23-83:1; 82:16 (Youdim).)

Dr. Ruth Levy is a named inventor on the '446 Patent and a current employee of Teva. (Tr. 147:15-18; 147:24-25 (Levy).) Dr. Levy was the project leader for the development of Azilect® at Teva. (Tr. 148:23-149:10 (Levy).)

Dr. Peter Jenner has a Ph.D. in pharmacy and is an Emeritus Professor of Pharmacology at Kings College in London. (Tr. 635:17-19; 635:9-11 (Jenner).) For almost forty years, Dr. Jenner has studied, researched, taught, worked, and managed in the field of Parkinson's disease. (Tr. 635:11-13 (Jenner).)

Dr. Claire Henchcliffe has a Doctor of Philosophy degree from Oxford University, an M.D. from Columbia University and is a board-certified neurologist. (Tr. 1080:9-23 (Henchcliffe).) Dr. Henchcliffe is an Associate Professor in the Division of Movement Disorders, Department of Neurology and Neuroscience, at the Weill Medical College at Cornell University in New York City. She is also a Director of the Weill Cornell Parkinson's Disease and Movement Disorders Institute and an attending physician at the Weill Cornell Medical Center. (Tr. 1080:3-8 (Henchcliffe).)

8

Professor Jerry Hausman has a Doctor of Philosophy degree from Oxford University and is the McDonald Professor of Economics at the Massachusetts Institute of Technology. (Tr. 1208:8-15 (Hausman).)

**B. Mylan's Expert Witnesses**

Mylan presented the following witnesses at trial:

Dr. Neal Castagnoli is the Emeritus Peters Professor of Chemistry at Virginia Polytechnic Institute and State University ("Virginia Tech"). (DTX 1519; Tr. 267:1-5 (Castagnoli).) He is the former Co-Director of the Harvey W. Peters Research Center for the Study of Parkinson's Disease and Disorders of the Central Nervous System at Virginia Tech. (Tr. 267:1-5; 267:6-9 (Castagnoli).) Dr. Castagnoli earned his Ph.D. in Chemistry, his M.S. in Endocrinology and his B.S. in Chemistry from the University of California at Berkeley. (Tr. 267:17-21 (Castagnoli).) After graduating, he joined the University of California, San Francisco School of Pharmacy, where he was a Professor from 1966 until 1988. (Tr. 267:6-11; 267:23-268:3; 268:8-9 (Castagnoli).) From 1985 until 1988, Dr. Castagnoli was the Chairman of the Division of Toxicology at the UCSF School of Pharmacy. (DTX 1519.) Dr. Castagnoli's research activities have been focused on the molecular mechanisms of the MAO enzyme, including the role of MAO-B inhibitors in Parkinson's Disease. (Tr. 265:17-23 Castagnoli).)

Dr. Peter LeWitt is a Board-certified neurologist. (DTX 1467; Tr. 467:7 (LeWitt).) He currently serves as the Director of the Parkinson's Disease and Movement Disorders Program of the Henry Ford Health System. (Tr. 467:7-8; 468:7-10 (LeWitt).) He is also a full-time affiliate Professor of Neurology at Wayne State University, School of Medicine. (DTX 1467.) Prior to joining Henry Ford, Dr. LeWitt was the Associate Professor of Neurology at Wayne State

9

University School of Medicine (1984-1989), the Interim Chairman of Neurology at William Beaumont Hospital, Royal Oak, Michigan (2005-2006), the Director of the Clinical Neurosciences Center (2000-2006), and the Director of the Clinical Neuroscience Program at Sinai Hospital in Detroit (1988-1998). (DTX 1467; Tr. 469:21-24 (LeWitt).) Dr. LeWitt has more than 32 years of experience treating patients suffering from Parkinson's disease. (Tr. 470:1-2 (LeWitt).)

## VI.    **Parkinson's Disease and Treatments**

Parkinson's disease is a degenerative disease of the brain that results in motor movement disturbances. (Tr. 48:11-14 (Ruffolo).) It is characterized by symptoms such as uncontrollable tremors, muscle stiffness, gait problems, and at later stages, akinesia or the inability to move. (Tr. 48:11-14; 49:15-21 (Ruffolo).) Dopamine is one of the neurotransmitters in the brain that transmits signals necessary for the control of muscle movement. (Tr. 53:2-6 (Ruffolo).) The movement problems typically seen in Parkinson's disease are a result of the death of dopamine-producing neurons in the brain. (Tr. 52:17-53:2 (Ruffolo).) Reduced levels of dopamine in the brain are also responsible for the motor symptoms associated with Parkinson's disease. (Tr. 53:6-15 (Ruffolo).)

The Court's validity analysis must take into account the state of the relevant art in the treatment of Parkinson's disease as of January 3, 1990, the priority date of the '446 Patent. In early 1990 – and as of today – the most widely used treatment for Parkinson's disease was levodopa or L-DOPA. (Tr. 53:21-25; 54:13-18 (Ruffolo).) L-DOPA is a dopamine precursor, which means that it is converted into dopamine in the brain. (Tr. 54:20-23 (Ruffolo).) As such, L-DOPA helps relieve the symptoms of Parkinson's disease by replacing the dopamine that is

10

reduced in the brains of Parkinson's disease patients.[6]  (Id.)

However, several problems are associated with L-DOPA treatment.  (Tr. 55:14-16; 1092:12-21 (Ruffolo).)  First, because L-DOPA is not a potent drug, very high doses of the drug are required.  (Tr. 55:21-56:6 (Ruffolo).)  As a result, patients taking L-DOPA must take several capsules at a time, up to six times a day.  (Tr. 55:20-56:7 (Ruffolo).)  This may be problematic for elderly patients.  (Tr. 56:3-8 (Ruffolo).)  Second, L-DOPA is also short-acting and somewhat unpredictable in terms of patient response.  (Tr. 56:11-14 (Ruffolo).)  This may make it difficult for physicians to determine a precise dose for their patients.  (Id.)  Third, L-DOPA therapy may cause side-effects such as nausea and vomiting.  (Tr. 56:17-21 (Ruffolo).)  Finally, and most importantly, after about two to five years of L-DOPA therapy, problems known as dyskinesias and the "on/off" phenomenon occur in patients.  (Tr. 56:25-57:6 (Ruffolo); 1096:21-1097:16 (Henchcliffe).)  Dyskinesias are involuntary and disabling muscle movements such as swaying back and forth and flailing of the arms.  (Tr. 56:25-57:16 (Ruffolo).)  The "on/off" phenomenon is a decreased response to L-DOPA therapy over time.  (Tr. 56:22-57:6 (Ruffolo).)  Specifically, during "on" times, a patient's symptoms are controlled, while during "off" times, they are not. (Tr. 1096:21-1097:16 (Henchcliffe).)

As discussed in more detail below, other relevant Parkinson's disease treatments in the late 1980s and early 1990 included dopamine agonists, pro-drugs of L-DOPA, Catechol-O-methyltransferase ("COMT") inhibitors and MAO-B inhibitors.

---

[6] Dopamine cannot be administered directly to Parkinson's disease patients because it does not cross the blood-brain barrier and thus cannot penetrate the brain.  (Tr. 55:1-9 (Ruffolo).)  In contrast, L-DOPA crosses the blood-brain barrier, where it is then converted to dopamine.  (Tr. 55:11-13 (Ruffolo).)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having received documentary and testimonial evidence from the parties' experts, as well as substantial briefing on the various issues presented in this matter, the Court issues this Opinion which constitutes its findings of fact and conclusions of law with respect to the validity of the '446 Patent.[7]

## OBVIOUSNESS

Mylan asserts that the '446 Patent is invalid for obviousness. Mylan argues that based on both the prior art knowledge regarding racemic PAI (AGN 1135) and the success of another similar MAO-B inhibitor in the treatment of Parkinson's disease, Teva developed the '446 Patent "through the predicable application of routine steps, none of which were inventive, rendering the patent invalid as obvious." (Mylan's Post-Trial Brief, Docket No. 525, ("MPTB"), 1.) Teva responds that the method claimed in the '446 Patent is not obvious because Mylan has not proven by clear and convincing evidence that: 1) in 1990, a POSA would have selected AGN 1135 as a lead compound for a new drug to treat Parkinson's disease; 2) in 1990, a POSA would have been motivated to combine the prior art references to obtain R(+)-PAI with a reasonable expectation of success; or 3) that the invention of the '446 Patent was obvious to try. Teva additionally argues that the objective evidence further demonstrates that the method claimed in the '446 Patent was not obvious.

### I.   Applicable Law

Under 35 U.S.C. § 103(a), a party may not obtain a patent "if the differences between the

---

[7] Although Teva argues that the '446 Patent is not anticipated, Mylan did not focus on any argument regarding anticipation in its post-trial briefs. Mylan has not shown that the '037 Patent

12

subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." An issued patent is presumed valid, however, and "included within the presumption of validity is . . . a presumption of nonobviousness." Structural Rubber Prods. Co. v. Park Rubber Co., 749 F.2d 707, 714 (Fed. Cir. 1984).

"A party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." Procter & Gamble Co. v. Teva Pharms. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009) (internal quotation omitted). An invention may also be found obvious when it would have been "obvious to try"— i.e., "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 421 (2007); Eisai Co. v. Dr. Reddy's Labs., Ltd., 533 F.3d 1353, 1359 (Fed. Cir. 2008).

The Supreme Court has enumerated four factors to be considered by courts to determine whether an invention is obvious. Takeda v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)). These four factors are: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations, or "objective indicia of non-obviousness." Id.; see also KSR, 550 U.S. at 405.

---

or any other prior art anticipates the '446 Patent.

13

The "objective indicia" of non-obviousness include, but are not limited to: meeting a long-felt need, the inventors' success despite the failure of others, commercial success, copying, praise and recognition for the invention, unexpected results, and significant effort and serendipity. See Ruiz v. A.B. Chance Co., 234 F.3d 654, 660-62 (Fed. Cir. 2000); see also Procter & Gamble, 566 F.3d at 994 (Fed. Cir. 2009). A court must make findings of fact and conclusions of law as to each of these Graham factors.

## II.    Scope and Content of the Prior Art

This Court will first define the scope and content of the prior art. As stated above, the relevant scope and content of the prior art is to be assessed as of the January 3, 1990 priority date of the '446 Patent. (PTX 1.)

### A.    Scope – Generally

As an initial matter, the parties contest the scope of the relevant art. Mylan argues that the relevant prior art should be limited to the "extensive study of the both the laboratory and therapeutic uses of MAO-B inhibitors, including (-) deprenyl and racemic PAI, extensive literature on the reasons to separate and evaluate racemic mixtures, including FDA guidelines, and the extensive literature as to the techniques to separate racemic compounds generally and racemic PAI specifically." (Mylan's Proposed Findings of Fact ("MPFF") ¶ 97.) Because Mylan views the problem to be overcome by the '446 Patent as "finding an MAO-B inhibitor that improved on the properties of (-) deprenyl, specifically by removing (-) deprenyl's amphetamine metabolite," (MPFF ¶ 106), Mylan argues that other classes of compounds that were being developed for Parkinson's disease in 1990 are not analogous art. (MPFF ¶¶ 108-113). In response, Teva posits that the scope of the analogous prior art includes all new chemical

14

compounds that were being investigated as possible treatments for Parkinson's disease.  (Teva's Proposed Findings of Fact ("TPFF") ¶¶ 136-137.)  Teva further argues that limiting the scope of the relevant art to only MAO-B inhibitors, as Mylan suggests, would reflect improper hindsight bias.

The Court agrees with Teva.  In determining the scope and content of the prior art, the court must consider "the prior art as a whole."  Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1567 n.37, 1568 (Fed. Cir. 1987).  As such, courts must construe the scope of analogous prior art broadly.  Wyers v. Master Lock Co., 616 F.3d 1231, 1238 (Fed. Cir. 2010) (citing KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 402 (2007)).

Further, "[a] reference qualifies as prior art for a determination under § 103 when it is analogous to the claimed invention."   Innovention Toys, LLC v. MGA Entm't, Inc., 637 F.3d 1314, 1321 (Fed. Cir. 2011) (citation omitted).   "Two separate tests define the scope of analogous art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved."  Id. (citing In re Bigio, 381 F.3d 1320, 1325 (Fed. Cir. 2004)).  "A reference is reasonably pertinent if . . . it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem."   Id. (citation omitted).   Therefore, "[i]f a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection."   Id.  Whether a prior art reference is "analogous" is a question of fact.  Id.

Here, the invention is directed to a method of treating Parkinson's disease. (PTX 1, Claim 1) ("A method of treating a subject for Parkinson's disease which compromises administering to the subject an amount of . . .") As such, the prior art encompasses any and all references concerning possible new treatments for Parkinson's disease. See Daiichi Sankyo Co., Ltd. v. Apotex, Inc., 501 F.3d 1254 (Fed. Cir. 2007) (explaining that with regard to a patent drawn to a method for treating bacterial ear infections by administering an antibiotic to the ear, the prior art related broadly to the creation of a compound to treat ear infections without damaging a patient's hearing); Eli Lilly & Co. v. Actavis Elizabeth LLC, 731 F. Supp. 2d 348, 357-364 (D.N.J. 2010), rev'd in part on other grounds, 435 F. App'x. 917 (Fed. Cir. 2011), (explaining that for a patent claiming a method of treating attention-deficit/hyperactivity disorder, the scope of the prior art included all four of the main classes of drugs that were being used to treat ADHD before the priority date of the patent).

Further, to limit the prior art to only MAO-B inhibitors, the particular solution that the patentees devised to address the problem of treating Parkinson's disease, is to engage in improper hindsight reasoning. See Ecolochem, Inc. v. Southern California Edison Co., 227 F.3d 1361, 1372 (Fed. Cir. 2000) (clarifying that "defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness"); AstraZeneca Pharms. LP v. Anchen Pharms., Inc., No. 10-cv-1835, 2012 U.S. Dist. LEXIS 43989, at *55 (D.N.J. Mar. 28, 2012) (explaining that "the Federal Circuit has admonished against the use of the claimed invention to define the prior art" because "[b]y importing the ultimate solution into the problem facing the inventor, the district court adopt[s] an overly narrow view of the scope of the prior art"). As such, the Court finds that the scope of the analogous prior art includes all drug

16

compounds that were being investigated for possible use to treat Parkinson's disease as of 1990. Specifically, these compounds included dopamine agonists, L-DOPA pro-drugs, COMT inhibitors and MAO-B inhibitors. The Court will now examine each in turn.

B.    Dopamine Agonists

At trial, Teva presented evidence from Dr. Jenner indicating that dopamine agonists were a primary focus of research and development activity in 1990 by those seeking to discover a new drug to treat Parkinson's disease. (Tr. 645:4-7 (Jenner).)  Dr. Jenner testified that researchers were interested in dopamine agonists because these compounds directly stimulate dopamine receptors and therefore were thought to offer the most direct way to transmit the electrical signals necessary for the control of motor movement.  (Tr. 645:8-16 (Jenner).)  Dr. Ruffolo further explained that dopamine agonists will continue to work even as the dopaminergic neurons in the brain are dying.  (Tr. 58:15-19 (Ruffolo).)

Dr. Jenner and Dr. Henchcliffe both testified that there were two dopamine agonists approved for use in the United States prior to 1990 – bromocriptine and pergolide – both of which caused side effects (Tr. 648:23-649:10 (Jenner); 1104:20-1105:4 (Henchcliffe)) based on the fact that these compounds were derivatives of the ergot fungus.  (Tr. 649:13-650:11 (Jenner).)  As such, Dr. Jenner testified that a POSA in 1990 would have been motivated either to modify the known ergot derivative dopamine agonist compounds in an effort to reduce their side effects or to look for non-ergot derivative compounds that also functioned as dopamine receptor agonists.  (Tr. 650:12-25 (Jenner).)

Finally, Dr. Jenner testified that several pharmaceutical companies were investigating dopamine agonists in the late 1980s, including Sandoz, Eli Lilly, Schering A.G., Merck Sharp &

17

Dohme, Smith Kline & French, Roussel UCLAF, and Lundbeck & Co. (Tr. 648:13-22 (Jenner)), and that these pharmaceutical companies were investigating both modifications to ergot derivative dopamine agonists and non-ergot derivative dopamine agonists as possible new treatments for Parkinson's disease. (Tr. 650:1-2; 651:1-5; 653:2-7; 17-21 (Jenner); PTX 44; PTX 54; PTX 66; PTX 124; PTX 125; PTX 126; PTX 133; PTX 149; PTX 153; PTX 155; PTX 157; PTX 159; PTX 161; PTX 167; PTX 170; PTX 171; PTX 173; PTX 174; PTX 184.)

According to Dr. Jenner, at least five of the dopamine agonists that were being investigated in the late 1980s were subsequently approved for use in the treatment of Parkinson's disease, including cabergoline, ropinerole, pramipexole, apormorphine and rotigotine. (Tr. 657:7-13 (Jenner).)[8]

C.    Pro-drugs of L-DOPA

Pro-drugs of L-DOPA are also included within the scope of the relevant prior art. At trial, Dr. Jenner testified that, as of 1990, pro-drugs of L-DOPA offered potential as new drugs to treat Parkinson's disease. (Tr. 672:19-25 (Jenner).) As explained above, L-DOPA is converted into dopamine in the brain. However, L-DOPA has a short duration of effect and produces unwanted side effects. (Tr. 55:13-56:21 (Ruffolo).)

Dr. Ruffolo explained that a pro-drug is a derivative of L-DOPA that is first converted to L-DOPA before being transformed to dopamine in the brain. (Tr. 58:20-25 (Ruffolo).) Dr. Jenner testified that L-DOPA pro-drugs were of interest because, when effective, they exhibit

---

[8] The Court takes into consideration Mylan's argument that several of the dopamine agonists cited by Dr. Jenner were also reported to have orthostatic hypotension as a side effect.

18

increased bioavailiabity and brain penetration, thus allowing more L-DOPA to reach the brain. (Tr. 673:1-17 (Jenner).)   Dr. Ruffolo further testified that these pro-drugs can increase the duration of action of L-DOPA and therefore result in a more even exposure of the patient to L-DOPA.  (Tr. 58:20-59:1 (Ruffolo); 673:13-23 (Jenner).) Finally, Dr. Jenner testified regarding the pharmaceutical companies that were investigating pro-drugs of L-DOPA as of 1990.  (Tr. 674:22-675:5 (Jenner).)  He explained that Merck Sharp & Dohme developed a L-DOPA pro-drug, MB-355, which was reported in 1989 to have a prolonged duration of effect, thereby allowing a reduction in the number of daily doses of L-DOPA while also producing a more even patient response.  (Tr. 675:6-23 (Jenner); PTX 183.)  Additionally, Chiesi was marketing a L-DOPA pro-drug in Europe at that time.  (Tr. 678:16-21 (Jenner).)

     D.    <u>COMT Inhibitors</u>

     Catechol-O-methyltransferase ("COMT") inhibitors are also part of the relevant prior art. At trial, Dr. Jenner testified that COMT inhibitors were being actively investigated as drugs to treat Parkinson's disease as of 1990.  (Tr. 679:14-22 (Jenner).)  As Dr. Ruffolo explained, COMT is an enzyme that metabolizes L-DOPA before it reaches the brain and thus inactivates L-DOPA.  (Tr. 59:2-8 (Ruffolo).)  If the COMT enzyme is inhibited, more L-DOPA reaches the brain.  (Tr. 59:2-8 (Ruffolo); 679:24-680:22 (Jenner).)  Dr. Jenner testified that, in the late 1980s, there was particular interest in a new class of COMT inhibitors – 3-nitrocatechols – that were considered more selective than prior art COMT inhibitors.  (Tr. 681:5-18 (Jenner).)  Further, Dr. Jenner stated that at least two pharmaceutical companies, Hoffman-LaRoche and Orion, were actively investigating three different COMT inhibitors, entacapone, nitecapone and tolcapone, in

this new class. (Tr. 681:19-682:20 (Jenner); PTX 129; PTX 162; PTX 163.) Tolcapone and entacapone were subsequently approved for use in many countries. (Tr. 683:19-21 (Jenner).)

E.    MAO-B Inhibitors

The final class of compounds included within the scope of the relevant prior art are MAO-B inhibitors. By 1990, it was known that the MAO enzyme, which exists in two different forms, MAO-A and MAO-B, was involved in the metabolism of dopamine. (Tr. 59:11-15 (Ruffolo).) Specifically, it was known that the MAO-B enzyme binds with dopamine and renders it inactive. (Tr. 59:25-60:21; PTX 6001 at P-demo-RR-15-17.) By inactivating dopamine, the MAO-B enzyme decreases dopamine levels in the brain, which results in an increase in the symptoms of Parkinson's disease. (Tr. 52:17-53:14 (Ruffolo).) MAO-B inhibitors treat the symptoms of Parkinson's disease by preventing the MAO-B enzyme from inactivating dopamine. (Tr. 59:12-15; 59:25-60:212 .)

Two MAO-B inhibitors are relevant to this action – (-) deprenyl and AGN 1135 (or racemic PAI). Both deprenyl and AGN 1135 are chiral structures, meaning they consist of two enantiomers, as described in detail above. (Tr. 63:25-64:2; 64:3-15 (Ruffolo); 295:14-296:15 (Castagnoli); DTX 1004 at 377.) MAO-B enzymes are also chiral in nature. (Tr. 281:21-283:9.) Because of the chirality of the MAO-B enzyme and MAO-B inhibitors, each enantiomer of an MAO-B inhibitor is expected to bind to the MAO-B enzyme in a different manner. (Tr. 281:21-283:9 (Castagnoli).)

1.    (-) Deprenyl

The racemic compound deprenyl was first developed in 1966 by Dr. Joseph Knoll. (DTX 1004 (Knoll 1967).) Subsequently, Dr. Knoll and his colleagues investigated the enantiomers of

racemic deprenyl and established that the (-) deprenyl enantiomer[9] was 500 times more potent than (+) deprenyl in its inhibition of MAO.  (DTX 1004 at 384).  In 1985, it was noted that (-) deprenyl had the "R" absolute configuration and that (-) deprenyl was highly selective for MAO-B rather than MAO-A. (DTX 1065 at 4107, Table 1; Tr. 292:16-293:12, 327:9-22 (Castagnoli).)  The prior art also taught that (-) deprenyl was known not to cause the "cheese effect."  (DTX 1043 at 387.)  The cheese effect is a sudden rise in blood pressure which occurs when foods high in tyramine, such as aged cheeses or red wine, are consumed when a MAO inhibitor is also in the body.  This sudden spike in blood pressure can lead to a stroke, which can be fatal.   (Tr. 701:20-702:3 (Jenner); 270:20-271:1 (Castagnoli).)  Prior to 1990, it was discovered that that the cheese effect resulted from the inhibition of MAO-A, the form of the enzyme responsible for the metabolism of tyramine in the gut.  (DTX-1043 at 388.)

Clinical studies in 1989 indicated that (-) deprenyl was a safe drug in patients with early, untreated Parkinson's disease, that early (-) deprenyl therapy delayed the need for treatment with L-DOPA, and that (-) deprenyl appeared to slow the rate of progression of Parkinson's disease.  (DTX 1142 at 521; PTX 655.)  Finally, it was established by 1990 that MAO-B inhibitors such as (-) deprenyl were effective in the MPTP model, which offered a prospect of neuroprotection.  (DTX 1066;  DTX 1043;  DTX 1074.)    MPTP refers to  1-Methyl-4-phenyl-1,2,3,6-tetrahydropyridine, a neurotoxin that produces a parkinsonian-like syndrome in humans.  The FDA approved (-) deprenyl in 1989.  (See Tr. 308:2-8; 328:5-10 (Castagnoli); see also DTX 1317 (2008 version of deprenyl label).)

_____

[9] (-) deprenyl is also referred to as selegiline.

21

(-) Deprenyl was closely examined in the DATATOP study, a clinical study which appeared in the November 1989 issue of the New England Journal of Medicine.   (PTX 655.) According to the testimony of both Dr. Castagnoli and Dr. LeWitt, the DATATOP study established that MAO-B inhibitors such as (-) deprenyl were effective as a monotherapy for Parkinson's disease.   (PTX 655 at 1367-68; Tr. 304:7-307:5 (Castagnoli); Tr. 512:6-15 (LeWitt).)  According to Dr. Castagnoli, the DATATOP study indicated that MAO-B inhibitors offered a hope for neuroprotection in the treatment of Parkinson's disease.   (Tr. 332:9-16 (Castagnoli); PTX 655.)  Dr. Castagnoli further explained that the DATATOP study would have "encouraged a POSA to pursue avenues to generate potent, selective, irreversible, and safe [MAO-B inhibitors] to use in Parkinson's patients." (Tr. 305:12-14; 306:25-307:5 (Castagnoli).)

2.    AGN 1135

a.    The Prior Art Patents

In addition to (-) deprenyl, AGN 1135 (racemic PAI) is a MAO-B inhibitor relevant to the Court's analysis.  AGN 1135 was first claimed in U.S. Patent No. 3,253,037 ("the '037 Patent"), entitled "N-2-alkynyl-Amino-Benzocyclo-Alkanes," which issued on May 24, 1966. (DTX 1103 Col. 15, ll. 15-31.)   The '037 Patent disclosed the synthesis of numerous compounds, including AGN 1135.   AGN 1135 is specifically disclosed in Example 9 and claimed in claim 4.  (DTX 1003 at 15:15-31, 19:13.)  The '037 Patent taught that the disclosed compounds, including AGN 1135, may be administered orally, do not show blood pressure raising effects and are useful in treating depression.  (DTX 1003 at 17:55-65, 4:48-66.)  The '037 Patent also disclosed that AGN 1135 is a MAO inhibitor.  (DTX 1103 Col. 4, ll. 48-50; Tr. 814:20-22, 814:23-815:3 (Ruffolo); Tr. 310:13-14 (Castagnoli).)  Finally, the '037 Patent taught

22

that the racemates of the claimed compounds "may be resolved into the optically active d- and l-forms according to known resolution procedures," including the use of tartaric acid. (DTX 1003 at 9:51-53, 9:58-60.)

With regard to the disclosures of the '037 Patent, Dr. Ruffolo testified that the patent did not actually describe a method of treating a subject for Parkinson's disease. (Tr. 813:25-814:13 (Ruffolo).) Although the '037 Patent disclosed that the compounds claimed therein could be used as "stimulating agents in the treatment of fatigue, depression, and the like," it did not mention Parkinson's disease in particular. (DTX 1003 col.4, ll. 64-66; Tr. 813:25-814:4 (Ruffolo).) Dr. Ruffolo further explained that although some Parkinson's disease patients also have depression, there is no mention in the patent of the involuntary muscle disturbances and motor dysfunction that characterize Parkinson's disease. (Tr. 814:9-19 (Ruffolo).)

Dr. Ruffolo also pointed out that the '037 Patent did not actually describe the separation, isolation or characterization of the enantiomers of AGN 1135. (Tr. 841:23-842:1 (Ruffolo).) Finally, Dr. Ruffolo explained that although the '037 Patent disclosed that the compounds claimed therein, including AGN 1135, are MAO inhibitors generally, it did not disclose that the compounds are MAO-B inhibitors. (DTX 1003 col.4, ll. 48-50; Tr. 814:20-22 (Ruffolo).) Because the two forms of the MAO enzyme had not been identified at the time the '037 Patent issued, the patent drew no distinction between inhibition of the MAO-A enzyme versus inhibition of the MAO-B enzyme. (Tr. 310:13-14 (Castagnoli); 814:23-815:3 (Ruffolo).) Indeed, even Dr. Castagnoli admitted that a POSA reading the '037 Patent in 1990 would not have known if AGN 1135 was a selective inhibitor of the MAO-B form of the enzyme. (See Tr. 310:13-14 (Castagnoli).)

23

AGN 1135 was also identified in another relevant prior art patent, U.S. Patent No. 3,513,244 ("the '244 Patent"), entitled "Method of Lowering Blood Pressure By Administering Secondary and Tertiary Amines." The '244 Patent issued on May 19, 1970 and taught the use of AGN 1135 for the treatment of hypertension. (DTX 1011 Ex. 1, 5:49-64; 4:55-64.) The '244 Patent disclosed that patients who were orally administered 480 mg per day of AGN 1135 for two weeks had a marked lowering of blood pressure during this period. (DTX 1011 at 5:74-6:4.) The '244 Patent also taught the preparation of pharmaceutically acceptable salts, including mesylate salts. (DTX 1011 at 4:5-16.)

Teva's experts testified, however, that similar to the '037 Patent, the '244 Patent did not disclose that AGN 1135 could be used as a treatment for Parkinson's disease. In addition, the '244 Patent described AGN 1135's marked blood pressure lowering effect. (Tr. 703:22-705:15 (Jenner); 822:17-824:23 (Ruffolo).) Both Dr. Ruffolo and Dr. Jenner testified that Parkinson's disease patients were known to suffer from orthostatic hypotension, a condition in which blood pressure drops suddenly when the person goes from a lying or sitting position to standing upright. (Tr. 704:3-12 (Jenner); 823:16-824:10 (Ruffolo).) Dr. Ruffolo also testified that the '244 Patent did not identify how many persons were given AGN-1135 or whether they were healthy at the time the drug was given or were already suffering from high blood pressure. (DTX 1011 5:1-74 – 6:1-4; see also Tr. 825:10-24 (Ruffolo).) [10]

---

[10] The Court also considers Dr. Castagnoli's testimony that a POSA would recognize from the '244 Patent that AGN 1135 is safe even at doses much higher than the therapeutically relevant doses for treatment of Parkinson's disease. (Tr. 308:12-309:17 (Castagnoli); Tr. 331:18-24 (same).) Further, Dr. LeWitt testified that orthostatic hypotension can be managed by a patient

b.  Prior art references comparing AGN 1135 to (-) deprenyl

In addition to the '037 and '244 Patents, several articles regarding AGN 1135 are also part of the relevant prior art.

In 1980, Finberg, et al. authored an article entitled "Pharmacology of selective propargyl "suicide" inhibitors of monoamine oxidase," which appeared in the publication *Enzyme and Neurotransmitters in Mental Disease.* ("Finberg 1980") (DTX 1032.)  Finberg 1980 taught that MAO inhibitors have potential therapeutic value in the treatment of Parkinson's disease.  Finberg 1980 further explained that (-) deprenyl was a selective MAO-B inhibitor and was useful as adjunct therapy with L-DOPA.  According to the article, (-) deprenyl's clinical usefulness in the treatment of Parkinson's disease could be attributed to the fact that the human brain mainly contains the MAO-B form of the MAO enzyme.  (DTX 1032 at 205, 206, 216; Tr. 125:20-127:5; Tr. 315:10-316:7, 316:24-317:18 (Castagnoli).)  Finberg 1980 also explained that further animal and clinical studies would be required to determine the clinical value of the MAO-B inhibitor AGN 1135.  Finally, Finberg 1980 concluded that the work described therein with AGN 1135 demonstrated that new MAO inhibitors, which offered an improvement on (-) deprenyl, could be developed and could prove effective in the treatment of depression and Parkinson's disease. (DTX 1032 at 216; Tr. 127:2-128:1 (Youdim).)

Also in 1980, Youdim, et al. authored an article entitled "The use of selective MAO type B inhibitors in the treatment of Parkinson's disease," which appeared in the publication *Enzyme and Neurotransmitters in Mental Disease.* ("Youdim 1980") (DTX 1033.)  Like Finberg 1980, Youdim 1980 taught that selective MAO-B inhibitors were useful in the treatment of

---

consuming more water or salt.  (Tr. 486:1-11 (LeWitt).)

Parkinson's disease and that (-) deprenyl, which did not potentiate the tyramine pressor effect,
was an effective adjunct therapy to L-DOPA, especially in patients who exhibited the on/off
phenomenon.  Youdim 1980 posited that "[t]his new and successful approach in the treatment of
[Parkinson's disease] should be extended to other MAO-B inhibitors, e.g. AGN 1135 which has
similar pharmacological actions to deprenyl but without deprenyl's amphetamine-like property."
(DTX 1033 at 346, 348, 353; Tr. 117:16-118:8, 119:2-6 (Youdim); Tr. 530:16-531:18 (LeWitt).)

Subsequently, in 1981, Finberg et al. authored "Tyramine antagonistic properties of AGN
1135, An irreversible inhibitor of monoamine oxidase type B." ("Finberg 1981") (DTX 1042.)
Finberg 1981 taught that 80% of the MAO activity in the brain was MAO type B and that MAO-
B inhibitors have potential therapeutic value because of this fact.  Finberg 1981 also disclosed
that the use of (-) deprenyl in combination with L-DOPA was an effective treatment for
Parkinson's disease, and that AGN 1135 had similar biological properties to (-) deprenyl,
without the amphetamine-like effects.  (DTX 1042 at 31, 34, 41; Tr. 332:19-333:4 (Castagnoli).)

Finberg, et al. issued a second article in 1981 entitled "Tyramine antagonistic properties
of AGN 1135, An irreversible inhibitor of monoamine oxidase type B."  ("Finberg II 1981")
(DTX 1034.)   Finberg II 1981 discussed animal pharmacological experiments comparing (-)
deprenyl, AGN 1133 and AGN 1135.  Finberg II 1981 taught that AGN 1135 was a selective
inhibitor of MAO-B that did not potentiate the cheese effect and did not possess the intrinsic
amphetamine-like activity of (-) deprenyl.  (DTX 1034 at 65, 66, 70; Tr. 120:4-121:2 (Youdim).)

Kalir, et al. also authored an article in 1981, entitled "Selective acetylenic 'suicide' and
reversible inhibitors of monamine oxidase types A and B." ("Kalir 1981") (DTX 1044.)  Kalir
1981 taught that MAO-B inhibitors were useful as adjuncts to L-DOPA therapy in the treatment

26

of Parkinson's disease. Kalir 1981 further posited that AGN 1133 and AGN 1135 were of interest because both compounds were selective irreversible inhibitors of MAO-B; however AGN 1135 was more attractive because it demonstrated greater selectivity for MAO-B than AGN 1133 and possessed a tyramine antagonistic effect similar to that described for (-) deprenyl. (DTX 1044 at 55, 60; Tr. 121:16-123:6; 123:24-124:1 (Youdim); Tr. 318:14-20 (LeWitt).)

In 1985, Finberg, et al. published "Modification of blood pressure and nictitating membrane response to sympathetic amines by selective monoamine oxidase inhibitors, types A and B, in the cat." ("Finberg 1985") (DTX 1062; PTX 47.) Finberg 1985 compared the MAO inhibitors clorgyline and (-) deprenyl with AGN 1135. Finberg 1985 found that the tyramine pressor response was potentiated by clorgyline (a MAO-A inhibitor) but not by (-) deprenyl and AGN 1135 (selective MAO-B inhibitors). Finberg 1985 posited that AGN 1135, like (-) deprenyl, could be a useful drug in potentiating the action of L-DOPA in the treatment of Parkinson's disease. Finberg 1985 further explained that increasing the dosage of AGN 1135 could potentiate the cheese effect, while increasing the dosage of (-) deprenyl could produce sympathomimetic effects. (DTX 1062 at 544-545; Tr. 526:1-527:4 (LeWitt).)

Also in 1985, Heikkila, et al. authored "Prevention of MPTP-induced neurotoxicity by AGN 1133 and AGN 1135, selective inhibitors of monoamine oxidase-B." ("Heikkila 1985") (DTX 1066.) Heikkila 1985 taught that both AGN 1135 and (-) deprenyl were selective MAO-B inhibitors free of the cheese effect, and that AGN 1135 was a more potent inhibitor of MAO-B than (-) deprenyl. Heikkila 1985 also explained that AGN 1135 was protective against MPTP-induced toxicity in mice and that patients treated with (-) deprenyl and L-DOPA had a significant prolongation of their life span compared to those patients treated with L-DOPA alone. Finally,

27

Heikkila 1985 posited that MAO-B may play a role in the pathogenesis of Parkinson's disease and that AGN 1135 was attractive as a potential therapeutic agent in treating the disorder. (DTX 1066 at 313, 315, 316; Tr. 133:6-136:11 (Youdim); Tr. 528:8-530:15, 532:9-533:3 (LeWitt); Tr. 320:22-321:9, 331:4-9, 332:9-16, 357:22-358:9 (Castagnoli).)

Later, in 1986, Youdim, et al. published "MAO type B inhibitors as adjunct to L-dopa therapy." ("Youdim and Finberg 1986") (DTX 1076.) Youdim and Finberg 1986 explained that, of the various MAO inhibitors discovered, AGN 1135 was the most promising candidate for drug development because of its restricted resemblance to (-) deprenyl, its MAO-B selectivity and its tyramine antagonism. The authors further noted that AGN 1135 prevented MPTP-induced parkinsonism and that MAO-B inhibitors guarded against dopaminergic neuronal degeneration in Parkinson's disease patients. Youdim and Finberg 1986 stated that MAO-B inhibitors alone may prevent this neuronal degeneration. Youdim and Finberg 1986 taught that (-) deprenyl's effectiveness in the treatment of Parkinson's disease was not related to its unique intrinsic pharmacology, as other MAO-B inhibitors such as AGN 1135 share a similar pharmacological profile to (-) deprenyl. (DTX 1076 at 127, 134; Tr. 458:16-459:4.)

Finally, Youdim authored an article in 1986 entitled "Pharmacology of MAO B inhibitors: mode of action of (-) deprenyl in Parkinson's disease." ("Youdim 1986") (DTX 1075.) Similar to the prior art articles discussed above, Youdim 1986 taught that (-) deprenyl, which lacked the cheese effect, was useful as an adjunct to L-DOPA for the treatment for Parkinson's disease. Youdim 1986 also explained that AGN 1135 was a highly selective irreversible MAO-B inhibitor which was devoid of the cheese effect and shared similar biochemical and pharmacological properties to (-) deprenyl. Youdim 1986 further disclosed that

28

AGN 1135 had high selectivity for human and rat brain MAO-B as measured in vitro and in vivo and blocked the action of MPTP. (DTX 1075 at 96, 99-100; Tr. 136:18-137:8 (Youdim).)

In sum, these articles indicate that, as of the priority date of the '446 Patent, it was known that:

a. selective inhibitors of MAO-B had potential therapeutic value in the treatment of Parkinson's disease;

b. 80% of the MAO activity in the brain involves the MAO-B form of the enzyme;

c. (-) deprenyl was a selective MAO-B inhibitor that was useful as an adjunct to L-DOPA in the treatment of Parkinson's disease and that (-) deprenyl inhibited the tyramine pressor effect;

d. the clinical usefulness of (-) deprenyl derived from the fact that it was an MAO-B inhibitor;

e. Parkinson's disease patients treated with (-) deprenyl and L-DOPA had a significant prolongation of their life span compared to those patients treated with L-DOPA alone;

f. AGN 1135 showed biochemical and pharmacological properties similar to (-) deprenyl in that it was a potent, highly selective and irreversible inhibitor of MAO-B that did not cause tyramine potentiation;

g. AGN 1135 lacked (-) deprenyl's amphetamine-like actions; and

h. AGN 1135, like (-) deprenyl, protected against MPTP-induced parkinsonism.

(See DTX 1032 at 205, 206, 216; DTX 1033 at 346, 348, 353; DTX 1042 at 31, 34, 4; DTX 1034 at 65, 66, 70; DTX 1044 at 55, 60; DTX 1062 at 545; DTX 1066 at 313, 315, 316; DTX 1076 at 127, 134; DTX 1075 at 96, 99-100; DTX 1074 at 1364; DTX 5001 at 53.)

c.     Potential Issues with AGN 1135

i.     Preference for Reversible MAO-B Inhibitors

Despite the promise suggested by the prior art articles, Teva identified several potential issues in prior art that may have led a POSA away from investigating AGN 1135 as a potential treatment for Parkinson's disease. First, Teva presented testimony that it was a POSA's desire to develop a reversible MAO-B inhibitor rather than an irreversible inhibitor such as AGN 1135. (Tr. 686:9-15 (Jenner).)[11] Dr. Jenner explained that a reversible MAO-B inhibitor would have been preferred over an irreversible MAO-B inhibitor because when an individual is treated with a reversible enzyme inhibitor, the enzyme resumes functioning once the inhibitor compound is no longer administered. In contrast, with an irreversible inhibitor, the enzyme remains inactive even after the inhibitor compound is gone. As such, the body must synthesize more of the enzyme before enzyme function can resume. (Tr. 686:16-687:9 (Jenner).) According to Dr. Jenner, reversible MAO-B inhibitors would likely have been preferred because any adverse events, including but not limited to the potential cheese effect,[12] could be better managed by stopping the inhibitor. (Tr. 687:5-9 (Jenner); see also PTX 131.) Dr. Castagnoli admitted that

---

[11] Ro-19-6327 was one such reversible MAO-B inhibitor that was being investigated in the late 1980s. (Tr. 687:10-688:4 (Jenner); PTX 137; PTX 138; PTX 151.)

[12] Dr. Ruffolo testified that the risk of causing the cheese effect was viewed as a major impediment by the pharmaceutical industry in 1990 to the development of any MAO inhibitor compound. (Tr. 820:11-18 (Ruffolo).) However, the Court finds this argument only slightly probative with regard to AGN 1135, as it was known prior to 1990 that the cheese effect resulted from the inhibition of MAO-A. (DTX-1043 at 388.) As such, it was understood that selective MAO-B inhibitors did not cause the cheese effect. (DTX-1034 at 388.) More importantly, the prior art articles – the majority of which were authored by the inventors of the '446 Patent– indicated that AGN 1135 was specific to the MAO-B enzyme and therefore did not cause the cheese effect. (DTX 1032; DTX 1033; DTX 1034; DTX 1044; DTX 1062; DTX 1066; DTX 1076.)

30

termination of an undesired effect was more easily achieved with a reversible drug than an irreversible one. (Tr. 408:16-18 (Castagnoli).) Similarly, an article co-authored by Dr. Castagnoli indicates that reversible MAO-B inhibitors would be safer than (-) deprenyl. (Tr. 409:17-410:6 (Castagnoli); PTX 219.)

   ii.  <u>Lack of structural similarity to (-) deprenyl</u>

   Teva also highlighted at trial another potential issue with AGN 1135 – its structural dissimilarity to (-) deprenyl. Dr. Jenner presented evidence that there were known close structural analogs of (-) deprenyl that would have been more attractive MAO-B inhibitors than AGN 1135. (Tr. 689:9-690:2 (Jenner).) Specifically, Dr. Jenner provided information on two close structural analogs of (-) deprenyl – U-1424, and 4-fluorodeprenyl – that were reported in the prior art to have properties equivalent or superior to those of (-) deprenyl in several biochemical and pharmacological tests relevant to Parkinson's disease. (Tr. 692:11-693:25 (Jenner).) The compound U-1424 differs from (-) deprenyl only in that the six member phenyl ring on the left side of the (-) deprenyl molecule is replaced by a five member furanyl ring in U-1424. (Tr. 692:20-25 (Jenner).) Further, U-1424 was reported to be a promising selective MAO-B inhibitor. (Tr. 693:11-16 (Jenner).) Similarly, 4-fluorodeprenyl has the same structure as (-) deprenyl with the addition of a fluorine atom attached to the phenyl ring in the 4-position. (Tr. 693:1-4 (Jenner).) 4-fluorodeprenyl also showed increased dopamine levels in the brain and was reported to be efficacious in animal models of Parkinson's disease. (Tr. 693:17-25 (Jenner); PTX 185.)

   On the other hand, aside from similarities in AGN 1135's and (-) deprenyl's mode of pharmacological action – <u>i.e.</u> both are MAO-B inhibitors – Dr. Ruffolo testified that a POSA

would not have considered AGN-1135 to be a close structural analog of (-) deprenyl.  While the two molecules both have a propargylamine group (Tr. 1053:19-23 (Ruffolo)), Dr. Ruffolo testified that a POSA would recognize that there are other major structural differences between AGN-1135 and (-) deprenyl, including:

- the location of the respective chiral carbons in the two molecules.  (Tr. 858:1-12 (Ruffolo).)  In (-) deprenyl,  the chiral carbon is located two positions away from the phenyl ring, while in AGN 1135 the chiral carbon is located one position away from the phenyl ring.  (Id.)

- the ability of the respective chiral carbons to rotate in space.  (Tr. 858:13-860:19 (Ruffolo).)  While the chiral carbon in (-) deprenyl can adopt almost any position in space, the chiral carbon in AGN 1135 is fixed to the phenyl ring and is much more limited in its movement.  (Id.)

- the ability of the groups of atoms attached to the chiral carbon to rotate in space.  (Tr. 860:21-861:7 (Ruffolo).)  While the three groups attached to the chiral carbon in (-)

32

deprenyl can rotate freely, only one group attached to the chiral carbon in AGN 1135 can rotate freely.  (Id.)

- the environments surrounding the respective chiral carbons.  (Tr. 861:8-862:6 (Ruffolo).) The chiral carbon in (-) deprenyl exists in a relatively free environment, with only one methyl group in close proximity, while the chiral carbon in AGN 1135 is surrounded by a bulky structure.  (Id.)

- the number of groups attached to the nitrogen.  The nitrogen attached to the chiral carbon in (-) deprenyl has three groups of atoms attached to it, rendering it a "tertiary amine," while the nitrogen attached to the chiral carbon in AGN 1135 has only two groups of atoms attached to it, rendering it a "secondary amine."  (Tr. 862:9-24 (Ruffolo).)

Dr. Ruffolo explained that a POSA as of 1990 would have understood the importance of all of these structural differences between AGN 1135 and (-) deprenyl.  (Tr. 862:25-863:2 (Ruffolo).)  Dr. Castagnoli agreed that there are many structural differences between AGN 1135 and (-) deprenyl.  (Tr. 434:19-437:1 (Castagnoli).)

    F.  Resolution of Racemic Mixtures

In addition to the compounds detailed above, several references related to the resolution of racemic compounds are also of importance in the scope of prior art.  In particular, Mylan offered into evidence three prior art articles that were not cited by the patentees to the PTO during the prosecution of the '446 Patent: Ariens 1984 (DTX 1059); the FDA's 1987 Guidelines (DTX 1087); and DeCamp 1987 (DTX 1126).  Although discussed in more detail below, it is important to note here that the parties additionally dispute whether there would have been a

33

reasonable expectation of success that the R(+) enantiomer of AGN 1135 would be an effective treatment for Parkinson's disease.

         1.     The Prior Art Articles on Resolution

In 1984, Dr. E.J. Ariens, an expert in stereochemistry, discussed in an article the importance of separating and evaluating enantiomers of racemic compounds (DTX 1059 at 663), explaining that "[o]ften only one isomer is therapeutically active, but this does not mean that the other is really inactive." As such, "[i]t may very well contribute to the side-effects" and therefore the "therapeutically non-active isomer in a racemate should be regarded as an impurity (50% or more)." (Id.) The Ariens article also stated that "[o]ne must be aware of the fact that stereoisomers definitely are different chemicals, mostly with quite distinct biological properties." (Id. at 664.)

The second reference regarding resolution of enantiomers is the FDA Guidelines for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances (the "Guidelines"), issued in February 1987. (DTX 1087.) The Guidelines instructed that "[w]hen the [New Drug Substance] is asymmetric (e.g., contains one or more chiral centers …), the sponsor should ideally (and prior to the submission of an IND) have either separated the various potential stereoisomers of the NDS or synthesized them independently." (Id.) The Guidelines further disclosed that "[p]hysical/chemical information about each stereoisomer should be provided (in detail), or may be requested." (Id.) Finally, "[i]ndividual stereoisomers may need to be studied for pharmacologic and toxicological properties (and/or for safety and efficacy)." (Id.)

34

Finally, the Wilson DeCamp article discussed the "current regulatory position of the [FDA] with regard to the approval of racemates and pure stereoisomers." (DTX 1126 at Abstract.) In particular, DeCamp wrote that "good science" requires that "enantiomers should be separated or they should be synthesized" as does "good sense." (DTX 1126 at 6.) DeCamp concluded that whenever a "drug can be obtained in a variety of chemically equivalent forms (such as enantiomers) it is both good science and good sense to explore the potential for in vivo differences between these forms." (DTX 1126 at 6.)

In responding to these articles, Dr. Ruffolo explained that a POSA prior to 1990 would have understood the statements in the Ariens article (DTX 1059) regarding enantiomers in a racemic compound to be part of an ongoing, unsettled discussion that was taking place at the time in the scientific community. (Tr. 836:5-16 (Ruffolo).) Dr. Ruffolo was personally involved in these discussions, which included members of the pharmaceutical industry, academic scientists, and the FDA. (Id.) Dr. Ruffolo testified that the discussion on whether drugs should be marketed as separated enantiomers or as racemic compounds was in a "state of flux," and that no firm conclusions about the desirability of enantiomer separation had been reached by 1990. (Id.)

Dr. Ruffolo also testified that the 1987 FDA Guidelines were concerned with the drug manufacturing process rather than the drug discovery process. (Tr. 835:4-13, 20-22 (Ruffolo).) As such, Dr. Ruffolo clarified that the Guidelines would likely not have been seen by POSAs working on drug discovery, where the decision on whether to separate a racemic compound is typically made. (Id.) Moreover, Dr. Ruffolo testified that the Guidelines did not provide any directive or mandate for the development of single enantiomer drugs. (Tr. 835:23-836:4

35

(Ruffolo).)  Dr. Castagnoli conceded that the Guidelines were directed not to drug *development*, but to the drug *approval* process, which takes place "long after the drug [i]s discovered … long after all the pre-clinical testing [i]s done, and … the clinical trials [a]re completed." (Tr. 426:9-427:6 (Castagnoli).)

Finally, Dr. Ruffolo testified that the 1989 DeCamp article (DTX 1126) was adapted from a symposium presentation of an FDA employee and simply discussed the 1987 FDA Guidelines.  (Tr. 837:2-7 (Ruffolo).)  The DeCamp article also made clear that the decision to develop and market a racemic mixture versus a separated enantiomer "rests solely with the pharmaceutical company," and acknowledged that this decision is usually made some time before a drug company applies for FDA approval.  (Tr. 837:8-14 (Ruffolo).)

### 2. Supposed Benefits of Enantiomer Separation

At trial, the parties presented conflicting evidence as to whether a POSA would have been interested in resolving AGN 1135 into its enantiomers.  Dr. Castagnoli testified that a POSA would have known that the beneficial properties of AGN 1135 derive in whole or in part from one of the enantiomers of the racemic mixture and that the known properties of the mixture could be improved by resolution.  (Id.)  Dr. Castagnoli further emphasized that a POSA would have been motivated to separate the enantiomers of AGN 1135 because, as of January 3, 1990, a POSA would have understood that when the enantiomers of a racemic compound are resolved, there are three possibilities: (1) the racemate is the best drug candidate, (2) the R enantiomer is the best drug candidate, or (3) the S enantiomer is the best drug candidate.  (Tr. 282:16-283:9 (Castagnoli).)  However, Dr. Castagnoli admitted that he did not have significant involvement in

36

the development of treatments for Parkinson's disease in the late 1980s.   (Tr. 383:3-6 (Castagnoli).)

Dr. Ruffolo, on the other hand, explained that in general, there is no way to predict based on the racemic compound whether a separated enantiomer will have any particular characteristic necessary to be a successful drug for treating Parkinson's disease or any other disease.   (Tr. 842:20-25; 843:1-5 (Ruffolo).  For example, one enantiomer may have a similar activity to the other enantiomer or to the racemate (Tr. 837:15-23; 840:12-20 (Ruffolo), each enantiomer could have completely different but complementary activities (Tr. 837:24-838:8 (Ruffolo)), or one enantiomer could have characteristics that would make it dangerous to administer to humans. (Tr. 838:19-22 (Ruffolo).)   It is also possible for enantiomers to interact such that one enantiomer either enhances or blocks the activity of the other.   (Tr. 843:1-12 (Ruffolo).)  As such, until the enantiomers are separated and tested, there is no way to distinguish among these many possibilities.  (Id.)

In support of his analysis, Dr. Ruffolo presented evidence on examples of drug compounds where, although one enantiomer may have been more active than the other, neither alone possessed all of the properties necessary to be a successful drug.   (Tr. 837:24-838:8 (Ruffolo).)  These drug compounds included dobutamine, carvedilol, and nebivolol.  (Id.)  Dr. Ruffolo also gave testimony on examples of compounds where each enantiomer had activity equal to that of the racemic compound.   (Tr. 840:12-20 (Ruffolo).)   These drug compounds included fluoxetine, warfarin, several antibiotics, antidepressants and non-steroidal anti-inflammatory agents.  (Id.)

37

**A41**

### 3.   Reasonable Expectation of Success

Finally, Dr. Ruffolo testified that, in 1990, there was no basis for a reasonable expectation of success that the R(+) enantiomer of AGN 1135 would possess all of the properties needed to be a successful Parkinson's disease treatment.  (828:15-21; 842:2-14 (Ruffolo).)  First, Dr. Ruffolo explained that the facts known about AGN 1135 in 1990 – i.e. that it was a potent, selective and irreversible MAO-B inhibitor that was not metabolized to amphetamines, that it did not potentiate the tyramine pressor effect in animals, and that it was effective in the MPTP mouse model (Tr. 840:24-841:6 (Ruffolo)) – were insufficient to provide a reasonable expectation of success that AGN-1135 *itself* would be effective in treating Parkinson's disease. (Tr. 841:7-12 (Ruffolo).)  In fact, all three experts testified that there was no description in the prior art of the actual use of AGN 1135 to treat Parkinson's disease.   (Tr. 411:23-412:1 (Castagnoli); 605:22-606:5 (LeWitt); 841:13-16 (Ruffolo).)

Second, Dr. Ruffolo attested, and Dr. Castagnoli admitted, that there was no description in the prior art of any separation, isolation, or characterization of the enantiomers of AGN 1135. (Tr. 417:3-7 (Castagnoli); 841:23-842:1 (Ruffolo).   As such, the properties of R(+)-PAI, including any MAO-B inhibitory activity, were unknown. (Tr. 842:2-4 (Ruffolo); Tr. 842:5-9; 843:13-19 (Ruffolo).)  Similarly, there was no prior description about the tyramine pressor effect of the enantiomers of AGN 1135 because the enantiomers of AGN 1135 did not exist in the prior art.  (Id.)  Finally, as of 1990, there was no information on whether either enantiomer of AGN 1135 would possess all of the additional favorable characteristics of R(+)-PAI, including the appropriate absorption, distribution, metabolism, and elimination ("ADME") characteristics required to be an effective treatment for Parkinson's disease.  (Tr. 842:10-14 (Ruffolo).)

### III.    Level of Ordinary Skill in the Art

The parties' proposed definitions of the level of skill in the art are substantially similar. (Compare SOF ¶ 124 with ¶ 1212.)   Essentially, Teva and Mylan agree that a POSA is someone who, as of January 3, 1990 would have had a Ph.D. in pharmacology, medicinal chemistry, or a related discipline, and several years of experience in drug discovery research, which would include knowledge about the different classes of drugs that were known or being investigated for treating Parkinson's disease.   (TPFF ¶ 115.)   A POSA would also have knowledge of stereochemistry, including knowledge regarding the resolution of racemates into their enantiomers.   (Id.)   The only material difference between the parties' proposals is that Mylan's definition also includes a person having a "medical degree" who would "have access to individuals with expertise in biochemistry, molecular biology, and pharmacology."   (MPFF ¶ 89.)   Given that this case involves a method of treatment claim, the Court agrees with Mylan that a POSA could also include a person with a medical degree with access to individuals with expertise in biochemistry, molecular biology, and pharmacology.   Mayo Collaborative Serv. v. Prometheus Labs., Inc., 132 S. Ct. 1289, 1297 (2012) (explaining that in a method claim, "the 'administering' step simply refers to the relevant audience, namely doctors who treat patients with certain diseases").

### IV.    Differences between the Claimed Subject Matter and the Prior Art

#### A.    Lead Compound Analysis

Before turning to the differences between the claimed subject matter and the prior art, the Court must first address the parties' dispute regarding whether a "lead compound analysis" should be utilized in the obviousness inquiry.

Traditionally, a lead compound analysis is applied when the claims of a patent are directed to a new chemical compound.  See, e.g., Eisai Co. v. Dr. Reddy's Labs., Ltd., 533 F.3d 1353, 1359 (Fed. Cir. 2008) (explaining that "post-KSR, a prima facie case of obviousness for a chemical compound still, in general, begins with the reasoned identification of a lead compound" in the prior art); Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1361 (Fed. Cir. 2011) ("Where the patent at issue claims a chemical compound, a lead compound is often used to show structural similarities between the claimed compound and prior art.").

Teva points to several cases in which courts have applied a lead compound analysis to a patent that includes a method claim.  However, all of the cases cited by Teva involved claims related to new chemical compounds *in addition to* claims involving methods of using such compounds.  As such, the district courts in these cases would necessarily apply a lead compound analysis to the claims involving a new chemical compound.  For example, in Otsuka Pharm. Co. v. Sandoz, Inc., 678 F.3d 1280 (Fed. Cir. 2012), the Federal Circuit affirmed the district court's application of a lead compound analysis to – and its finding of validity of – a patent claiming the new chemical compound aripiprazole.  After upholding the validity of the compound claim, the Federal Circuit further explained that it need not review the validity finding on the dependent method claim.  Id. at 1296.  As such, the Federal Circuit did not employ a lead compound analysis on a method of treatment claim, but rather affirmed the district court's traditional use of a lead compound analysis on a new chemical compound claim.  See also P&G v. Teva Pharms. USA, Inc., 566 F.3d 989 (Fed. Cir. 2009) (applying a lead compound analysis to a patent that claimed the compound risedronate, pharmaceutical compositions containing risedronate *and* methods of treating diseases using risedronate); Novartis Pharms. Corp. v. Roxane Labs., Inc.,

40

No. 08-cv-3853 2011 U.S. Dist. LEXIS 35545, at *3, *12-15 (D.N.J. Mar. 31, 2011) (applying a lead compound analysis to a patent claiming both a chemical compound *and* a method of use of that compound); Merck Sharp & Dohme Pharms. v. Teva Pharms. USA, Inc., No. 07-1596, 2009 U.S. Dist. LEXIS 131869, at *136-142 (D.N.J. Aug. 19, 2009) (same); Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc., 456 F. Supp. 2d 644, 656-657 (D.N.J. 2006) (same).

In sum, Teva points to no case in which a lead compound analysis is applied to a patent that contains *only* a method of treatment claim without a corresponding claim to a compound itself. In any event, whether or not a lead compound analysis is considered, the ultimate question here, is whether it would have been obvious to a POSA in 1990 to treat Parkinson's disease by administering to a patient the MAO-B inhibitor R(+)-PAI. The Court finds that it would not have been obvious to do so because, for many of the reasons set forth above, this Court finds that the differences between the prior art and the invention covered by the '446 Patent are significant.

B.     Differences Between the Prior Art and the Claimed Invention

First, this Court finds that the prior art was not in accord as to the promise of either AGN 1135 or R(+)-PAI as the most attractive candidate for a Parkinson's disease drug based on the presence of several *other* promising candidates, including dopamine agonists, COMT inhibitors and L-DOPA pro-drugs. When the prior art as a whole is considered, only hindsight bias could support the conclusion that R(+)-PAI would have been selected as a potential treatment for Parkinson's disease. See Eli Lilly & Co. v. Zenith Goldline Pharms., Inc., 471 F.3d 1369, 1379 (Fed. Cir. 2006) ("[M]ere identification in the prior art of each component of a composition does not show that the combination as a whole lacks the necessary attributes for patentability, i.e. is obvious."); see also KSR, 550 U.S. at 421 (cautioning against "the distortion caused by hindsight

41

bias" and "arguments reliant upon ex post reasoning" in determining obviousness); Processing Corp. v. Am. Maize-Products Co., 840 F.2d 902, 907 (Fed. Cir. 1988) (noting that in considering obviousness, "[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit") (internal citations omitted).    Having considered the prior art as a whole—and being mindful of the complexities of Parkinson's disease, the causes of which remain unknown to this day—the Court does not find that a POSA in 1990 would have selected R(+)PAI as a treatment for Parkinson's disease over *all* of the other potential drug candidates.

Second, the relevant prior art patents that discuss and/or claim AGN 1135 – the '037 Patent and the '244 Patent – did not describe AGN 1135 as an inhibitor of the B form of MAO, did not describe the separation or characterization of the enantiomers of AGN 1135, and most importantly, did not disclose AGN 1135 as a potential treatment for Parkinson's disease. Without such knowledge, there would have been no basis from the prior art patents to draw a conclusion about the use of AGN 1135 to treat Parkinson's disease.  (Tr. 814:5-8 (Ruffolo).)  In fact, the marked blood pressure lowering effect described in the '244 Patent may have discouraged a POSA from choosing AGN 1135 as a potential new treatment for Parkinson's patients, who are known to suffer from orthostatic hypotension.

Third, despite the promising information regarding MAO-B inhibitors in the prior art articles, there were several issues associated with the use of AGN 1135 to treat Parkinson's disease.  For example, Teva presented evidence that a POSA would likely have selected a reversible MAO-B inhibitor over an irreversible one, which would allow for a more easy

termination of undesired drug effects.  In addition, Mylan did not present sufficient expert testimony to persuasively rebut Dr. Jenner's and Dr. Ruffolo's testimony that a POSA would have chosen a close structural analog of (-) deprenyl, rather than AGN 1135, in the hopes of improving upon (-) deprenyl's effectiveness as a treatment for Parkinson's disease.  In other words, Teva's experts presented cogent evidence that the significant structural differences between AGN 1135 and (-) deprenyl would have made AGN 1135 a less obvious candidate as a potential treatment for Parkinson's disease.  Finally, although the DATATOP study sparked interest in (-) deprenyl as a monotherapy and in the potential neuroprotective effects of MAO-B inhibitors, Dr. LeWitt admitted that he did not have any direct evidence that the results of the DATATOP study created any increased interest in AGN 1135, in particular, before January 2, 1990.  (Tr. 614:24-615:3 (LeWitt).)[13]

Fourth, the prior art regarding the desirability of enantiomer separation was unsettled at best in 1990, and the relevant prior art articles do not provide clear and convincing evidence that the separation of AGN 1135 was obvious to try.  See Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075 (Fed. Cir. 2008) (explaining that general knowledge in the field of stereochemistry "confirms, that the recognition that stereoisomers may exhibit different properties does not teach which results may ensue or how to separate any given enantiomers").  This is especially true given that, at that time, the FDA did not mandate that racemic compounds be resolved into their enantiomers, but merely provided manufacturing guidelines for the drug approval process.

---

[13] That the conclusions in the DATATOP study were eventually discovered to be somewhat inaccurate (Tr. 614:19-22 (LeWitt)) has no bearing on what a POSA would have understood regarding the study in 1990.

43

Moreover, the fact that the resolution of a racemic compound could lead to any number of possible outcomes in terms of both efficacy and safety would not necessarily have motivated a POSA to separate AGN 1135 based on a general expectation that one enantiomer would be more active than the other. "A new composition is 'obvious to try' when it is reasonable to expect that the trial will produce a predictable result." Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd., No. 2011-1223, 2013 U.S. App. LEXIS 12251, at *37 (Fed. Cir. June 18, 2013); see also KSR, 550 U.S. 398, 421, (2007) (explaining that "the fact that a combination was obvious to try might show that it was obvious under § 103" if, among other things, "there are a finite number of identified, predictable solutions").

As explained by Dr. Ruffolo, that situation did not exist in 1990 with regard to the separation of AGN 1135. See Eisai Co. v. Dr. Reddy's Labs., Ltd., 533 F.3d 1353, 1359 (Fed. Cir. 2008) ("To the extent an art is unpredictable, as the chemical arts often are, KSR's focus on these 'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable."). Mylan did not adequately rebut Teva's expert testimony that there was no basis for a reasonable expectation of success that R(+)-PAI would have any of the properties required to be an effective treatment for Parkinson's disease, let alone all of them. (Tr. 843:1-12 (Ruffolo). )[14] Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075 (Fed.

---

[14] The Court finds Teva's additional arguments regarding the increased cost of manufacturing based on the separation of enantiomers and the issues involved with separating enantiomers on a production scale to be less persuasive. (See TPFF ¶¶ 249, 257.) This is because "[t]here is no requirement that one of ordinary skill have a reasonable expectation of success in developing [the commercial product]. Rather, the person of ordinary skill need only have a reasonable expectation of success of developing the claimed invention." Allergan, Inc. v. Sandoz Inc., Nos. 2011-1619, -1639, -1620, -1635, 2013 U.S. App. LEXIS 8837, at *6 (Fed. Cir. May 1, 2013) (emphasis added).

44

Cir. 2008) (finding the patent not obvious because there was no reasonable expectation of success that claimed enantiomer would manifest all of the relevant properties and advantages). Indeed, Mylan provided no evidence that anyone had ever attempted to separate the enantiomers of AGN 1135 between the disclosure of AGN 1135 in the '037 Patent in 1966 and the priority date of the patent in January 1990.

In view of this Court's findings with respect to the first three Graham Factors, this Court finds that Mylan has not established, by clear and convincing evidence, that the '446 Patent is invalid for obviousness.

One case cited by Mylan in support of its obviousness argument, Aventis Pharma Deutschland GMBH v. Lupin Ltd., 499 F.3d 1293 (Fed. Cir. 2007), requires further discussion. The patent at issue in Aventis was directed to the pharmaceutical compound ramipril – in the form SSSSS – "substantially free of other isomers." Id. at 1295. Following a trial, the district court held that the defendant failed to establish by clear and convincing evidence that a POSA would have been motivated to purify SSSSS ramipril into a composition substantially free of other isomers. Id. at 1300.

The Federal Circuit reversed based on the existence of two prior art compounds. The first contained a mixture of SSSSS ramipril together with its SSSSR stereoisomer. Id. at 1300. The second, a well-known prior art molecule named enalapril, shared a close structural analogy with ramipril. Id. at 1302. The Federal Circuit explained that the prior art compounds provided a sufficient motivation to purify SSSSS ramipril as the therapeutic stereoisomer because "[i]n enalapril, . . .all of the stereocenters are in the S configuration" and the prior art "taught that the SSS configuration of enalapril is 700 times as potent as the SSR form." Id. As such, the "close

45

structural analogy between . . . ramipril and . . . enalapril would have led a person of ordinary skill to expect" that SSSSS ramipril would be the more potent enantiomer.  Id.

Here, the closest prior art compound, (-) deprenyl, does *not* share a close structural similarity with R(+)-PAI.  In brief, the chiral carbons are at different locations; the chiral carbon in (-) deprenyl is free to rotate while on AGN 1135, it is anchored in a rigid ring structure; the three groups attached to the chiral carbon in (-) deprenyl rotate while only one group rotates in AGN 1135; the environmental bulk around the chiral carbon in AGN 1135 is much greater; and the groups attached to the nitrogen in AGN 1135 differ.  Therefore, unlike the situation with the structurally similar compounds at issue in Aventis, a POSA in 1990 would not have expected the R-form of AGN 1135 to be the active enantiomer based on a structural similarity to (-) deprenyl.

More relevant to this Court's analysis is Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075 (Fed. Cir. 2008).  There, the patent claimed the compound Clopidogrel,  the dextrorotatory (+) isomer of the chemical compound methyl alpha-5(4,5,6,7-tetrahydro(3,2-c)thienopyridyl)(2-chlorophenyl) -acetate.  Id. at 1077.  The Federal Circuit's analysis focused on the patentability of this dextrorotatory isomer in view of its known racemate, which was fully described in earlier patents.  Id. at 1078.  On the basis of this trial evidence, the district court found that a POSA would not have reasonably predicted that the dextrorotatory enantiomer would provide all of the required therapeutic activity with none of the adverse neurotoxicity.  Id. at 1087.  The district court further found that separation of the enantiomers was not a simple or routine procedure and that success in separation, as well as the allocation of properties, was unpredictable.  Id. at 1088.

The Federal Circuit affirmed.  Specifically, the Federal Circuit explained that "[o]nly with hindsight knowledge that the dextrorotatory enantiomer has highly desirable properties"

46

could the defendant argue that "it would have been obvious to select this particular racemate and undertake its arduous separation." Id. at 1088. Similar to this case, the Federal Circuit found the "application of hindsight . . . inappropriate where the prior art d[id] not suggest that th[e] enantiomer could reasonably be expected to manifest the properties and advantages that were found for this particular dextrorotatory isomer." Id.

In sum, for the reasons stated above, the Court finds that Claim 1 of the '446 Patent is not invalid as obvious over the prior art. Because Claims 2, 17, 18 and 19 are dependent claims, the Court need not conduct a separate obviousness analysis for these claims. See Synqor, Inc. v. Artesyn Techs., inc., 709 F.3d 1365 (Fed. Cir. 2013) ("This court need not consider Defendants' arguments that certain dependent claim limitations would have been obvious where the base claim has not been proven invalid.").

In arriving at this conclusion, the Court found both Mylan's and Teva's experts to be credible and qualified. This Court's independent consideration of the totality of the prior art, however – after having the benefit of the experts' opinions – aligns more closely with the view of Dr. Jenner and Dr. Ruffolo.

## V.    Secondary Considerations

As Mylan has failed to demonstrate obviousness in accordance with the initial Graham factors, the Court need not consider the objective indicia of nonobviousness. See Takeda Chem. Indus. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1363 (Fed. Cir. 2007) ("In light of our conclusion that [the patent challenger] failed to prove that the claimed compounds would have been prima facie obvious, we need not consider any objective indicia of nonobviousness.").

47

However, the Court notes that the relevant secondary considerations do in fact support the Court's finding of nonobviousness.

"[S]econdary considerations [such] as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented" and "may have relevancy" as indicia of obviousness or nonobviousness. AstraZeneca LP v. Breath Ltd., No. 08-1512, 2013 U.S. Dist. LEXIS 49375, at *75 (D.N.J. Apr. 1, 2013) (citing to Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966). Specifically, the Court finds persuasive Teva's evidence showing the failure of others, skepticism in the industry, the satisfaction of a long felt need, and the commercial success of Azilect®.

A.    Failure of others

Teva presented evidence that several attempts by others to develop a treatment for Parkinson's disease were unsuccessful. Failure of others to "find a solution to the problem which the patent[] in question purport[s] to solve," can suggest that the inventor made a genuinely innovative discovery. Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1578 (Fed. Cir. 1991). Dr. Ruffolo testified that some of these failures were due to lack of efficacy, some to safety concerns, and some to tolerability and a range of other problems. (Tr. 879:4-9 (Ruffolo).) The failed treatments included: the dopamine agonist ciladopa (failed because it produced testicular tumors in animals) (Tr. 879:18-20 (Ruffolo)); dopamine agonist CY-208-243 (failed because it did not produce any effect at low doses and produced toxicities in animals that prevented the study of increased doses in humans) (Tr. 879:21-24 (Ruffolo)); dopamine agonist lergotrile (failed because it produced liver toxicity and mental changes in humans) (Tr. 879:25-

48

880:2 (Ruffolo)); dopamine agonist mesulergine (failed because it produced tissue abnormalities in animals) (Tr. 880:3-4 (Ruffolo)); dopamine agonist CQA 206-291 (failed because it produced unacceptable blood test toxicity results in humans) (Tr. 880:9-11 (Ruffolo)); dopamine autoreceptor ligand (-) 3-PPP (failed because it produced inconsistent and weak results in humans) (Tr. 880:12-14 (Ruffolo)); MAO-B inhibitor MDL-72145 (failed because it produced anemia) (Tr. 879:15-17 (Ruffolo)); MAO-B inhibitor milacemide (failed because it increased the severity of Parkinson's disease symptoms in subjects) (Tr. 880:5-8 (Ruffolo)); and MAO-B inhibitor lazabemide (failed because it produced liver toxicity in humans). (Tr. 880:15-16 (Ruffolo); PTX 36.)

Additionally, some of the compounds intended for use in the treatment of Parkinson's disease failed after the development stage, after the drug had already been approved for marketing. (Tr. 880:17-23 (Ruffolo).) For example, after the approval and marketing of the COMT inhibitor tolcapone, patients taking this compound experienced liver toxicities and even death. (Tr. 880:24-881:13 (Ruffolo).) Tolcapone was withdrawn from the market in Europe and Canada and given a "black box" warning on its labeling in the U.S. (Id.) Similarly, pergolide, a dopamine agonist used in the treatment of Parkinson's disease, was subsequently withdrawn from the market because it produced valvular heart lesions. (Tr. 881:14-18 (Ruffolo).) As such, the apparent failure of others to create a safe and therapeutically effective treatment for Parkinson's disease supports a finding that Teva's accomplishment would not have been obvious to those skilled in the art.

B.      Skepticism

Similar to failure of others, if contemporaneous observers expressed skepticism that the inventor's solution would solve the problem, this too can suggest nonobviousness. Tyco Healthcare Group LP v. Mutual Pharm. Co., Inc., 642 F.3d 1370, 1377 (Fed. Cir. 2011). One of the inventors listed on the '446 Patent, Dr. Moussa Youdim, testified that during the late 1970s and the first half of the 1980s, he attempted unsuccessfully to interest several pharmaceutical companies in the development of AGN 1135 as a possible treatment for Parkinson's disease. (Tr. 96:19-23 (Youdim); see also TPFF ¶¶ 82-89.) Dr. Youdim also testified that the inventors of the '446 Patent attended international meetings and congresses on Parkinson's disease, MAO inhibitors, and movement disorders. There, they presented data on AGN 1135 and attempted to interest other academic researchers in its development as a possible treatment for Parkinson's disease. (Tr. 102:17-102:24 (Youdim).) However, none of these conversations proved fruitful. (Tr. 102:25-103:3 (Youdim).) Finally, despite the numerous publications by Professors Youdim and Finberg on AGN 1135 discussed in detail above, the inventors were unsuccessful in interesting academic researchers in the further investigation of AGN 1135. (Tr. 102:25-103:3; 104:1-4 (Youdim).)

The Court does note that, aside from Dr. Youdim's testimony, there is only one letter in the record evidencing the communications between Dr. Youdim and these pharmaceutical companies. This letter from Warner Lambert, which is written in response to a proposal from Dr. Youdim for the development of AGN 1135, suggests that concerns over funding may have played a role in the company's rejection of Dr. Youdim's proposal. (See PTX 140.) In addition, the '037 Patent and the '244 Patent may have additionally dissuaded these pharmaceutical

50

companies from pursuing a compound that was already patented, albeit for another purpose. In any event, the Court finds that the overall skepticism shown by others in the pharmaceutical field about developing AGN 1135 as a treatment for Parkinson's disease supports a finding of nonobviousness. Indeed, the Court finds probative the fact that no MAO-B inhibitor other than (-) deprenyl was approved by the FDA to treat Parkinson's disease until Azilect® was approved in 2006. (Tr. 449:13-450:6 (Castagnoli).)

    C.    <u>Satisfaction of a long felt need</u>

"Evidence that an invention satisfied a long-felt and unmet need that existed on the patent's filing date is a secondary consideration of nonobviousness." <u>Perfect Web Techs., Inc. v. Infousa, Inc.</u>, 587 F.3d 1324, 1332 (Fed. Cir. 2009). Teva provided testimony from Dr. Henchcliffe that, as of January 2, 1990, there remained a long-felt need for a safe, effective, and more tolerable drug that could be used as monotherapy to treat the symptoms of Parkinson's disease and delay the need for treatment with L-DOPA. (Tr. 1139:9-1140:19 (Henchcliffe).)[i] Specifically, the 2002 TEMPO study demonstrated that Azilect®, when given as once-daily monotherapy, was effective and improved a range of scores on the Unified Parkinson's Disease Rating Scale, including improvements in motor function, activities of daily living, and amelioration of tremor and bradykinesia. (Tr. 1130:8-1134:11 (Henchcliffe); PTX 98.) The TEMPO study also demonstrated that use of Azilect® as monotherapy improved patients' quality of life based on feedback from patients on the drug. (<u>Id.</u>)

Finally, Dr. Henchcliffe presented evidence that Azilect® may slow the clinical progression of Parkinson's disease. (Tr. 1144:8-1149:19 (Henchcliffe); PTX 109; PTX 96.) In 2009, Teva completed the ADAGIO clinical trial, a large study involving almost 1200 patients

51

with early Parkinson's disease in 130 centers throughout the world. (Tr. 1145:12-1147:15 (Henchcliffe); PTX 96.) Although the study produced mixed results, the outcomes indicated that the currently marketed 1 mg dose of Azilect® produced a disease-modifying benefit. (Tr. 1147:16-1149:19 (Henchcliffe); PTX 96.) This conclusion is further supported by preclinical studies in animals suggesting that rasagiline has neuroprotective properties. (Tr. 1144:13-1145:14 (Henchcliffe); PTX 109.) Based on this data, Dr. Henchcliffe opined that "more likely than not," Azilect® slows the clinical progression of Parkinson's disease, (Tr. 1144:8-12; 1181:3-18 (Henchcliffe)), notwithstanding the FDA's rejection of a change in the Azilect® labeling to include a modification of the clinical progression of the disease (DTX 1444). In fact, Dr. LeWitt acknowledged that there is a "large body of basic science data" suggesting that Azilect® has the potential to be neuroprotective. (Tr. 561:11-562:7 (LeWitt).) Thus, there is sufficient evidence to show that Azilect® satisfied a long-felt need for a Parkinson's disease drug that could be used as monotherapy and that could potentially slow the clinical progression of the disease.

D. Commercial success

Finally, Teva presented evidence on the commercial success of Azilect®. (Tr. 1213:12-20; 1213:24-1214:25; 1215:6-12; 1215:20-1216:19 (Hausman); PTX 659; PTX 744; PTX 749; PTX 750.) "Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art. Thus, the law deems evidence of (1) commercial success, and (2) some causal relation or nexus between an invention and commercial success of a product

52

embodying that invention, probative of whether an invention was non-obvious." Merck & Co., v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1376 (Fed. Cir. 2005) (citation & quotation omitted).

Dr. Hausman presented evidence that Azilect®'s cumulative worldwide sales since its launch through the end of 2012 totaled near $1.7 billion and its current annual worldwide sales are close to $500 million. (Tr. 1213:22-1214:12 (Hausman); PTX 659; PTX 744; PTX 749.) Further, Azilect®'s cumulative U.S. sales since its launch through the end of 2012 totaled over $650 million and its current annual U.S. sales are approximately $168 million. (Tr. 1215:19-1216:19 (Hausman); PTX 659; PTX 744; PTX 750.) Prescriptions for Azilect® have also steadily grown, starting from zero at the time of its launch to more than 100,000 per quarter in the United States as of 2012. (Tr. 1217:25-1218:19 (Hausman); PTX 198; PTX 748; PTX 751.) Cumulative U.S. prescriptions for Azilect® since the time of its launch total 1.7 million. (Id.)

Finally, Azilect® is the number one treatment in the market by revenue share, with a share of approximately 27%. (Tr. 1219:20-1220:19 (Hausman); PTX 197; PTX 748; PTX 752.) Azilect® also has the largest share of prescriptions among branded treatments for Parkinson's disease. (Tr. 1221:8-1222:19 (Hausman); PTX 198; PTX 748; PTX 753.) In fact, Azilect® has taken prescription share away from generic selegiline, with selegiline's prescription share decreasing with the growth of Azilect®'s, despite Azilect®'s higher price. (Tr. 1222:22-1223:14 (Hausman); PTX 198; PTX 748; PTX 753.) Dr. Hausman explained that Azilect®'s share of the market is particularly impressive given that it was launched after most of its competitors. (Tr. 1221:14-1223:18; 1224:16-1225:24 (Hausman). This is because early entrants into a pharmaceutical market typically enjoy a "first mover advantage" against therapies that are introduced later. (Id.)

The Court finds that Azilect®'s commercial success has a nexus to the invention of the '446 Patent. Azilect® is the commercial embodiment of the '446 Patent, which claims the use of rasagiline to treat Parkinson's disease as both monotherapy and adjunct therapy to L-DOPA. (Tr. 1228:10-1230:18 (Hausman); PTX 1; PTX 2.) Dr. Henchcliffe testified that physicians prescribe Azilect® because of its clinical benefits, all of which are inherent attributes of the claimed invention. (Tr. 1150:1-1150:13 (Henchcliffe); 1230:9-1233:8 (Hausman).) These include, but are not limited to, Azilect®'s efficacy, safety and tolerability. (Id.)

Mylan argues that the commercial success of the patented invention may stem from other patents in the same family as the '446 Patent. (See MPFF ¶¶ 283-287.) However, the fact that certain features of Azilect® may be covered by other patents from the same family as the '446 Patent does not negate the nexus between Azilect®'s commercial success and the '446 Patent. (Tr. 1248:12-22 (Hausman).) First, the '446 Patent is the only patent in that family that claims the use of R(+)PAI for treatment of Parkinson's disease as both monotherapy and adjunct therapy. Second, even if other patents in the family claim certain characteristics of Azilect® that contribute to its commercial success, there is no reliable way in this case to distinguish the contribution of one patent over another. (Tr. 1252:20-1253:16 (Hausman).) In other words, Mylan has not definitively shown that the claimed properties attributable to the other patents are responsible for Azilect®'s commercial success. This is important because a "patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is *not* due to factors other than the patented invention." Demaco Corp. v. F. Von Langsdorff Licensing, Ltd., 851 F.2d 1387, 1311 (Fed. Cir. 1988) (emphasis added). "It is sufficient to show that the commercial success was of the patented invention itself," because a

54

"requirement for proof of the negative of all imaginable contributing factors would be unfairly burdensome, and contrary to the ordinary rules of evidence." Id. See also Crocs, Inc. v. ITC, 598 F.3d 1294, 1311 (Fed. Cir. 2010) (explaining that once the patentee demonstrates a prima facie nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger). As such, the Court finds that the commercial success of Azilect® supports a finding of nonobviousness.[15]

In sum, the Court finds that based on the four Graham factors, Claims 1, 2, 17, 18 and 19 of the '446 Patent are not invalid for obviousness.

## ENABLEMENT

Mylan also argues that the '446 Patent does not provide an enabling disclosure under 35 U.S.C. § 112, ¶ 1, because the specification discloses only animal and in vitro testing information similar to that found in the prior art. (See MPFF ¶¶ 332-368.) Although Mylan did not present expert testimony on the matter,[16] Mylan argues that because the specification does *not* include clinical or human data – including but not limited to data related to selectivity against other targets, ADME information, and information on molecular synthesis (Tr. 818:13-819:8, 827:11-829:2, 843:22-852:1 (Ruffolo)) – the patent does not enable a POSA to use R(+)-PAI as a Parkinson's disease treatment.

A patent must enable one of skill in the art to make and use what is claimed. 35 U.S.C. § 112 ("The specification shall contain a written description of the invention, and of the manner

---

[15] Teva's trial experts did not emphasize unexpected results, industry praise or copying. (TPFF ¶¶ 357-382.) Regardless, Teva has produced sufficient evidence on the other objective indicia of nonobviousness to support this Court's overall finding of nonobviousness.

[16] Neither Dr. Castagnoli nor Dr. LeWitt offered any opinion at trial with respect to the issue of

55

and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."). The Federal Circuit has explained that enablement is a requirement distinct from that of written description. Ariad Pharms., Inc. v. Eli Lilly & Co., 598 F.3d 1336 (Fed. Cir. 2010). A patent is enabled when a POSA, having read the specification, can practice the invention without "undue experimentation." In re Wands, 858 F.2d 731, 736-37 (Fed. Cir. 1988). However, routine or standard experimentation is not "undue." Id.

Enablement is closely related to the requirement for utility. The utility requirement is defined in 35 U.S.C. § 101 as follows: "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." In essence, the utility requirement prevents the patenting of mere ideas. This is important because "[p]atent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable. . . . Tossing out the mere germ of an idea does not constitute enabling disclosure." Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1366 (Fed. Cir. 1997). Moreover, "the utility requirement also prevents the patenting of a mere research proposal or an invention that is simply an object of research." Janssen Pharmaceutica N.V. v. Teva Pharms. USA, Inc. (In re '318 Patent Infringement Litig.), 583 F.3d 1317, 1323-24 (Fed. Cir. 2009).

The Federal Circuit explained in Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1358 (Fed. Cir. 1999) that "the enablement requirement of 35 U.S.C. § 112, ¶ 1 requires

enablement.

that the specification adequately discloses to one skilled in the relevant art how to make, or in the case of a process, how to carry out, the claimed invention without undue experimentation," while "[t]he utility requirement of 35 U.S.C. § 101 mandates that any patentable invention be useful and, accordingly, the subject matter of the claim must be operable." As such, "[i]f a patent claim fails to meet the utility requirement because it is not useful or operative, then it also fails to meet the how-to-use aspect of the enablement requirement." Id.

Mylan has failed to prove, by clear and convincing evidence, that the claims of the '446 Patent are invalid for lack of enablement and/or utility. The Federal Circuit has held that "human trials are not required for a therapeutic invention to be patentable." Janssen, 583 F.3d at 1324 (Fed. Cir. 2009). The Federal Circuit further explained that "patent applications need not 'prove that compounds or other materials which [the applicant] is claiming, and which [the applicant] has stated are useful for "pharmaceutical applications" are safe, effective, and reliable for use with humans.'" Id. (citations omitted). This is because if "Phase II testing [human trials]" were required "in order to prove utility, the associated costs would prevent many companies from obtaining patent protection on promising new inventions, thereby eliminating an incentive to pursue . . . potential cures." Id. (citation omitted). As such, "results from animal tests or in vitro experiments may be sufficient to satisfy the utility requirement." Id. at 1325-25. See also In re Krimmel, 292 F.2d 948, 953 (C.C.P.A. 1961) (holding that animal tests showing that a new nonobvious compound "exhibits some useful pharmaceutical property" are sufficient to demonstrate utility); Cross v. Iizuka, 753 F.2d 1040, 1050-51 (Fed. Cir. 1985) (concluding that in vitro test results for a claimed pharmaceutical compound, combined with animal test results for a structurally similar compound, showed "a reasonable correlation between the

57

disclosed in vitro utility and an in vivo activity").

Here, the '446 Patent discloses both in vitro and in vivo data demonstrating that R(+)-PAI is a potent and selective MAO-B inhibitor. (PTX 1 at 11:61-12:1; 13:16-30; 14: 6-12; 14: 26-31; 15:51-17:2 (Example 24).) The specification explains that (-) deprenyl, like R(+)-PAI, belongs to the class of compounds known as MAO-B inhibitors and treats the symptoms of Parkinson's disease when used as adjunct therapy to L-DOPA. (PTX 1 at 1:66-2:3; 2: 31-37.) Finally, Example 25 of the '446 Patent discloses animal model data demonstrating that the MAO-B inhibitory activity of R(+)-PAI increases dopamine in the brain and influences motor control activity. (PTX 1, Example 25.)[17]

Based on the in vitro and in vivo information contained in the patent, Dr. Ruffolo testified that a POSA would have understood R(+)-PAI to be a potent and selective MAO-B inhibitor. (Tr. 885:8-16 (Ruffolo).) With regard to Example 25 in particular, Dr. Ruffolo explained that a POSA would have understood the test to represent a "standard and common" animal model used to measure a drug's ability to increase dopamine activity in the brain, a desired outcome in the treatment of Parkinson's disease. (Tr. 885:17-22 (Ruffolo).) Because R(+)-PAI increased the stereotyped head movements of the tested animals (Tr. 886:15-19 (Ruffolo)), a POSA would have concluded that R(+)-PAI, through inhibition of MAO-B, could potentially increase dopamine in the brain and therefore have a positive effect on motor activity

---

[17] To test a drug using the "potentiation of amphetamine-induced stereotyped behavior" model of Example 25, amphetamine is given to an animal. This causes dopamine release in the brain that in turn causes repeated or "stereotyped" movements of the head in the animal. (Tr. 885:24-886:5 (Ruffolo).) The tested drug is then administered to the animal, and if the stereotyped movements are potentiated, or increased, this indicates that the drug is increasing dopamine activity in the brain and thereby directly affecting motor behavior. (Tr. 886:6-14 (Ruffolo).)

58

in Parkinson's patients. (Tr. 886:22-887:3 (Ruffolo).) Moreover, a POSA would have been comfortable relying on this indirect model of Parkinson's disease because no direct models of Parkinson's disease were – or are even today – readily available. (Tr. 887:18-888:6 (Ruffolo).)

The Court further notes that Mylan did not present any expert evidence indicating that undue experimentation would be needed to carry out the method of treatment claimed in the '446 Patent, or that the claims to the use of R(+)-PAI to treat Parkinson's disease reflected only a mere hypothesis. In fact, Mylan presented expert testimony that both the resolution techniques and the animal tests reported in the patent are routine. (Tr. 351:12-352:21; 361:21-362:6 (Castagnoli); see also PTX 1 at 4:36-59 (stating that enantiomer separation could be accomplished by "conventional" means in 1990).) In sum, having considered all of the data disclosed in the patent, including the test results reported for R(+)-PAI and the disclosures regarding the use of (-) deprenyl, the Court holds that the '446 Patent would have enabled a POSA in 1990 to use R(+)-PAI to treat Parkinson's disease. Similarly, based on the information disclosed in the'446 Patent, the utility of R(+)-PAI as a treatment for Parkinson's disease was sufficiently disclosed to enable the claimed invention.

## CONCLUSION

For the reasons discussed above, this Court concludes that Mylan has failed to prove, by clear and convincing evidence, that the '446 Patent is invalid for obviousness or for lack of enablement/utility. The parties are directed to submit a Judgment and Form of Order consistent with this Court's opinion.

Dated: September 20, 2013

**HON. CLAIRE C. CECCHI**
**United States District Judge**

59

# Addendum 3

US005453446A

# United States Patent [19]

## Youdim et al.

[11] Patent Number: 5,453,446

[45] Date of Patent: * Sep. 26, 1995

[54] **USE OF THE R-ENANTIOMERS OF N-PROPARGYL 1-AMINOINDAN COMPOUNDS FOR TREATING PARKINSON'S DISEASE.**

[75] Inventors: **Moussa B. H. Youdim**, Haifa; **John P. M. Finberg**, Tivon; **Ruth Levy**, Tel-Aviv; **Jeffrey Sterling**; **David Lerner**, both of Jerusalem; **Tirtsah Berger-Paskin**, Raanana; **Haim Yellin**, Ramat-Gan, all of Israel

[73] Assignees: **Teva Pharmaceutical Industries, Ltd.,** Jerusalem; **Technion Research and Development Foundation Ltd.,** Haifa, both of Israel

[ * ] Notice: The portion of the term of this patent subsequent to Feb. 7, 2012 has been disclaimed.

[21] Appl. No.: **255,046**

[22] Filed: **Jun. 7, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 63,455, May 18, 1993, Pat. No. 5,387,612, which is a continuation of Ser. No. 632,184, Dec. 21, 1990, abandoned.

[30] **Foreign Application Priority Data**

Jan. 3, 1990   [IL]   Israel ........................... 92952

[51] Int. Cl.$^6$ ................................. **A61K 31/135**
[52] U.S. Cl. ............................ **514/647**; 564/308
[58] Field of Search ...................... 514/647, 657; 564/308, 428

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,201,470 | 8/1965 | Huebner | 260/577 |
| 3,253,037 | 5/1966 | Huebner | 260/577 |
| 3,513,244 | 5/1970 | Gittos et al. | 424/320 |
| 4,826,875 | 5/1989 | Chiesi | 514/534 |

#### FOREIGN PATENT DOCUMENTS

1003686   9/1965   United Kingdom .

#### OTHER PUBLICATIONS

Finberg and Youdim, Modification of blood pressure and nictitating membrane response to sympathetic amines by selective monoamine oxidase inhibitors, types A and B, in the cat *British J. Pharmac.* (Jun. 1985) 85(2):541–546.
Kabins and Gershon, Potential applications for monoamine oxidase B inhibitors *Dementia* (1990) 1:323–348.
The Merck Index (Tenth ed. 1983) pp. 149, 248–249.
The Parkinson Study Group, Effect of deprenyl on the progression of disability in early Parkinson's disease. *New England J. Med.* (1989) 321(20):1364–1371.
The Parkinson Study Group, Effects of tocopherol and deprenyl on the progression of disability in early Parkinson's disease, *New England J. Med.* (Jan. 21, 1993) 328(3):176–183.
Riederer and Youdim, Monoamine oxidase activity and monoamine metabolism in brains of Parkinsonian patients treated with 1–deprenyl, *J. Neurochem.* (1986) 46(5):1359–1365.
Tekes, et al., Effect of MAO inhibitors on the uptake and metabolism of dopamine in rat and human brain, *Pol. J. Pharmacol. Pharm.* (1988) 40:653–658.
Youdim et al. in Handbook of Experimental Pharmacology vol. 90/I (1988) Chapter 3, Trendelenburg and Weiner, eds.

*Primary Examiner*—Allen J. Robinson
*Assistant Examiner*—Brian M. Burn
*Attorney, Agent, or Firm*—John P. White

[57] **ABSTRACT**

R(+)-N-p-opargyl-1-aminoindan, its preparation and use and pharmaceutical compositions containing it. The novel compound was found to be useful for the treatment of human patients for Parkinson's disease, memory disorders, dementia of the Alzheimer type (DAT), depression and the hyperactive syndrome.

**20 Claims, 17 Drawing Sheets**


PLAINTIFFS' TRIAL EXHIBIT
CV-10-5078 & CV-11-3076
**PTX 1**

ORC-RAS 017287



FIGURE 1

● = R(+)PAI
○ = S(-)PAI
△ = RAC

ORC-RAS 017288



FIGURE 2

● = R(+)PAI
○ = S(-)PAI
△ = RAC

INHIBITOR CONCENTRATION -LOG M

MAO ACTIVITY % CONTROL

ORC-RAS 017289

## FIGURE 3A



ORC-RAS 017290

## FIGURE 3B



ORC-RAS 017291



FIGURE 4

ORC-RAS 017292

FIGURE 5

O——O S(-)PAI    ●·····● R(+)PAI    △---△ RAC

DOSE mg/kg

MAO ACTIVITY % CONTROL

ORC-RAS 017293




FIGURE 6

ORC-RAS 017294



FIGURE 7

ORC-RAS 017295



ORC-RAS 017296



**FIGURE 9**

ORC-RAS 017297



FIGURE 10

ORC-RAS 017298




**FIGURE 11**

A3634

ORC-RAS 017299



FIGURE 12

ORC-RAS 017300



FIGURE 13

ORC-RAS 017301



FIGURE 14

ORC-RAS 017302

**FIGURE 15**



ORC-RAS 017303

**FIGURE 16**

ORC-RAS 017304

5,453,446

1

## USE OF THE R-ENANTIOMERS OF N-PROPARGYL 1-AMINOINDAN COMPOUNDS FOR TREATING PARKINSON'S DISEASE.

This application is a continuation of U.S. Ser. No. 08/063,455, (now U.S. Pat. No. 5,387,612) filed May 18, 1993, which is a continuation of U.S. Ser. No. 07/632,184, filed Dec. 21, 1990, abandoned.

### FIELD OF THE INVENTION

The present invention is in the field of selective irreversible inhibitors of the enzyme monoamine oxidase (hereinafter MAO) and relates to the R(+) enantiomer of N-propargyl-1 -aminoindan (hereinafter, PAI) which is a selective irreversible inhibitor of the B-form of the monoamine oxidase enzyme (hereinafter, MAO-B). The invention also relates to pharmaceutical compositions containing R(+) PAI which is particularly useful for the treatment of Parkinson's disease, memory disorders and dementia of the Alzheimer type (DAT), depression, and hyperactive syndrome in children.

### BACKGROUND OF THE INVENTION AND PRIOR ART

Parkinson's disease is widely considered to be the result of degradation of the pre-synaptic dopaminergic neurons in the brain, with a subsequent decrease in the amount of the neurotransmitter dopamine, that is being released. Inadequate dopamine release, therefore, leads to the onset of voluntary muscle control disturbances symptomatic of Parkinson's disease.

Various procedures for treating Parkinson's disease have been established and are currently in widespread use, for example, the administration of L-Dopa together with a decarboxylase inhibitor, such as L-carbidopa or benzerazide. The decarboxylase inhibitor protects the L-Dopa molecule from peripheral decarboxylation and thus ensures L-Dopa uptake by the remaining dopaminergic neurons in the striatum of the brain. Here the L-Dopa is converted into dopamine resulting in increased levels of dopamine in these neurons. In response to physiological impulses these neurons are therefore capable of releasing larger amounts of dopamine, the quantity of which approximates the normal required levels. This treatment therefore alleviates the symptoms of the disease and contributes to the well-being of the patients.

However, this L-Dopa treatment has its drawbacks, the main one being that its effectiveness is diminished and is optimal only in the first few years following the onset of treatment. After this initial period the clinical response is accompanied by adverse side effects which include dyskinesia, fluctuation in efficacy throughout the day ("on-off effect") and psychiatric symptoms such as confusional states, paranoia and hallucinations. This fall-off in the effect of L-Dopa treatment is attributed to a number of factors, including the natural progression of the disease, alteration in dopamine receptors as a consequence of increased dopamine production or increased levels of dopamine metabolites, and pharmacokinetic problems of L-Dopa absorption (reviewed by Youdim et al., *Progress in Medicinal Chemistry*, Vol. 21, Chapter 4, pp. 138– 167 (1984), Eds. Ellis and West, Elsevier, Amsterdam).

In order to overcome the drawbacks of the L-Dopa treatment, various treatments have been devised in which

2

L-Dopa is combined with MAO inhibitors, with the aim of reducing the metabolic breakdown of the newly formed dopamine (see for example, U.S. Pat. No. 4,826,875).

MAO exists in two forms known as MAO-A and MAO-B which have selectivity for different substrates and inhibitors. For example, MAO-B metabolizes more efficiently substrates such as 2-phenylethylamine and is selectively and irreversibly inhibited by (–)-deprenyl (as described below).

It should be noted, however, that combining L-Dopa with an inhibitor of both MAO-A and MAG-B is undesirable leading to adverse side effects related to an increased level of catecholamines throughout the neuraxis. Furthermore, complete inhibition of MAO is also undesirable as it potentiates the action of sympathomimetic amines such as tyramine leading to the so-called "cheese effect" (reviewed by Youdim et al., *Handbook of Experimental Pharmacology*, Vol. 90, Chap. 3 (1988) Eds, Trendelenburg and Weiner, Springer-Verlag). As MAO-B was shown to be the predominant form of MAO in the brain, selective inhibitors for this form were thus considered to be a possible way for achieving a decrease in dopamine breakdown on the one hand, together with a minimization of the systemic effects of total MAO inhibition, on the other.

One of these selective MAO-B inhibitors, (–)-deprenyl, has been extensively studied and has been used as an MAO-B inhibitor to augment L-Dopa treatment. This treatment with (–)-deprenyl is generally favorable, not causing the "cheese effect" at doses causing nearly complete inhibition of MAO-B (Elsworth et al., *Physchopharmacology*, 57, 33 (1978). Furthermore, addition of (–)-deprenyl to a combination of L-Dopa and decarboxylase inhibitor to Parkinson's patients leads to improvements in akinesia and overall functional capacity as well as the elimination of "on-off" type fluctuations (reviewed by Birkmayer & Riederer in "Parkinson's Disease" pp. 138–149, Springer-Verlag (1983)).

Thus, (–)-deprenyl enhances and prolongs the effect of L-Dopa and permits a lowering of the dosage of L-Dopa whereby the adverse effects of L-Dopa treatment are limited.

However, (–)-deprenyl is not without its own adverse sides effects which include activation of pre-existing gastric ulcers and occasional hypertensive episodes. Furthermore, (–)-deprenyl is an amphetamine derivative and is metabolized to yield amphetamine and methamphetamines which may lead to undesirable side effects associated with these substances, e.g. increased heart rate (Simpson, *Biochemical Pharmacology*, 27, 1591 (1978); Finberg et al., in "Monoamine Oxidase Inhibitors—The State of the Art", pp. 31–43, Eds. Youdim and Paykel, (1981) Wiley).

Other compounds that are selective irreversible inhibitors of MAO-B but which are free of the undesirable effects associated with (–)-deprenyl have been described. One such compound, namely N-propargyl-1-aminoindan. HCl (racemic-PAI.HCl) was described in GB 1,003,686, GB 1,037, 014 and U.S. Pat. No. 3,513,244. It is a potent, selective, irreversible inhibitor of MAO-B, is not metabolized to amphetamines and does not give rise to unwanted sympathomimetic effects.

In comparative animal tests racemic PAI was shown to have considerable advantages over (–)-deprenyl, for example, racemic PAI produced no significant tachycardia, did not increase blood pressure (effects produced by doses of 5 mg/kg of (–)-deprenyl), and did not lead to contraction of nictitating membrane nor to an increase in hear rate at doses up to 5 mg/kg (effects caused by (–)-deprenyl at doses over

**A3640**

ORC-RAS 017305

5,453,446

**3**

0.5 mg/kg). Furthermore, racemic PAI.HCl does not potentiate the cardiovascular effects of tyramine (Finberg et al. in "Enzymes and Neurotransmitters in Mental Disease", pp. 205–219, (1980), Eds. Usdin et al., Pub. John Wiley and sons, N.Y.; Finberg et al. (1981) in "Monoamine Oxidase Inhibitors—The State of the Art", ibid; Finberg and Youdim, *British Journal Pharmacol.* 85 451, (1985).

One object of this invention is to separate the racemic PAI compounds and to produce an enantiomer with MAO-B inhibition activity.

Since deprenyl has a similar structure to PAI and it is known that the (–)-enantiomer of deprenyl, i.e. (–)-deprenyl, is considerably more pharmaceutically active than the (+)-enantiomer, it was expected, by those skilled in the art, that only the (–) enantiomer of PAI would be the active MAO-B inhibitor.

However, contrary to such expectations, upon resolution of the enantiomers, it was found, in accordance with the present invention that the (+)-PAI enantiomer was in fact the active MAO-B inhibitor while the (–)enantiomer showed extremely low MAO-B inhibitory activity. Furthermore, the (+)PAI enantiomer surprisingly also had a higher degree of selectivity for MAO-B inhibition than the corresponding racemic form and may thus have less undesirable side effects in the treatment of the indicated disease.-These findings are based on both in vitro and in vivo experiments as presented hereinafter in greater detail.

It was subsequently shown that (+)-PAI has the R absolute configuration. This was also surprising based on the expected structural analogy with deprenyl and the amphetamines.

The high degree of stereoselectivity of pharmacological activity between R(+)-PAI and the S(–) enantiomer is also remarkable. The compounds R(+)-PAI is nearly four orders of magnitude more active than the S(–) enantiomer in MAO-B inhibition. This ratio is significantly higher than that observed between the two deprenyl enantiomers (Knoll and Magyar, *Adv. Blochem. Physchopharmacol.*, 5, 393 (1972); Magyar, et al., *Acta Physiol. Acad. Sci. Hung.*, 32, 377 (1967). Furthermore, in some physiological tests, (+) deprenyl was reported to have equal or even higher activity than the (–) enantiomer (Tekes, et al., *Pol. J. Pharmacol. Pharm.* 40, 653 (1988).

N-methyl-N-propargylaminoindan (MPAI) is a more potent inhibitor of MAO activity, but with lower selectivity for MAO-B over A (Tipton, et al., *Biochem. Pharmacol.*, 31, 1250 (1982). Surprisingly, in this case we have found only small degree of difference in the relative activities of the two resolved enantiomers thus further emphasising the remarkableness of the case of R(+)-PAI. (See Table 1A).

Another object of the present invention is to provide for the first time use of the pharmaceutically active PAI-enantiomer alone (without L-Dopa) for treatment of Parkinson's disease, dementia and depression (see review by Youdim et al. in *Handbook of Experimental Pharmacology,* Vol. 90/I, (1988), chap.3, Eds. Trendelenberg and Wiener).

It is yet another object of the invention to provide for the use of the pharmaceutically active PAI-enantiomer for pre-treatment alone or together with synergistic agents, of Parkinson's disease in order to delay the L-Dopa treatment and its associated adverse side effects. This approach has been studied with respect to (–)-deprenyl which was shown to be effective when administered alone to early Parkinsonism patients, and may also have a synergistic effect in these patients when administered together with α-tocopherol (a

**4**

vitamin E derivative), (The Parkinson's Study Group, *New England J. Med.,* 321 (20), 1364–1371, (1989).

In addition to its usefulness in treating Parkinson's disease, (–)-deprenyl has also been shown to be useful in the treatment of patients with dementia of the Alzheimer type (DAT) (Tarlot et al., *Psychopharmacology,* 91, 489–495, 1987), and in the treatment of depression (Mendelewicz and Youdim, *Brit. J. Psychiat.* 142, 508–511, 1983). Thus, the R(+)-PAI compound of this invention has been shown to possess activity in restoration of memory, thus having potential for treatment of memory disorders, dementia and especially useful in Alzheimer's disease and for the treatment of the hyperactive syndrome in children.

### DETAILED DESCRIPTION OF THE INVENTION

The present invention thus provides as a novel compound the R(+)-enantiomer of N-propargyl-1-aminoindan [R(+)PAI] of the formula (I):

(I)

and pharmaceutically acceptable acid addition salts thereof. The present invention also relates to the preparation of R(+)PAI, to pharmaceutical compositions comprising the compound R(+)PAI together with suitable carriers and to the use of R(+)PAI for the treatment of human patients for Parkinson's disease, memory disorders, dementia of the Alzheimer type and hyperactive syndrome.

The R(+) PAI may be obtained by optical resolution of racemic mixtures of R and S-enantiomer of PAI. Such a resolution can be accomplished by any conventional resolution method, well known to a person skilled in the art, such as those described in "Enantiomers, Racemates and Resolutions" by J. Jacques, A. Collet and S. Wilen, Pub. John Wiley & Sons, N.Y., 1981. For example, the resolution may be carried out by preparative chomatography on a chiral column. Another example of a suitable resolution method is the formation of diastereomeric salts with a chiral acid such as tartaric, malic, mandelic acid or N-acetyl derivatives of amino acids, such as N-acetyl leucine, followed by recrystallisation to isolate the diastereomeric salt of the desired R enantiomer.

The racemic mixture of R and S enantiomers of PAI may be prepared, e.g. as described in GB 1,003,676 and GB 1,037,014. The racemic mixture of PAI can also be prepared by reacting 1-chloroindan or 1-bromoindan with propargylamine. Alternatively, this racemate may be prepared by reacting propargylamine with 1-indanone to form the corresponding imine, followed by reduction of the carbon-nitrogen double bond of the imine with a suitable agent, such as sodium borohydride.

In accordance with this invention, the R enantiomer of PAI, can also be prepared directly from the optically active R-enantiomer of 1-aminoindan by reaction with propargyl bromide or propargyl chloride in the presence of an organic or inorganic base and optionally in the presence of a suitable solvent.

Suitable organic or inorganic bases for use in the above reaction are, e.g., triethylamine, pyridine, alkali metal carbonates or bicarbonates etc. If the reaction is conducted in

A3641

ORC-RAS 017306

5,453,446

5

the presence of a solvent, this may be chosen from, e.g., toluene, methylene chloride and acetonitrile. A preferred method of preparation of the aforementioned compound is the reaction between R-1-aminoindan with proparyl chloride using potassium bicarbonate as a base and acetonitrile as solvent.

The above described reaction of 1-aminoindan generally results in a mixture of unreacted primary amine, the desired secondary amine and the tertiary amine N,N-bispropargylamino product. The desired secondary amine, i.e. N-propagyl-1-aminoindan, can be separated from this mixture by any conventional separation method, such as chromatography, distillation, selective extraction, etc.

The R-1-aminoindan starting material can be prepared by methods known from the literature, examples Lawson and Rao, Bichochemistry (1980) 19, 2133 and the references cited therein, and European Patent No. 235,590.

The R-1-aminoindan can also be prepared by resolution of a racemic mixture of the R and S enantiomers, e.g. by formation of diastereomeric salts with chiral acids, or by any other known method, such as those reported in the above mentioned "Enantiomers, Racemates and Resolutions" by J. Jacques et al, Pub. John Wiley & Sons, N.Y., 1981. Alternatively, the R-1-aminoindan starting material may be prepared by reacting 1-indanone with an optically active amine, followed by reduction Of the carbon-nitrogen double bond of the resulting imine by hydrogenation over a suitable catalyst, such as palladium on carbon, platinum oxide, Raney-nickel etc. Suitable optically active amines are, for example, one of the antipodes of phenethylamine or an ester of an aminoacid, such as valine or phenylalanine. The benzylic N—C bond may be cleaved subsequently, by hydrogenation under non-vigorous conditions.

Additional methods for preparing R-1-aminoindan are the hydrogenation, as described above, of indan-1-one oxime ethers, wherein the alkyl portion of the ether contains an optically pure chiral center. Alternatively, a non-chiral derivative of indan-1-one containing a carbon-nitrogen double bond, such as an imine or oxime, can be reduced with a chiral reducing agent, e.g. a complex of lithium aluminium-hydride and ephedrine.

For the preparation of pharmaceutically acceptable acid addition salts of the compound of R(+)PAI, the free base can be reacted with the desired acids in the presence of a suitable solvent by conventional methods. Similarly, an acid addition salt may be converted to the free base form in a known manner.

In accordance with the present invention, the compound R(+)PAI may be prepared as pharmaceutical compositions particularly useful for the treatment of Parkinson's disease, dementia of the Alzheimer type (DAT) or depression. Such compositions may comprise the compound of R(+)PAI or pharmaceutically acceptable acid addition salts thereof, together with pharmaceutically acceptable carriers and/or excipients. For example, these compositions may be prepared as medicaments to be administered orally, parenterally, rectally or transdermally. Suitable forms for oral administration include tablets, compressed or coated pills, dragées, sachets, hard or soft gelatin capsules, sub-lingual tablets , syrups and suspensions; for parenteral administration the invention provides ampoules or vials that include an aqueous or non-aqueous solution or emulsion; for rectal administration there are provided suppositories with hydrophilic or hydrophobic vehicles; and for topical application as ointments and transdermal delivery there are provided suitable delivery systems as known in the art.

6

These above compositions may be used alone to treat Parkinson's disease, Alzheimer's disease or depression, or alternatively, in the case of Parkinson's disease, they may be used as an adjunct to the conventional L-Dopa treatments. A composition may comprise 2–10 mg of R(+)-N-propargyl-1-aminoindan, 50–200 mg of Levodopa, and 12.5–50 mg of benserazide.

The preferred dosages of the active ingredient, i.e., R-PAI compounds, in the above compositions are within the following ranges: for oral suppository formulations 2–20 mg per dosage unit to be taken daily and more preferably 5–10 mg per dosage unit to be taken daily may be used; and for injectable formulations 1–10 mg/ml per dosage unit to be taken daily and more preferably 2–5 mg/ml per dosage unit to be taken daily may be used.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graphic representation of the results according to Example 19.

FIG. 2 is a graphic representation of the results according to Example 19.

FIG. 3A is a graphic representation of the results according to Example 19.

FIG. 3B: See description of FIG. 3A

FIG. 4 is a graphic representation of the results according to Example 20.

FIG. 5 is a graphic representation of the results according to Example 20.

FIG. 6 is a graphic representation of the results according to Example 20.

FIG. 7 is a graphic representation of the results according to Example 20.

FIG. 8 is a graphic representation of the results according to Example 20.

FIG. 9 is a graphic representation of the results according to Example 20.

FIG. 10 is a graphic representation of the results according to Example 20.

FIG. 11 is a graphic representation of the results according to Example 20.

FIG. 12 is a graphic representation of the results according to Example 21.

FIG. 13 is a graphic representation of the results according to Example 21.

FIG. 14 is a graphic representation of the results according to Example 21.

FIG. 15 is a graphic representation of-the results according to Example 21.

FIG. 16 is a graphic representation of the results according to Example 22.

The invention will now be described in more detail in the following non-limiting examples and their accompanying Tables and Figures.

EXAMPLE 1

Racemic N-propargyl-1-aminoindan hydrochloride

Racemic 1-aminoindan (10.0 g) and 10.4 g of potassium carbonate were added to 75 ml of acetonitrile. The resulting suspension was heated to 60° C. and 4.5 g of proparyl chloride were added dropwise.

The mixture was stirred at 60° C. for 16 hours, whereafter most of the volatiles were removed by distillation in vacuo.

ORC-RAS 017307

5,453,446

**7**

The residue was partitioned between 10% aqueous sodium hydroxide and methylene chloride.

The organic phase was dried and the solvent removed by distillation. The residue was flash chromatographed on silica gel, eluting with 40% ethyl acetate/60% hexane. The fractions containing the title compound as a free base were combined and the eluant replaced by ether. The ethereal solution was treated with gaseous HCl, the precipitate formed was isolated by suction filtration and recrystallized from isopropanol to yield 7.3 g of the title compound, m.p. 182°–4° C.

Chromatographic and spectroscopic data were in accordance with the literature (U.S. Pat. No. 3,513,244) and an authentic sample.

NMR ($\delta$, CDCl$_3$): 2.45 (2H, m), 2.60 (1H, t), 2.90 (1H, m), 3.45 (1H, m), 3.70 (2H, d), 4.95 (1H, t), 7.5 (4H, m) ppm.

EXAMPLE 2

S-(–)-N-Propargyl-1-aminoindan hydrochloride

The title compound in free base form was isolated by resolving the racemic mixture of the free base of Example 1 on a Chiracel OJ (cellulose tris[p-methylbenzoate]) preparative HPLC column eluting with 10% isopropanol/90% hexane and collecting the first eluted major peak. The resulting oil was converted to the title compound (hydrochloride) by treatment of a 10% diethyl ether solution of the oil with gaseous HCl and the resulting precipitate was collected by suction filtration.

[a]$_D$–29.2° (1%, ethanol), m.p. 182°–184° C. Other chromatographic and spectroscopic properties were identical with the hydrochloride salt of Example 1.

EXAMPLE 3

R-(+)-N-Propargyl-1-aminoindan hydrochloride

The title compound was prepared as in Example 2 above, except that the second eluted peak from the preparative HPLC was collected: [a]$_D$+29.1° (0.8%, ethanol), m.p. 179°–181° C. Other chromatographic and spectroscopic properties were identical with the hydrochloride salt of Example 1.

EXAMPLE 4

R-(+)-N-Propargyl-1-aminoindan hydrochloride

R-(–)-1-aminoindan (12.4 g) and 12.9 g of potassium carbonate were added to 95 ml of acetonitrile. The resulting suspension was heated to 60° and 5.6 g of propargyl chloride were added dropwise. The mixture was stirred at 60° C. for 16 hours, whereafter most of the volatiles were removed by distillation in vacuo. The residue was partitioned between 10% aqueous sodium hydroxide and methylene chloride.

The organic phase was dried and the solvent removed in vacuo, the residue was flash chromatographed on silica gel eluting with 40% ethyl acetate/60% hexane. Fractions containing the free base of the title compound were combined and the solvent replaced by ether. The ethereal solution was treated with gaseous HCl and the resulting precipitate was isolated by suction filtration and recrystallized from isopropanol to yield 6.8 g of the title compound, m.p. 183°–185° C., [$\alpha$]$_D$+30.90 (2%, ethanol). Spectral properties were identical to those reported for the compound of Example 1.

**8**

EXAMPLE 5

S-(–)-N-propargyl-1-aminoindan hydrochloride

The title compound was prepared by the method of Example 4, except that S-(+)-1-aminoindan was used as starting material. The product exhibited [a]$_D$–30.3 (2%, ethanol), m.p. 183°–5° C. Spectral properties were identical to those reported for the compound of Example 1.

EXAMPLE 6

Di (R-(+)-N-propargyl-1-aminoindan)L-tartarate

To a solution of L-Tartaric acid (4.4 g) in 48 ml of boiling methanol was added a solution of R-(+)-N-propargyl-1-aminoindan free base (5.0 g) in methanol (48 ml). The solution was heated to reflux and 284 ml of t-butylmethyl ether was added over 20 minutes. The mixture was heated for an additional 30 minutes, cooled, and the resulting precipitate was isolated by suction filtration to yield 6.7 g of the title compound, m.p. 175°–177° C. [a]$_D$ (1.5, H$_2$O)=+34.3; Anal. calcd. for C$_{28}$H$_{32}$O$_6$N$_2$; C. 68.26, H, 6.56, N, 5.69. Found: C, 68.76; H, 6.57; N, 5.61.

EXAMPLE 7

R-(+)-N-Methyl-N-propargyl-1-aminoindan hydrochloride

The free base form of R-(+)-N-propargyl-1-aminoindan from Example 4 (1.2 grams), potassium carbonate (0.97 grams) and methyl iodide (1 gram) were added to 15 ml of acetone and the resulting suspension heated to reflux under a nitrogen atmosphere for 8 hrs. Thereafter the volatiles were removed under reduced pressure and the residue partitioned between 10% aqueous sodium hydroxide (30 ml) and methylene chloride (30 ml). The organic phase was dried and the solvent removed in vacuo. The residue was flash chromatographed on silica gel eluting with 40% ethyl acetate/60% hexane. Fractions containing the title compound as a free base were combined and the solvent replaced by diethyl ether. The ethereal solution was treated with gaseous HCl, the volatiles removed in vacuo and the residue recrystallized from isopropanol to yield 400 mg of the title compound as a white crystalline solid, m.p.: 134°–136° C. [a]$_D$+31.40 (ethanol). NMR($\delta$CDCl$_3$):2.55 (2H, m); 2.7 (1H, br.s); 2.8 (3H, s); 3.0 (1H, m); 3.4 (1H, m); 3.9 (2H, br.s); 5.05 (1H, m) 7.7 (4H, m) ppm.

EXAMPLE 8

S-(–)-N-methyl-N-propargyl-1-aminoindan hydrochloride

The title compound was prepared as in Example 7 above, except that S-(–)-N-proparyl-1-aminoindan (free base) from Example 5 was used as starting material. All of the physical and spectral properties of the title compound were identical to those in Example 7 except for the [a]$_D$ –34.9° (ethanol).

EXAMPLE 9

| Tablet Composition | |
|---|---|
| R(+)-N-propargyl-1-aminoindan hydrochloride | 5.0mg |
| Pregelatinized starch | 47.0mg |
| Lactose hydrous | 66.0mg |

**A3643**

ORC-RAS 017308

5,453,446

**9**

-continued

| Tablet Composition | |
| --- | --- |
| Microcrystalline cellulose | 20.0mg |
| Sodium starch glycolate | 3.0mg |
| Talc | 1.5mg |
| Magnesium stearate | 0.7mg |
| Purified water added as required for granulation. | |

### EXAMPLE 10

| Tablet Composition | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 1.0mg |
| Lactose hydrous | 50.0mg |
| Pregelatinized starch | 36.0mg |
| Microcrystalline cellulose | 14.0mg |
| Sodium starch glycolate | 2.2mg |
| Talc | 1.0mg |
| Magnesium stearate | 0.5mg |
| Purified water added as required for granulation. | |

### EXAMPLE 11

| Capsule Composition | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 5.0mg |
| Pregelatinized starch | 10.0mg |
| Starch | 44.0mg |
| Microcrystalline cellulose | 25.0mg |
| Ethylcellulose | 1.0mg |
| Talc | 1.5mg |
| Purified water added as required for granulation. | |

### EXAMPLE 12

| Injection Composition | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 5.0mg |
| Dextrose anhydrous | 44.0mg |
| HCl added to pH 5 | |
| Purified water added as required for 1 ml | |

### EXAMPLE 13

| Injection Composition | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 1.0mg |
| Sodium chloride | 8.9mg |
| HCl added to pH 5 | |
| Purified water added as required to 1 ml | |

### EXAMPLE 14

| Injection Composition | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 2.0mg |
| Sodium chloride | 8.9mg |

**10**

-continued

| Injection Composition | |
| --- | --- |
| HCl added to pH 5 | |
| Purified water added as required to 1 ml | |

### EXAMPLE 15

| Syrup Composition | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 5.0 mg |
| Sucrose | 2250.0 mg |
| Saccharin sodium | 5.0 mg |
| Methylparaben | 6.0 mg |
| Propylparaben | 1.0 mg |
| Flavor | 20.0 mg |
| Glycerin USP | 500 mg |
| Alcohol 95% USP | 200 mg |
| Purified water as required to 5.0 ml | |

### EXAMPLE 16

| Sublingual Tablets | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 2.5 mg |
| Microcrystalline cellulose | 20.0 mg |
| Lactose hydrous | 5.0 mg |
| Pregelatinized starch | 3.0 mg |
| Povidone | 0.3 mg |
| Coloring agent | q.s. |
| Flavor | q.s. |
| Sweetener | q.s. |
| Talc | 0.3 mg |

Blend the excipients and the active and granulate with an
ethanol solution of Povidone. After drying and weighing, it
is blended with the talc and compressed.

### EXAMPLE 17

| PAI Sublingual Tablets | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 5.0mg |
| Microcrystalline cellulose | 15.0mg |
| Pregelatinized starch | 12.0mg |
| Ethyl cellulose | 0.3mg |
| Talc | 0.3mg |
| Purified water added as required for granulation. | |

### EXAMPLE 18

| Tablet Composition | |
| --- | --- |
| R(+)-N-propargyl-1-aminoindan hydrochloride | 5.0 mg |
| Levodopa | 100.0 mg |
| Carbidopa | 25.0 mg |
| Pregelatinized starch | 24.0 mg |
| Starch | 40.0 mg |
| Microcrystalline cellulose | 49.5 mg |
| Col. D & C Yellow No. 10 | 0.5 mg |
| Col. D & C Yellow No. 6 | 0.02 mg |
| Alcohol USP added as required for granulation. | |

A3644

ORC-RAS 017309

5,453,446

| 11 | 12 |

The following Examples and their accompanying Tables and Figures relate to the Biological Experiments carried out in accordance with this invention.

tivity between MAO-B and MAO-A.

TABLE 1

IC-50 (nM) VALUES FOR INHIBITION OF MAO-A AND MAO-B BY RACEMIC-PAI AND THE R(+) AND S(−) ENANTIOMERS THEREOF IN RAT BRAIN HOMOGENATE IN VITRO

| | IC-50 (nM) | | | | | |
| | MAO-A | | | MAO-B | | |
| Compound: | S(−)PAI | R(+)PAI | Rac | S(−)PAI | R(+)PAI | Rac |
| | 26000 | 73 | 140 | 17000 | 2.5 | 5 |

## EXAMPLE 19

### Inhibition of MAO Activity In Vitro

#### Experimental Protocol

The MAO enzyme source was a homogenate of rat brain in 0.3M sucrose, which was centrifuged at 600g for 15 min. The supernatant was diluted appropriately in 0.05M phosphate buffer, and pre-incubated with serial dilutions of compounds of general formula I: R(+)-PAI, S(−)-PAI and racemic-PAI (wherein A is hydrogen) for 20 min at 37° C. $^{14}$C-labelled substrates (2-phenylethylamine, hereinafter PEA; 5-hydroxytryptamine, hereinafter 5-HT) were then added, and the incubation continued for a further 20 min (PEA), or 30–45 min (5-HT). Substrate concentrations used were 50uM (PEA), and 1 mM (5-HT). In the case of PEA, enzyme concentration was chosen so that not more than 10% of the substrate was metabolized during the course of the reaction. The reaction was then stopped by addition of tranylcypromine (to final concentration 1 mM), and the incubate filtered over a small column of Amberlite CG-50, buffered to pH 6.3. The column was washed with 1.5 ml water, the eluates pooled and the radioactive content determined by liquid scintillation spectrometry. Since the amine substrates are totally retained on the column, radioactivity in the eluate indicates the production of neutral and acidic metabolites formed as a result of MAO activity. Activity of MAO in the sample was expressed as a percentage of control activity in the absence of inhibitors, after subtraction of appropriate blank values. The activity determined using PEA as substrate is referred to as MAO-B, and that determined using 5-HT as MAO-A.

### Results

Inhibitory activity of the R(+)-PAI, S(−)-PAI and racemic-PAI compounds of formula I were examined separately in vitro, and the results of typical experimental runs are shown in FIGS. 1 and 2. The entire experiment was repeated three times. Concentration of inhibitor producing 50% inhibition of substrate metabolism (IC-50) was calculated from the inhibition curves, and is shown in Table 1. From this data it can be seen that:

    (a) the R(+)-PAI is twice as active as the racemate for inhibition of MAO-B;

    (b) the R(+)-PAI is 29 times more active for inhibition of MAO-B than MAO-A;

    (c) the S(−)-PAI is only 1/6,800 as active as the R(+)-PAI for inhibition of MAO-B, and shows little or no selec-

The results of the same experiment using R(+) and S(−) MPAI (N-methyl-N-propargyl-1-aminoindan) are reported in Table 1A. Each of the enantiomers of MPAI is less selective between MAO-B and MAO-A inhibition than R(+)PAI. Furthermore, R(+)MPAI is only five times as active as S(−)MPAI in MAO-B inhibition, in contrast to R(+)PAI which is about 7000 times as active as S(−)PAI in this assay.

TABLE 1A

IC-50 (nM) VALUES FOR INHIBITION OF MAO-A AND MAO-B BY THE R(+) AND S(−) ENANTIOMERS OF MPAI IN RAT BRAIN HOMOGENATE IN VITRO

| | IC-50 (nM) | | | |
| | MAO-A | | MAO-B | |
| Compound: | S(−)MPAI | R(+)MPAI | S(−)MPAI | R(+)MPAI |
| | 70 | 3 | 50 | 10 |

Some experiments were also carried out with human cerebral cortical tissues, obtained 6 hours post-mortem, and treated as described above. The results of such an experiment are shown in FIG. 3 (where the R(+)PAI, S(−)PAI and racemic PAI compounds were those equivalent to formula I).

### EXAMPLE 20

### Inhibition of MAO Activity In Vivo: Acute Treatment

#### Experimental Protocol

Rats (male Sprague-Dawley derived) weighing 250±20 g were treated with one of the enantiomers or the racemic form of PAI by intraperitoneal injection (ip) or oral gavage (po) and decapitated 1 h or 2 h later respectively. Groups of three rats were used for each dose level of inhibitor, and MAO activity determined in brain and liver using the general technique described above. The amount of protein in each incubation was determined using the Folin-Lowry method, and enzyme activity calculated as nmol substrate metabolized per hour incubation for each mg protein. Activity of MAO in tissues from animals treated with inhibitors was expressed as a percentage of the enzyme activity in a group of control animals, administered vehicle (water for oral administration; 0.9% saline for ip injection) and killed as above.

**A3645**

ORC-RAS 017310

5,453,446

## 13

### Results

None of the dose levels used with the inhibitor drugs produced any obvious behavioural alteration. The results are depicted in FIGS. 4 to 11. Following ip administration, compound R(+)-PAI produced 90% inhibition of brain MAO-A activity at a dose of 0.5 mg/kg. The same dose produced only 20% inhibition of MAO-A activity. By oral administration, the same dose of R(+)-PAI produced 80% inhibition of MAO-B with no detectable inhibition of MAO-A. Essentially similar results were seen for inhibition of hepatic MAO, as for brain MAO. The doses producing 50% inhibition of MAO-A and MAO-B (IC-50) were calculated from the inhibition curves, and are shown in Table 2. These data show:

  (a) that MAO inhibitory activity of compound R(+)-PAI is maintained in vivo in the rat;

  (b) that selectivity for inhibition of MAO-B, as opposed to MAO-A, by R(+)-PAI is maintained in vivo;

  (c) that the much greater activity of the (+)-as opposed to (−)-enantiomer, is maintained in vivo;

  (d) that the compounds are effectively absorbed after oral administration; and

  (e) that the compounds effectively pass the blood-brain barrier, and effectively inhibit brain MAO. The fact that R(+)-PAI was about twice as active as the racemic compound for inhibition of MAO-B is a reflection of the extremely low activity of S(−)-PAI for inhibition of MAO-B.

TABLE 2

IC-50 VALUES (mg/kg) FOR INHIBITION OF MAO-A
AND MAO-B BY R(+)-PAI, S(−)-PAI OR RACEMIC-
PAI, IN THE RAT FOLLOWING INTRAPERITONEAL (IP)
INJECTION OR ORAL ADMINISTRATION (PO)

| | IC-50 (mg/kg) | | | | | |
|---|---|---|---|---|---|---|
| | MAO-A | | | MAO-B | | |
| Compound: | S(−)PAI | R(+)PAI | Rac | S(−)PAI | R(+)PAI | Rac |
| IP BRAIN | >10 | 1.2 | 2.5 | >10 | 0.07 | 0.22 |
| IP LIVER | >10 | 5 | 5 | >10 | 0.06 | 0.11 |
| PO BRAIN | >10 | >5 | >5 | >10 | 0.17 | 0.29 |
| PO LIVER | >10 | >5 | >5 | >10 | 0.05 | 0.09 |

### EXAMPLE 21

Inhibition of MAO Activity In Vivo: Chronic
Treatment

#### Experimental Protocol

Rats (specification as in Example 20:4 animals for each dose level) were treated with compound R(+)-PAI or racemic form at three dose levels (0.05, 0.1 and 0.5 mg/kg) by oral administration, one dose daily for 21 days, and decapitated 2 hours after the last dose. The activity of MAO types A and B was determined in brain and liver as described in Example 20.

#### Results

A dose of 0.1 mg/kg daily of compound R(+)-PAI produced a good degree of selective inhibition, with more than 80% inhibition of brain MAO-B and 20% or less inhibition of brain MAO-A. At the higher dose of 0.5 mg/kg daily, MAO-A was still inhibited by less than 50% (FIGS. 12 and 13). Hepatic MAO showed a similar degree of selective

## 14

inhibition (FIGS. 14 and 15). Compound R(+)-PAI was again more potent than the racemic form of the inhibitor, by a factor of about twofold. In the case of brain MAO, R(+)-PAI had a better degree of selectivity for inhibition of MAO-B than the racemic form.

These results show that selectivity of MAO-B inhibition can be maintained following chronic treatment with the compounds. As with other irreversible inhibitors, the degree of enzyme inhibition is greater with chronic treatments than following a single dose of the drug. Compound R(+)-PAI shows a better degree of selectivity for inhibition of brain MAO-B than the racemic compound.

### EXAMPLE 22

Irreversible Nature of MAO Inhibition

#### Experimental Protocol

A single dose of compound R(+)-PAI (1 mg/kg) was administered by ip injection to groups of 4 rats, and the animals killed 2,6,18,24,48 and 72 hours later. Activity of MAO-B was determined in whole brain tissues as described herein before.

#### Results

The results are shown in FIG. 16. Maximal inhibition of MAO-B was attained at 6 hours after the injection. MAO activity had only returned to 30% control activity at 72 hours after the injection. This experiment demonstrates the irreversible nature of the MAO inhibition by compound R(+)-PAI.

### EXAMPLE 23

Potentiation of Tyramine Pressor Effect in
Conscious Rats

#### Experimental Protocol

Rats were anesthetised with a mixture of pentobarbital (30 mg/kg) and chloral hydrate (120 mg/kg) by intraperitoneal injection. The left carotid artery and jugular vein were cannulated with fine polythene tubing (artery) or fine silicone rubber tubing connected to polyethylene tubing (vein), the distal end of which was brought under the skin to an anchor point behind the neck. The tubing was filled with heparinised saline solution, and plugged with a fine steel rod. The animals were treated with 20 mg chloramphenicol by intramuscular injection and allowed to recover from the operation overnight. The following day, the rats were placed

A3646

ORC-RAS 017311

5,453,446

| 15 | 16 |

in a high-walled container permitting free movement. The arterial catheter was connected to a pressure transducer via a 100 cm length of saline-filled, fine-bore polyethylene tubing, and the venous catheter connected to a 1 ml syringe via a similar length of tubing, which, together with the syringe, contained a solution of tyramine hydrochloride in saline (1 mg/ml).

Following an equilibration period of 30 to 40 min, tyramine injections (50 or 100 μg) were given, and blood pressure responses recorded. At least 15 min was maintained between injections, after return of blood pressure to control values. Control pressor responses were established, and then one of the drugs injected intra-peritoneally, and tyramine responses repeated over the next 4 hours. Area under the blood pressure response curve was estimated, and the ratio of this area after treatment to before treatment determined, using the average of 3 to 4 values obtained in control period, and 1 to 3 hours after injection of the compounds.

Results

The results are shown in Table 3. Compound R(+)-PAI at a dose of 1 mg/kg, (which causes complete inhibition of MAO-B in brain and liver, and 40 to 50% inhibition of MAO-A in these tissues) caused no significant potentiation of tyramine pressor response. At the higher R(+)-PAI dose of 5 mg/kg, (which causes more extensive inhibition of MAO-A in brain and periphery), there was a significant potentiation of the tyramine pressor response, which was similar in extent to that produced by the same dose of deprenyl, and less than that produced by clorgyline (at a dose which inhibits hepatic MAO-A activity by over 85%).

TABLE 3

POTENTIATION OF TYRAMINE PRESSOR EFFECT IN
CONSCIOUS RATS BY MAO INHIBITORS

| Inhibitor | Dose (mg/kg) | No. of rats (n) | Ratio Area Under Pressor Response Curve; After/Before | SEM |
|---|---|---|---|---|
| Saline | | 12 | 1.25 | 0.28 |
| Clorgyline | 2 | 6 | 10.39 | 2.13 |
| (−)Deprenyl | 1 | 2 | 1.15 | |
| (−)Deprenyl | 5 | 3 | 2.36 | 0.16 |
| R(+)PAI | 1 | 3 | 1.38 | 0.7 |
| R(+)PAI | 5 | 3 | 3.49 | 0.98 |

From this experiment it can be concluded that compound R(+)-PAI causes no potentiation of the tyramine pressor effect at a dose which effectively inhibits MAO-B.

EXAMPLE 24

Suppression of MPTP-induced Dopaminergic
Toxicity by R(+)-PAI

1-Methyl-4-phenyl-1,2,3,6-tetrahydropyridine (MPTP) is a neurotoxin that damages nigrostriatal dopaminergic neurons in several mammalian species including mice and produces a parkinsonian syndrome in humans and primates. A crucial initial step in the mechanism of its neurotoxicity involves conversion of MPTP to its toxic metabolite 1-methyl-4-phenyl pyridinium ion (MPP+). This reaction is catalyzed by the enzyme MAO-B and probably takes place outside of dopaminergic neurons, mainly in glia. It is known that MPTP is both a substrate and an irreversible inhibitor of MAO-B. Pretreatment of experimental animals with

MAO-B inhibitors such as deprenyl or pargyline protects against and prevents the MPTP-induced damage to nigrostriatal neurons because the oxidative conversion of MPTP to MPP+ is blocked. One of the major current hypotheses suggests that the progressive nigrostriatal degeneration in Parkinson's may be due to exposure to environmentally-derived exogenous MPTP-like neurotoxins. In such case, there is an additional strong indication to initiation of sustained treatment with an MAO-B inhibitor from the very early stages of Parkinson's disease in the hope that it will neutralize the damaging effects of such yet putative MPTP-like toxins and thus arrest or slow down the progression of the illness. A successful MAO-B inhibitor drug is currently judged by its ability to block MPTP-induced damage to nigrostriatal dopaminergic neurons in vivo. We therefore tested the (−) and (+) enantiomers of PAI for their potency in preventing or attenuating the MPTP-induced striatal dopamine depletions in mice.

Experimental Protocol

Male C57 black mice (20–25 g weight) were injected with MPTP.HCl (30 mg/kg dissolved in distilled water, s.c.) or vehicle alone or one hour after pretreatment with the (−) or (+) isomers of PAI (2.5 mg/kg, i.p.) or with deprenyl (5 mg/kg, i.p.) and decapitated 5 days later. Brains were removed and corpora striata dissected on an ice-cold glass plate and frozen on dry ice. Striatal tissues were homogenized in 0.1M perchloric acid, and deproteinized aliquots containing dihydroxybenzylamine as an internal standard were assayed for dopamine and its major metabolite 3,4-dihydroxy-phenylacetic acid (DOPAC) using HPLC with electro-chemical detection.

Results

Table 4 shows the results of this experiment. Treatment with MPTP alone produced marked striatal dopamine (DA) and DOPAC depletions. Treatment with the (−) and (+) enantiomers of PAI or with (−) deprenyl did not affect striatal DA concentrations. Pretreatment with the (−) isomer of PAI did not affect the MPTP-induced DA and DOPAC levels in striatum. The (+)-isomer of PAI given before MPTP, completely abolished the reduction in striatal DA and DOPAC levels produced by the toxin. At a dose of 2.5 mg/kg it was equipotent to (−) deprenyl (5 mg/kg) in its protective effect.

TABLE 4

EFFECT OF PRETREATMENT WITH THE (−) AND (+)
ENANTIOMERS OF THE MAO-B INHIBITOR PAI ON THE
STRIATAL DA AND DOPAC DEPLETIONS INDUCED BY
MPTP IN MICE IN VIVO.

| | | DA | DOPAC |
|---|---|---|---|
| | | (ng/mg protein) | |
| Control | | 162.8 ± 7.2 | 8.4 ± 0.5 |
| MPTP | | 53.1 ± 6.2 | 3.2 ± 0.3 |
| (−)-PAI | | 174.0 ± 4.8 | 7.5 ± 0.2 |
| (−)-PAI | + MPTP | 53.4 ± 6.9 | 7.0 ± 0.6 |
| (+)-PAI | | 185.0 ± 6.9 | 3.3 ± 0.3 |
| (+)-PAI | + MPTP | 177.8 ± 14.4 | 6.0 ± 0.3 |
| (−)Deprenyl | | 170.6 ± 7.1 | 5.6 ± 0.3 |
| (−)Deprenyl | + MPTP | 197.0 ± 8.0 | 6.4 ± 0.5 |

Above values for DA and DOPAC expressed as Mean ± S.E.M., and No. of rats, n = 7–11 in each group.

These results indicate that the R(+)-PAI is an excellent

ORC-RAS 017312

5,453,446

<table>
<tr><td>17</td><td>18</td></tr>
</table>

MAO-B inhibitor in vivo, and is of especially great potential for the treatment of Parkinson's disease.

While the invention has been described with reference to the aforementioned Examples and their accompanying Tables and Figures, it is not restricted thereto. various modifications and applications of the invention are possible, for example, compounds of Formula I may be combined, in a synergistic way, with α-tocopherol (Vit. E. deriv.) for the treatment of Parkinson's disease.

## EXAMPLE 25

### Effect of PAI Enantiomers on Amphetamine Induced Stereotype Behavior in Senescent Rats

Amphetamine is known to induce stereotypic behaviour (Sulser, F. & Sanders-Bush, E. Ann. Rev. Pharmacol. 11:209–230 (1971)) by the mobilization of endogenous dopamine. Amphetamine is not metabolized by MAO-B. Inhibition of MAO-B by an effective inhibitor and administration of amphetamine cause release of dopamine which will not undergo degradation by the inhibited MAO-B. Thus, an increase of synaptic dopamine is expected after administration of amphetamine and effective MAO-B inhibitor leading to an increase in stereotype behavior— potentiation of the amphetamine effect. The extent of this behavior is rated in accordance with the number of lateral head movements over a period of 1 minute.

### Experimental Protocol

The test compound was administered at a dose of 0.5 mg/kg/day in drinking water, 24 hours before the infliction of hypoxia (92% nitrogen+8% oxygen for 6 hours). Following that, amphetamine was injected s.c. at a dose of 0.5 mg/kg 45 min. later, lateral head movements were counted.

### Results

The results of these experiments are shown in Table 5.

#### TABLE 5

EFFECT OF PAI ISOMERS ON AMPHETAMINE-INDUCED STEREOTYPE BEHAVIOUR IN SENESCENT RATS (CONTROL AND HYPOXIALESIONED)

| Group | Treatment | Stereotype Behavior Rating |
|---|---|---|
| Control (6) | — | 87 ± 10 |
| Control (5) | (+)PAI | 126 ± 16− |
| Control (4) | (−)PAI | 94 ± 18 |
| Hypoxia lesioned (5) | — | 93 ± 12 |
| Hypoxia lesioned (6) | (+)PAI | 143 ± 6− |

Numbers in parenthesis are numbers of animals tested
P < 0.001 with respect to untreated hypoxia group or untreated control group correspondingly

The results in Table 5 indicate that (+)PAI caused significant potentiation of the amphetamine-induced stereotype behavior in both hypoxia-lesioned and control rats. (−)PAI was totally inactive in this respect. These behavioral in vivo results corroborate previous biochemical findings that (+)PAI is an active inhibitor of MAO-B in the brain while (−)PAI is inactive in this respect.

## EXAMPLE 26

### Effect on R(+)PAI on the Improvement or Restoration of Memory

Newborn rat pups subjected to a brief episode of anoxia and then allowed to resume their growth in a normal way, develop a long-lasting impairment of memory (Speiser, et al. Behav. Brain Res. 30:89–94, 1988). This memory impairment is expressed as an inferior performance in the passive avoidance test.

The effect of R(+)PAI and S(-1)PAI on the improvement or restoration of memory was investigated in the passive avoidance test. If the drug is effective it increases the latency of response to enter a dark compartment or chamber where an electroshock has been experienced earlier by the rat being tested. The latency of the maximal response is 300 seconds.

### Experimental Protocol

Young rats were subjected to post-natal anoxia as described in Example 27. R(+)PAI or S(-)PAI were administered according to one of the following protocols:

Protocol A—Nursing mothers were given a dose of either isomer of 1–1.5 mg/kg/day, in drinking water until weaning at 21 days. The weaned off-springs were directly dosed with the same dose for 20 days. Treatment was terminated at 40 days and the test was performed at 60 days, that is 20 days after the last dose of the drug.

Protocol B—The dose was reduced to 0.5 mg/kg/day administered to the nursing mother till weaning at 21 days than directly to the young rats to 60 days at which time the test was performed.

Passive Avoidance Test—The apparatus consisted of a lit chamber adjoining a dark chamber and a sliding door separating the two. At training, a rat was placed in the lit chamber for 30 sec. then the door was opened. The rat moved to the dark chamber with a latency that was recorded. Upon entry of the rat into the dark compartment, the door was closed and a 0.3 mA foot- shock was delivered for 3 sec.

Retention (memory) after 48 hours was determined by repeating the test and recording the latency to step through from light to darkness to an arbitrary maximum of 300 sec.

### Results

The results of these experiments are shown in Table 6.

#### TABLE 6

EFFECT OF PAI ISOMERS ON PASSIVE AVOIDANCE RESPONSE IN YOUNG RATS (60-DAYS OLD)

| Group | Treatment | Before Electroshock | After Electroshock |
|---|---|---|---|
| PROTOCOL A | | | |
| Control | — | 49 ± 13 | 201 ± 111 |
| Control | (+)PAI | 49 ± 19 | 220 ± 100(+9%)* |
| Control | (−)PAI | 48 ± 13 | 192 ± 116 |
| Anoxia-lesioned | — | 45 ± 11 | 183 ± 109 |
| Anoxia-lesioned | (+)PAI | 49 ± 10 | 239 ± 99(+19%)* |
| Anoxia-lesioned | (−)PAI | 55 ± 27 | 179 ± 123 |
| PROTOCOL B | | | |
| Control | — | 53 ± 20 | 104 ± 101 |
| Control | (+)PAI | 48 ± 11 | 128 ± 119(+23%)* |
| Anoxia-lesioned | — | 45 ± 8 | 119 ± 105 |

ORC-RAS 017313

5,453,446

| 19 | 20 |

**TABLE 6-continued**

EFFECT OF PAI ISOMERS ON PASSIVE AVOIDANCE
RESPONSE IN YOUNG RATS (60-DAYS OLD)

| Group | Treatment | Before Electroshock | After Electroshock |
|-------|-----------|---------------------|--------------------|
| Anoxia-lesioned | (+)PAI | 52 ± 12 | 137 ± 126(+15%)* |
| Anoxia-lesioned | (−)PAI | 48 ± 19 | 112 ± 112 |

— Figures represent the latency in seconds for entering a dark compartment
where an electroshock had been first experienced by the rat tested.
*The indicated percent increases are with respect to the anoxia or control
groups correspondingly.

The experimental results indicated that (+)PAI but not
(−)PAI is effective in improving the memory of anoxia-
lesioned and control rats. Drugs active in this test are
considered to be potentially useful for treatment of various
memory impairment disorders, dementia and especially
senile dementia of the Alzheimer's type.

### EXAMPLE 27

Effect of R(+)PAI on the Anoxia-induced
Hyperactive Syndrome in Juvenile Rats

Rats that had been exposed postnatally to anoxia and then
left to grow under normal conditions show increased motor
activity in the open field at the age of 10–42 days (Hertsh-
kowitz et al., *Dev. Brain Res.* 7: 145–155 (1983) ).

The effect of R(+)PAI and R(−)PAI on such hyperactive
syndrome was investigated.

#### Experimental Protocol

Anoxia was performed on rat pups on the first postnatal
day. They were placed in a glass chamber and exposed to
100% nitrogen for 25 min. They were resuscitated by
intermittent massage softly applied to the chest and then
returned to their respective mothers. Control rats received
the same treatment but with air instead of nitrogen.

The R(+)PAI or S(−)PAI (0.5 mg/kg/day ) was adminis-
tered to the nursing mothers in drinking water, thereby
transferred to the sucklings through milk.

Locomotion was measured in 6 fully computerized cages
(28×28 cm) by recording the number of crossing over a
given period of time. Crossings of grid infrared beams at
4-cm intervals initiated electrical impulses which fed a
counter. Recordings of motor activity were made at the ages
of 15 and 20 days, over a period of 15 min.

#### Results

The experimental results are given in Table 7.

**TABLE 7**

EFFECT OF EACH OF THE TWO ENANTIOMERS ON
THE ANOXIA-INDUCED HYPERACTIVE SYNDROME

| Group | Treatment | 15-day old rats | 20-day old rats |
|-------|-----------|-----------------|-----------------|
| Control | — | 414 ± 192(11) | 808 ± 212(12) |
| Control | (+)PAI | 254 ± 149(11)c | 719 ± 110(13) |
| Anoxia-lesioned | — | 482 ± 119(7) | 858 ± 96(9) |
| Anoxia-lesioned | (+)PAI | 276 ± 186(15)a | 737 ± 150(16)c |
| Anoxia-lesioned | (−)PAI | 334 ± 196(5) | 778 ± 232(6) |

Numbers in parenthesis are numbers of animals tested.

**TABLE 7-continued**

EFFECT OF EACH OF THE TWO ENANTIOMERS ON
THE ANOXIA-INDUCED HYPERACTIVE SYNDROME

| Group | Treatment | 15-day old rats | 20-day old rats |
|-------|-----------|-----------------|-----------------|

— The figures are the number of crossings of infrared beam grid in the
activity cage over a period of 15 minutes.
a P < 0.001 compared to anoxia untreated group.
b P < 0.05 compared to anoxia untreated group.
c P < 0.05 compared to control group.

These results indicate that chronic oral treatment with
R(+)PAI at dose of 0.5 mg/kg administered to the nursing
mother and reaching the milk-fed offspring, significantly
improved the hyperactive syndrome. Consequently, R(+)PAI
is a potentially useful drug for the treatment of the hyper-
active syndrome in children.

We claim:

1. A method of treating a subject for Parkinson's disease
which comprises administering to the subject an amount of
R(+)-N-propargyl-1-aminoindan or a pharmaceutically
acceptable salt thereof effective to treat the subject.

2. The method of claim 1, wherein R(+)-N-propargyl-1-
aminoindan or the pharmaceutically acceptable salt thereof
is administered orally.

3. The method of claim 2, wherein the amount of R(+)-
N-propargyl-1-aminoindan or the pharmaceutically accept-
able salt thereof administered is 2 to 20 mg per daily dosage
unit.

4. The method of claim 2, wherein the amount of R(+)-
N-propargyl-1-aminoindan or the pharmaceutically accept-
able salt thereof administered is 5 to 10 mg per daily dosage
unit.

5. The method of claim 1, wherein R(+)-N-propargyl-1-
aminoindan or the pharmaceutically acceptable salt thereof
is administered rectally.

6. The method of claim 5, wherein the amount of R(+)-
N-propargyl-1-aminoindan or the pharmaceutically accept-
able salt thereof administered is 2 to 20 mg per daily dosage
unit.

7. The method of claim 5, wherein the amount of R(+)-
N-propargyl-1-aminoindan or the pharmaceutically accept-
able salt thereof administered is 5 to 10 mg per daily dosage
unit.

8. The method of claim 1, wherein R(+)-N-propargyl-1-
aminoindan or the pharmaceutically acceptable salt thereof
is administered transdermally.

9. The method of claim 8, wherein the amount of R(+)-
N-propargyl-1-aminoindan or the pharmaceutically accept-
able salt thereof administered is 2 to 20 mg per daily dosage
unit.

10. The method of claim 8, wherein the amount of
R(+)-N-propargyl-1-aminoindan or the pharmaceutically
acceptable salt thereof administered is 5 to 10 mg per daily
dosage unit.

11. The method of claim 1, wherein R(+)-N-propargyl-1-
aminoindan or the pharmaceutically acceptable salt thereof
is administered parenterally.

12. The method of claim 11, wherein the amount of
R(+)-N-propargyl-1-aminoindan or the pharmaceutically
acceptable salt thereof administered is 1 to 10 mg per mL per
daily dosage unit.

13. The method of claim 12, wherein the amount of
R(+)-N-propargyl-1-aminoindan or the pharmaceutically
acceptable salt thereof administered is 2 to 5 mg per mL per
daily dosage unit.

ORC-RAS 017314

5,453,446

21

**14**. The method of claim **13** which further comprises administering to the subject a decarboxylase inhibitor in an amount effective to ensure L-Dopa uptake.

**15**. The method of claim **14**, wherein the decarboxylase inhibitor is Carbidopa.

**16**. The method of claim **15**, wherein the decarboxylase inhibitor is benserazide.

**17**. The method of claim **1** which further comprises administering to the subject Levodopa in an amount relative to the amount of R(+)-N-propargyl-1-aminoindan or a pharmaceutically acceptable salt thereof effective to treat the disease.

22

**18**. The method of claim **1** which further comprises administering to the subject a decarboxylase inhibitor in an amount effective to ensure L-Dopa uptake.

**19**. The method of claim **18**, wherein the decarboxylase inhibitor is Carbidopa.

**20**. The method of claim **18**, wherein the decarboxylase inhibitor is benserazide.

\* \* \* \* \*

**A3650**

ORC-RAS 017315

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 12,529 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 and 14-point Times New Roman type.

Dated:  February 18, 2014.              _____/s/Dan L. Bagatell_____

                                        Dan L. Bagatell
                                        Attorney for Appellants

## CERTIFICATE OF AUTHORITY AND PROOF OF SERVICE

I certify that I am counsel of record for the Mylan appellants and that I have the authority of my co-counsel Shannon M. Bloodworth to include her electronic signature on this document.

In accordance with Federal Rule of Appellate Procedure 25 and Federal Circuit Rule 25, I further certify that I caused this brief to be served via the Federal Circuit's CM/ECF system on the counsel for the appellees.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  February 18, 2014, at Phoenix, Arizona.


　　　　　　　　　　　　/s/Dan L. Bagatell　　　　　
　　　　　　　　　　　　　　Dan L. Bagatell